IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

**RASHALL M. BRACKNEY-WHEELOCK, PH.D.**
of Charlottesville, Virginia 22911

*Plaintiff,*

v.

**CITY OF CHARLOTTESVILLE**
605 E. Main Street
Charlottesville, VA 22902
Serve: Lisa Robertson, City Attorney

**CHARLES 'CHIP' BOYLES, FORMER CITY
MANAGER WITH CHARLOTTESVILLE**
406 Princess Anne Street
Fredericksburg, VA 22401

**LISA ROBERTSON, CITY ATTORNEY**
605 E. Main Street
Charlottesville, VA 22902

**HEATHER HILL, FORMER CITY
COUNCILOR**
656 Evergreen Avenue
Charlottesville, VA 22902

**LLOYD SNOOK, CITY COUNCILOR**
*CURRENT MAYOR OF CHARLOTTESVILLE*
605 E. Main Street, 2nd Floor
Charlottesville, VA 22902

**SENA MAGILL, CITY COUNCILOR**
605 E. Main Street, 2nd Floor
Charlottesville, VA 22902

**BELLAMY BROWN, FORMER POLICE
CIVILIAN REVIEW BOARD CHAIR (PCRB)**
606 E. Market Street
Charlottesville, VA 22902

Case No.: 3:22-cv-35

1

**LATROY 'TITO' DURRETTE, ASSISTANT
POLICE CHIEF**
606 E. Market Street
Charlottesville, VA 22902

**JAMES MOONEY, FORMER ASSISTANT
POLICE CHIEF**
7 Apache Trial
Palmyra, VA 22963

**MICHAEL WELLS, POLICE
BENEVOLENT ASSOCIATION,
CENTRAL VIRGINIA CHAPTER PRESIDENT**
Albemarle County Police Department
1600 5th Street, Suite D
Charlottesville, VA 22902

**BRIAN WHEELER, FORMER
COMMUNICATIONS DIRECTOR AND FOIA
OFFICER FOR THE CITY OF
CHARLOTTESVILLE**
89 Langford Place
Charlottesville, VA 22903

*Defendants*

## COMPLAINT
(Jury Trial Demanded)

COMES NOW, the Plaintiff, **RASHALL M. BRACKNEY-WHEELOCK, PH.D.**,

(hereinafter referred to as "Plaintiff" or "Dr. Brackney"), by the undersigned counsel, and files this

Complaint against the Defendants, **CITY OF CHARLOTTESVILLE, CHARLES "CHIP"**

**BOYLES, LISA ROBERTSON, HEATHER HILL, LLOYD SNOOK, SENA MAGILL,**

**BELLAMY BROWN, LATROY "TITO" DURRETTE, JAMES MOONEY, MICHAEL**

**WELLS, and BRIAN WHEELER** (hereinafter individually and collectively referred to as

"Defendants"), and alleges the following:

2

## PARTIES

1.      Plaintiff, Dr. Brackney is over the age of eighteen (18) and a resident citizen of the State of Virginia, residing in Charlottesville, Virginia.

2.      The Defendant, CITY OF CHARLOTTESVILLE, is organized under the laws of the Commonwealth of Virginia and at all times relevant to the occurrences complained of, herein, Defendant was/is the employer and/or principal of Defendant CHARLES 'CHIP' BOYLES, Former City Manager with Charlottesville; Defendant LISA ROBERTSON, City Attorney; Defendant HEATHER HILL, Former City Councilor; Defendant LLOYD SNOOK, City Council; Defendant SENA MAGILL, City Councilor; Defendant BELLAMY BROWN, Former Police Civilian Review Board Chair (PCRB); Defendant LATROY 'TITO' DURRETTE, Assistant Police Chief; Defendant JAMES MOONEY, Former Assistant Police Chief; Defendant MICHAEL "MIKE" WELLS, Police Benevolent Association, Central Virginia Chapter-President; and Defendant BRIAN WHEELER, Former Communications Director and FOIA Officer for the City of Charlottesville, and is liable for the actions of those individuals on the basis of *respondeat superior* and other applicable law, including Title VII.

3.      Defendant CHARLES 'CHIP' BOYLES, (hereinafter referred to as "Defendant BOYLES") is the Former City Manager with Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant BOYLES was acting in his individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant BOYLES on the basis of *respondeat superior* and other applicable law.

4.      Defendant LISA ROBERTSON, (hereinafter referred to as "Defendant ROBERTSON") is the City Attorney of Charlottesville and is an adult resident of Virginia. At all

3

times relevant to the occurrences complained of herein, Defendant ROBERTSON was acting in her individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant ROBERTSON on the basis of *respondeat superior* and other applicable law;

5.      Defendant HEATHER HILL, (hereinafter referred to as "Defendant HILL") is the Former City Councilor of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant HILL was acting in her individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant HILL on the basis of *respondeat superior* and other applicable law;

6.      Defendant LLOYD SNOOK, (hereinafter referred to as "Defendant SNOOK") is the City Council of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant SNOOK was acting in him individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant SNOOK on the basis of *respondeat superior* and other applicable law;

7.      Defendant SENA MAGILL, (hereinafter referred to as "Defendant MAGILL") is the City Councilor of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant MAGILL was acting in her individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant MAGILL on the basis of *respondeat superior* and other applicable law;

8.      Defendant BELLAMY BROWN, (hereinafter referred to as "Defendant

BROWN") is the Former Police Civilian Review Board Chair (PCRB) of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant BROWN was acting in his individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant BROWN on the basis of *respondeat superior* and other applicable law;

9.      Defendant LATROY 'TITO' DURRETTE, (hereinafter referred to as "Defendant DURRETTE") is the Assistant Police Chief of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant DURRETTE was acting in his individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant DURRETTE on the basis of *respondeat superior* and other applicable law;

10.     Defendant JAMES MOONEY, (hereinafter referred to as "Defendant MOONEY") is the Former Assistant Police Chief of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant MOONEY was acting in his individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant MOONEY on the basis of *respondeat superior* and other applicable law;

11.     Defendant MICHAEL "MIKE" WELLS, (hereinafter referred to as "Defendant WELLS") is the Police Benevolent Association, Central Virginia Chapter-President of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant WELLS was acting in his individual capacity as an agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant WELLS on the basis of *respondeat superior* and other

applicable law;

12.     Defendant BRIAN WHEELER, (hereinafter referred to as "Defendant WHEELER") is the Former Communications Director and FOIA Officer for the City Of Charlottesville and is an adult resident of Virginia. At all times relevant to the occurrences complained of herein, Defendant WHEELER was acting in his individual capacity as an employee and/or agent of Defendant CITY OF CHARLOTTESVILLE, and Defendant CITY OF CHARLOTTESVILLE is liable for the actions of Defendant WHEELER on the basis of *respondeat superior* and other applicable law.

13.     The Defendant, CITY OF CHARLOTTESVILLE, is the proper Defendant pursuant to § 8.01-195.4 of the Virginia Tort Claim Act. Defendant CITY OF CHARLOTTESVILLE is a body politic, and corporate body, which may sue and be sued and has waived any applicable sovereign immunity in accordance with the Virginia State Tort Claims Act. Defendant CITY OF CHARLOTTESVILLE was in charge of and operates, the Charlottesville Police Department (CPD).  It was responsible for and had the duty to provide proper supervision and training over all employees within the CITY OF CHARLOTTESVILLE and CPD.

## JURISDICTION AND VENUE

14.     This action is being brought pursuant to the Equal Employment Opportunity Act, 42 U.S.C. Chapter 21, Subchapter VI and includes any and all federal law claims plead herein for which jurisdiction and venue is attached.

15.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1367(a) and 28 U.S.C. § 2202.

16.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391 because Defendants are located in the district and all of or a substantial part of the events and omissions giving rise to

the proceeding claims occurred in this judicial district.

## STATEMENT OF LAW

17.     This action is brought for discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17.

18.     The Virginia Office of the Attorney General has entered into a Work-Sharing Agreement with the U.S. Equal Employment Opportunity Commission which provides in § 2(A). that: "In order to facilitate the assertion of employment rights, the EEOC and the FEPA each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges."

19.     Virginia Code §2.2-3011 provides in pertinent part as follows: "No employer may discharge, threaten, or otherwise discriminate or retaliate against a whistleblower, in whole or in part, because the whistleblower is requested or subpoenaed by an appropriate authority to <u>participate in an investigation, hearing, or inquiry by an appropriate authority</u> or in a court action." *See* Va. Code § 2.2-3011 [emphasis added].

20.     Plaintiff has timely filed, within one hundred and eighty (180) days after the last unlawful employment practice occurred, her charges of discrimination, satisfying the requirements of 42 U.S.C. Section 2000(e).

21.     Under §18.2-417 of the Virginia Code, it is unlawful to intentionally make false communications to another about a person that damages such person's reputation. *See* Va. Code §18.2-417.

22.     Virginia Code § 18.2-499 *et seq.* imposes liability on "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever [...]". *See* Va. Code §18.2-499.

23.     The Virginia Constitution prohibits government actors from discriminating on the basis of race, providing that "the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged." Va. Const. art. I, §11.

24.     Pursuant to the Code of Virginia and the Virginia Human Rights Act (VA HRA), it is unlawful to discriminate "in employment" because of race, color, sex, or gender. *See* Va. Code § 2.2-3900.

25.     Virginia's Freedom of Information Act (FOIA) grants Virginia citizens access to all public records pursuant to §2.2-3704(A). *See* VA Freedom of Information Act §2.2-3704(A).

## STATEMENT OF FACTS

26.     During the fall of 2017 and early into 2018, the City of Charlottesville Police Department ("CPD") was in a state of disarray, instability, and chaos. The community was angry and engaged in ongoing protesting, to display their displeasure with CPD's pattern and practice of negative responses to community concerns.  On July 8, 2017, the citizen's civil right to assemble was met with the deployment of gas for non-violent protestors resulting in at least 23 arrests. One month later, on August 12, 2017, during the "Unite the Right Rally", three individuals were killed and dozens injured. These actions were scrutinized and followed by a scathing report regarding CPD's response to the Unite the Right Rally of 2017.

27.     In an effort by the City of Charlottesville to repair broken trust with the community, a search was conducted for the next Police Chief who would  bring empathy, community-oriented training, and years of law enforcement methodology to the table.

28.     On June 18, 2018, the Plaintiff, Dr. RaShall Brackney, signed an Employment Agreement with the City of Charlottesville (the "City").

8

29.     The Plaintiff was appointed as an employee of the City to serve in the position of Chief of Police for the City of Charlottesville, Virginia.

30.     Dr. Brackney earned a Bachelor and a Master's Degree from Carnegie-Mellon University and a Ph.D. from Robert Morris University. Additionally, she has earned professional certifications from the Command Institute for Police Executives and the Police Executive Research Forum. Dr. Brackney is also a graduate of the FBI National Academy in Quantico, Virginia; the United States Secret Service Dignitary Protection course in Washington, D.C.; Redstone Arsenal "Bomb School" for managers in Huntsville, Alabama; and Leadership Pittsburgh XIX Program.

31.     As Chief of Police, Dr. Brackney's priority was to stabilize CPD, by building rapport with its employees, whilst simultaneously empowering them to challenge their personal assumptions, regarding policing in the 21st century.

32.     This goal was accomplished by Dr. Brackney via a multi-phase data collection process, which included a departmental SWOT analysis and self-developed goals by each specialized internal unit to create voluntary collaboration and a sense of shared goal setting.

33.     Dr. Brackney became intimately familiar with each internal unit's assets, organizational structure, service delivery model(s),and training needs. She worked collectively to create a strategic plan for each department and corresponding budget for their success.

34.     From phase two of the data collection, Dr. Brackney determined that specific attention would be focused on the following divisions: Jefferson Area Drug Enforcement (JADE), Special Weapons and Tactics (SWAT), Investigations, Strategic Initiative Unit, School Resource Officers (SROs), and Recruitment and Retention.

9

35.     In phase three, Dr. Brackney conducted a detailed analysis of three divisions to identify organizational barriers to success and the overall impact on performance and the organization.

36.     Based upon the data collected, Dr. Brackney determined that CPD employees lacked the basic skill sets needed to perform in the specialized units, support services, and/or patrol. Assignments were not based on strengths, but decades-old, archaic practices such as nepotism, favoritism, genderism, and racism.

37.     With her tasks clearly set out in front of her and a mandate from the community (and those who hired her) for policing reform, Dr. Brackney implemented policies to improve the culture of the Charlottesville Police Department.

38.     Dr. Brackney implemented weekly command team meetings to collaborate and develop action plans, focused on addressing priorities and changes.

39.     Dr. Brackney established monthly meetings for Lieutenants and Directors, as well as quarterly meetings for all supervisors.

40.     Dr. Brackney reorganized the CPD by expanding from three to four branches to create a flatter, more accessible organization with less hierarchy.

41.     As a move to, again, promote transparency and accountability of the CPD, Dr. Brackney transferred the positions of Accreditation Manager, Budget Manager, Quartermaster, and Public Information Officer from a sworn officer position to a civilian position.

42.     Additionally, Dr. Brackney developed the Physical Security Specialist program, and hired its inaugural incumbent as Physical Security Specialist.

43.     Implementing a political theory known as Deliberative Democracy, which

encourages decisions to be the product of fair and reasonable discussion, Dr. Brackney instituted ( 1 ) weekly Command meetings, beginning in July of 2018; (2) annual "All-Hands" meetings beginning in 2018; (3) monthly Lieutenant and Directors meetings in 2019, after which the minutes were prepared and distributed to ensure transparency and accountability, (4) quarterly supervisor meetings, beginning in 2019; and (5) stood up the Command Advisory Board in January 2021.

44.    In 2020, Dr. Brackney implemented Anti-Defamation League Training, Mandatory Crisis Intervention Training (CIT) for all new hires and launched a CPD climate survey to gauge the organizational culture and spot check her progress as she pushed forward reforms.

45.    Dr. Brackney also increased the pay of sworn officers by 4.3%, and of executive assistants by 10%.

46.    In 2021, Dr. Brackney brought standardized quarterly training to the CPD, with emphasize on a renewed focus on education and information in the form of open access to all online training through the Academy and Post Training Academy, including Community Engagement and "truth telling" for all new hires.

47.    As Chief, Dr. Brackney created the motto *"Service Beyond the Call,"* and proved CPD's commitment to those words when she expanded the Charlottesville Police Foundation (CPF) housing assistance program to be within 3 miles of the city, and increased pay to support services and Community Service Officers between 3 - 15%. These actions angered those who resented having a Black female at the helm of a police department, particularly one in the South with a conservative undercurrent.

48.    Dr. Brackney further advanced the department by improving the CPD's

equipment: *e.g.,* tasers, upgraded Glocks, outer vest carriers, ATF K-9's (Explosive), Bikes/Racks, Segways, Ballistic Shields, body-worn camera upgrades, radio upgrades, and PowerDMS policy management software in 2021.

49.   Dr. Brackney was selected by the Department of Justice to address biased-based and hate crime reporting challenges in the nation.

50.   Dr. Brackney was selected by the Divided Community Project to join their Steering Committee, and by the Vera Institute to serve on their national Steering Committee for Policing Programs.

51.   Additionally, as a result of her work in social and racial justice, Dr. Brackney was granted a fellowship to Carnegie-Mellon University Institute for Politics and Strategy, where she specializes in the influence of race on politics and policy.

52.   As Chief, Dr. Brackney embraced progressive reforms rooted in proven political and organizational theory and she focused on equity, social justice, and restorative justice.

53.   Racial disparity throughout the criminal justice system is obvious. Disparities in stops, arrests, incarceration, and use of force were an outgrowth of the problematic pattern and practices of systemic racism, racial bias, and a lack of cultural sensitivity by some untrained and/or undisciplined members of the Charlottesville Police Department.

54.   On or about June 3, 2021, at 10:18 AM, Dr. Brackney received an email, subject: "Letter of Concern" which included information and a video involving regarding police misconduct and discriminatory behavior of CPD officer(s), namely Corporal Robbie Oberholzer.

55.   On June 3, 3021, Plaintiff reported unlawful, criminal, departmentally inappropriate, misogynistic, harassing, and racist behaviors she witnessed in a video provided in a

citizen's complaint.

56.     At all times material hereto, Dr. Brackney was mandated by her employment duties to report and/or conduct an investigation in response to the initial complaint received.

57.     An analysis of a forensic report, regarding the initial investigation related to the June 3, 2021 citizen complaint, exposed several other suspected unlawful, criminal, and racist behaviors, as well as police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment and threats within Defendant's police department.

58.     Dr. Brackney, acting within the scope of her employment, took disciplinary and corrective measures such as disassembling the SWAT team and termination or suspension of each individual found to be involved in the unlawful, criminal, threatening and racist behaviors, or any police violence and/or corruption, or departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment.

59.     On or about June 13, 2021, Defendant BOYLES was contacted by Defendant HILL along with Defendant SNOOK, regarding an "all-hands meeting" on June 14, 2021.

60.     On or about August 10, 2021, Defendant WELLS met with Defendant BOYLES and Defendant WELLS mentioned Steve Sellers' Interim Chief situation and requested a copy of Plaintiff's employment contract.

61.     Defendants, including and specifically, Defendant BELLAMY BROWN and Defendant WELLS, gathered or convened to assemble a seventeen (17) question Police Benevolent Association ("PBA") survey with questions intentionally negatively worded and targeting Plaintiff as a result of the investigation and disciplinary actions described above.

62.     This survey was conducted after and because of Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt.

Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury).

63.     Defendants did not conduct a similar survey on any Caucasian male employees in leadership roles.

64.     Defendants organized and conducted the 17 question PBA survey with the intention and expectations of receiving negative feedback regarding the Plaintiff and her role as Chief of Police.

65.     Defendant Boyles stated that he felt that the 17 question PBA survey "was intended to highlight Chief Brackney in a less than positive way" and was a "hit job."

66.     Between June and September 2021, Defendants including, but not limited to, Defendant BROWN, Defendant HILL, Defendant WELLS, Defendant SNOOK, Defendant BOYLES, Defendant MOONEY, and Defendant MAGILL assembled, physically and virtually, to conspire and agree to mutually undertake together for the purpose of willfully and maliciously injuring Dr. Brackney's reputation, in efforts to gain supportive reasoning to terminate her as Chief.

67.     On August 26, 2021, Defendant BOYLES had a meeting with Dr. Brackney during which he indicated his confidence in her abilities as Chief, as evidenced in the audio-recording of the meeting.

68.     On September 1, 2021, Dr. Brackney was notified of her termination "without-cause", effective November 30, 2021.

69.     Pursuant to Dr. Brackney's Employment Agreement, she was to receive ninety (90) days advance written notice prior to her effective termination date.

70.     On September 1, 2021, Dr. Brackney's employment was interfered with by

Defendants.

71.    On or about September 1, 2021, Defendant ROBERTSON ordered the IT Department to access Chief Brackney's email account and copy/archive Chief's emails and change her signatures and fonts, despite Chief still being employed until November 30, 2021.

72.    On or about September 1, and September 3, 2021, Defendant BOYLES authored and published several press releases and made several comments regarding the termination of Plaintiff.

73.    Between September 2021 and the present, Defendants have made multiple statements about Dr. Brackney, her employment, and termination.

74.    Such statements were made with actual malice, knowledge of the falsity, and/or reckless disregard for the truth.

75.    On or about October 4, 2021, Defendant SNOOK interviewed on CBS19 News 11:00PM News, explaining he supported the decision to fire Plaintiff because: "Even Black women officers were leaving."

76.    On September 3, 2021, Defendant BOYLES published a press release that stated: "However, in order to dismantle systemic racism and eliminate police violence and misconduct in Charlottesville, we need a leader who is not only knowledgeable in that work, but also is effective building collaborative relationships with the community, the department, and the team at City Hall […] [w]hile very good work and progress has been made, I ultimately decided new leadership was required to continue the City's progress towards building a new climate and culture within the department."

77.    On September 3, 2021, Defendant published a press release insinuating Plaintiff's termination was "for cause" stating she was "not a good fit."

78.     On September 3, 2021, Defendant BOYLES stated that he is not changing the language in the press conference that implied a letter shared with the public on August 20, 2021 sharing background information was "her letter" (Dr. Brackney's) despite knowing that the letter was in fact not Dr. Brackney's but instead was Defendant ROBERTSON's draft, and became an edited collaboration between Defendant ROBERTSON, Defendants MOONEY, Defendant BOYLES, and Plaintiff.

79.     On September 17, 2021, Defendant BOYLES wrote an Op-Ed in Daily Progress stating, "[d]espite successes in modernizing the department, recent public statements made by the Virginia Police Benevolent Association brought to the public's attention two officer surveys assessing officers' opinions of the current state of leadership in the department. These surveys revealed substantial concerns of trust and confidence in the leadership. I found these concerns troubling, especially when factoring in the known strained relationships across government, community, religious and regional stakeholder groups. These relationships are critically important; and when internal and external strife are present, it is imperative to act. [...] In hindsight, I would have engaged the City Council more directly in my deliberations and worked in partnership with Chief Brackney to develop an improvement plan. Fact is, I just did not have the luxury of time. I found the moment critical to act and felt the larger community would respect my intentions to guide our police department to a stable and evolving law enforcement outfit capable of making all residents safe, respected, and proud."

80.     September 20, 2021, during a Council meeting, Defendant BOYLES stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function."

81.     The articles and press conferences are libel per se, made with actual malice,

16

knowledge of the false statements contained therein, and/or reckless discard for the truth.

82.     The defamatory statements and articles created, and made apparent, a substantial danger to the Plaintiff's reputation and were in contrast to recorded statements made by Defendant BOYLES in his meeting with Dr. Brackney on August 26, 2021.

83.     On or about October 21, 2021, Defendant DURRETTE authorized and requested that the Charlottesville Police Department website alter and remove the Plaintiff, Dr. Brackney's information and biography from the website, despite Plaintiff's Employment Agreement providing that she shall hold the Chief of Police position until November 30, 2021, stating, "Nathan and I updated the Police web pages on the City's website and removed the pages for Chief Brackney and Major Mooney and updated your page to reflect you are now the Assistant Chief and Major Durrette."

84.     On September 18, 2021, Dr. Brackney submitted a FOIA request for "all records including the documents read by Chip Boyles' during his meetings with Chief Brackney on August 26, 2021, and September 1, 2021, and his briefings to Council on September 7, 2021, referencing the termination of Chief R. Brackney's employment contract."

85.     In response to Dr. Brackney's FOIA request, Defendant Brian WHEELER, FOIA Officer of Communications, wrote, "The records responsive to your request are attached. Redactions have been made in accordance with exemptions allowed by the Virginia Freedom of Information Act. Specific exemptions are noted on each page in the header area of the document."

86.     Upon inquiry from Plaintiff regarding the script Defendant BOYLES was reading during their August 26, 2021, meeting, on October 13, 2021, Defendant WHEELER replied, "I met with Chip and Lisa today. Attached is an additional record provided by Chip ("the script") for August 26. We made a mistake sending you the redacted September 1 notes. The unredacted

version is attached."

87.    The unredacted "script" that Defendant WHEELER and Defendant BOYLES subsequently provided to Plaintiff was not the same script that was read by Defendant BOYLES during the August 26, 2021 meeting.

88.    On October 14, 2021, Plaintiff submitted a FOIA request for "Lisa Robertson's and Chip Boyles' properties logs associated with the creation, and editing of the document (script) provided…".

89.    To date, the original property logs from August 26, 2021, have not been provided to Dr. Brackney; and instead, Defendants ROBINSON and BOYLES submitted falsified documents contradictory to the audio recording of Dr. Brackney and Defendant BOYLES August 26, 2021, meeting.

90.    Dr. Brackney has suffered and continues to suffer substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, as well as physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment, in an amount to be shown according to proof.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Race Discrimination
### Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)

91.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

92.    At all times material hereto, Plaintiff was an employee of Defendant as defined by 42 U.S.C. § 2000e-(f).

93.     At all times material hereto, Defendant was an employer within the meaning of 42 U.S.C. § 2000e-(b).

94.     Defendants have engaged in intentional racial discrimination in the terms and conditions of the Plaintiff's employment, including, but not limited to, the Plaintiff's termination.

95.     Defendants' differential treatment of Plaintiff based on race has created a racially hostile environment in which the Defendant's institution, itself, stereotypes and denigrates employees based on their race.

96.     Plaintiff cannot avoid the racially hostile environment because it is intentionally woven into countless aspects of the Defendant's institution and the Defendant has publicly acknowledged this racially hostile environment.

97.     In 2018, Defendant hired Plaintiff, who was the City of Charlottesville first African-American female chief, with the intention of combating the Defendant's deep-rooted issues with systemic racism and police misconduct.

98.     On or about August 26, 2021, Defendant BOYLES noted to, and on September 1, 2021, stated to Plaintiff, "I know without a doubt that you will make a great chief in many places, I am just convinced that this community will not allow you to be a great chief here. They never gave you a chance from day one and you came into an impossible situation and given a nearly impossible vision to meet."

99.     On September 1, 2021, in response to Plaintiff's termination, Former Mayor Walker addresses the racism within the department and on Facebook Live stated, "People who are not anti-racist are struggling with a chief who's trying to create an anti-racist police department and she's the one out?" Former Mayor Walker continued with stating that the city manager's decision to get rid of Brackney was a sign that "white supremacy is winning."

100.    On or about September 3, 2021, Defendant BOYLES admitted to systemic racism and police violence within the department and stated, "In order to dismantle systemic racism and eliminate police violence and misconduct in Charlottesville, we need a leader who is not only knowledgeable in that work, but also is effective building collaborative relationships with the community, the department, and the team at City Hall." (See **Exhibit "A"**).

101.    Defendant's racial discrimination included, but was not limited to, the following:

A.    By subjecting Plaintiff to a hostile and offensive environment, as Caucasian male employees made videos of racist and color discriminatory content on company phones, an action Plaintiff was required to investigate, and Plaintiff, who is African-American was subsequently ridiculed, berated, surveyed, and ultimately fired for taking disciplinary action against such employee and those involved.

B.    By conducting a 17 question PBA Survey that was specifically intended to target and highlight Plaintiff in a negative manner. This survey was conducted after, and because of, Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury), and Defendant did not conduct a similar survey on any Caucasian male employees in leadership roles.

C.    On or about August 19, 2021, Defendant WELLS stated that the racist videos were "[O]fficers just being silly, and videoing themselves in their car and sending it out, dealing with the pandemic last year." (See **Exhibit "B"**).

D.    Retaliating against Plaintiff by terminating her employment for reporting, investigating, and taking disciplinary and corrective action against Caucasian employees of Defendant, after finding that they were involved in racist and departmentally inappropriate

behaviors, misogynistic, and/or discriminatory behaviors and/or harassment and by not terminating said Caucasian male employees.

E.   By declaring Plaintiff was "not a good fit," on or around September 3, 2021, when Defendant BOYLES stated that his decision to terminate Plaintiff was "for cause" and because she was deemed "not a good fit" for the City of Charlottesville.

F.   By declaring Plaintiff did not have the right "feel and function," on September 20, 2021, when Defendant BOYLES publicly stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function." (See **Exhibit "C"**).

G.   On or around September 17, 2021, Defendant BOYLES publicly stated, "While great strides were made during Chief Brackney's time with the department in areas of racial equity and addressing officer conduct, many of these changes came about at the expense of leadership mistrust among many of the officers we depend on to protect and serve our city." (See **Exhibit "D"**).

H.   September 17, 2021, Defendant BOYLES publicly stated, "In hindsight, I would have engaged the City Council more directly in my deliberations and worked in partnership with Chief Brackney to develop an improvement plan. Fact is, I just did not have the luxury of time." (See **Exhibit "D"**).

I.   On or about October 4, 2021, Defendant SNOOK interviewed on CBS19 News 11:00PM News, explaining that he supported the decision to fire Plaintiff because: "Even Black women officers were leaving. […] These were her hand-picked people…" (See **Exhibit "E"**).

J.   By continuously subjecting Plaintiff to racial discrimination, by treating her adversely, and less equally as an employee pending separation from employment, than other

Caucasian employees (on the LEAD team or Director positions), when Defendants MOONEY and BOYLES:

(1) revoked Plaintiff's access to: the building, Charlottesville Police Department and city facilities, all police and law enforcement systems, city issued credit card;

(2) required her to make appointments to work in her own office, to be escorted throughout facilities while at work, to request permission (which was ultimately denied) from subordinates to access law enforcement systems; and

(3) removed Plaintiff's photo from the interior lobby, Plaintiff's information, photo, and biography from the Charlottesville Police Department website, and Plaintiff from local task force workgroups.

K.    No Caucasian LEAD team members or Caucasian directors who notified the city of their pending resignations, or separation from employment, had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraph, prior to their separation, including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant BOYLES, Defendant WHEELER, or Defendant MOONEY.

102.    The racially hostile environment is so severe, pervasive, and objectively offensive that it drastically undermines Plaintiff's career and effectively deprives her of equal opportunities.

103.    The creation of such a racially hostile environment is the responsibility of Defendants because it is directly created by Defendant's employees and policies.

104.    Defendants' actions have caused injury to Plaintiff, including depriving her of constitutional and statutory rights.

105.    Defendants have no legitimate or compelling government interest in indoctrinating racial stereotypes and treating Plaintiff, or any employee, differently based upon race, nor is their

22

practice of doing so narrowly tailored to any such interest.

106.    The excuses that the department "did not have the luxury of time" and that its policies have already been in place and are difficult to change is not an acceptable government interest or reason to continue practicing racial stereotypes and discrimination.

107.    On November 9, 2021, Plaintiff filed timely charges of racial discrimination with the Charlottesville Office of Human Rights and Human Resource Office, in addition to a complaint on December 13, 2021, with the Virginia Office of the Attorney General – Civil Rights Division ("OCR"). On January 19, 2022, the OCR acknowledged receipt of Plaintiff's complaint and on February 8, 2022, the Attorney General's Office referred the case to the U.S. Equal Employment Opportunity Commission.

108.    As a proximate result of Defendant's unlawful racial discrimination, as set forth above, Plaintiff has suffered, and continues to suffer substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, in an amount to be shown according to proof.

109.    As a further proximate result of Defendant's unlawful racial discrimination, Plaintiff has suffered, and continues to suffer, physical personal injuries, embarrassment, humiliation, mental anguish and other general damages, all to her detriment, in an amount to be shown according to proof.

110.    Defendants have engaged in discriminatory practices with malice and reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to 42 U.S.C. § 1981a.

111.    Plaintiff demands judgment against Defendant, a trial by jury on all issues so

triable, and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION
### Color Discrimination
### Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)

112.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

113.    At all times material hereto, Plaintiff was an employee of Defendant as defined by 42 U.S.C. § 2000e-(f).

114.    At all times material hereto, Defendant was an employer within the meaning of 42 U.S.C. § 2000e-(b).

115.    Defendants have engaged in intentional color discrimination in the terms and conditions of the Plaintiff's employment, including, but not limited to, the Plaintiff's termination.

116.    Defendant's color discrimination included, but was not limited to, the following:

A.    By subjecting Plaintiff to a hostile and offensive environment as Caucasian male employees made videos of racist, and color discriminatory, content on company phones, an action Plaintiff was required to investigate, and Plaintiff, who is African-American was subsequently ridiculed, berated, surveyed, and ultimately fired for taking disciplinary action against such employee and those involved.

B.    By conducting a 17 question PBA Survey that was specifically intended to target and highlight Plaintiff in a negative manner. This survey was conducted after and because of Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury), and Defendant did not conduct a similar survey on any Caucasian male employees in leadership roles.

24

C.     On or about August 19, 2021, Defendant WELLS stated that the racist videos were "[O]fficers just being silly, and videoing themselves in their car and sending it out, dealing with the pandemic last year." (See **Exhibit "B"**).

D.     By retaliating against Plaintiff by terminating her employment for reporting, investigating, and taking disciplinary and corrective action against employees of Defendant after finding that they were involved in racist and departmentally inappropriate behaviors, misogynistic, and/or discriminatory behaviors and/or harassment and by not terminating other Caucasian employees in leadership roles.

E.     By declaring Plaintiff was "not a good fit," on or around September 3, 2021, when Defendant BOYLES stated that his decision to terminate Plaintiff was "for cause" and because she was deemed "not a good fit" for the City of Charlottesville.

F.     By declaring Plaintiff did not have the right "feel and function," on September 20, 2021, when Defendant BOYLES publicly stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function." (See **Exhibit "C"**).

G.     On or about October 4, 2021, Defendant SNOOK interviewed on CBS19 News 11:00PM News, explaining that he supported the decision to fire Plaintiff because: "Even Black women officers were leaving. […] These were her hand-picked people…" (See **Exhibit "E"**).

H.     By continuously subjecting Plaintiff to color discrimination, by treating her adversely, and less equally as an employee pending separation from employment, than other Caucasian employees (on the LEAD team or Director positions), when Defendants MOONEY and BOYLES:

(1) revoked Plaintiff's access to: the building, Charlottesville Police Department and city

facilities, all police and law enforcement systems, city issued credit card;

(2) required her to make appointments to work in her own office, to be escorted throughout facilities while at work, to request permission (which was ultimately denied) from subordinates to access law enforcement systems; and

(3) removed Plaintiff's photo from the interior lobby, Plaintiff's information, photo, and biography from the Charlottesville Police Department website, and Plaintiff from local task force workgroups.

I.     No other Caucasian LEAD team members or directors who notified the city of their pending resignations, or separation from employment, had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraph, prior to their separation, including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant BOYLES, or Defendant MOONEY.

117.    On November 9, 2021, Plaintiff filed timely charges of color discrimination with the Charlottesville Office of Human Rights and Human Resource Office, in addition to a complaint on December 13, 2021, with the Virginia Office of the Attorney General – Civil Rights Division ("OCR"). On January 19, 2022, the OCR acknowledged receipt of Plaintiff's complaint and on February 8, 2022, the Attorney General's Office referred the case to the U.S. Equal Employment Opportunity Commission.

118.    As a proximate result of Defendant's unlawful color discrimination, as set forth above, Plaintiff has suffered, and continues to suffer, substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, in an amount to be shown according to proof.

119.    As a further proximate result of Defendant's unlawful color discrimination, Plaintiff has suffered, and continues to suffer, physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment, in an amount to be shown according to proof.

120.    Defendants have engaged in discriminatory practices with malice and reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to 42 U.S.C. § 1981a.

121.    Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Gender Discrimination
### Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)

122.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 110 above as though fully set forth at length herein.

123.    At all times material hereto, Plaintiff was an employee of Defendant as defined by 42 U.S.C. § 2000e-(f).

124.    At all times material hereto, Defendant was an employer within the meaning of 42 U.S.C. § 2000e-(b).

125.    Defendants have engaged in intentional gender discrimination in the terms and conditions of the Plaintiff's employment, including, but not limited to, the Plaintiff's termination.

126.    Defendant's gender discrimination included, but was not limited to, the following:

A.    By subjecting Plaintiff to a hostile and offensive environment, as male employees made videos of nude female content on company phones, an action Plaintiff, who is female was required to investigate, and Plaintiff was subsequently ridiculed, berated, surveyed, and ultimately

27

fired for taking disciplinary action against such employee and those involved.

      B.    By conducting a 17 question PBA Survey that was specifically intended to target and highlight Plaintiff in a negative manner. This survey was conducted after, and because of, Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury); and Defendant did not conduct a similar survey on any Caucasian male employees in leadership roles.

      C.    Retaliating against Plaintiff by terminating her employment for reporting, investigating, and taking disciplinary and corrective action against employees of Defendant, after finding that they were involved in racist, departmentally inappropriate behaviors, misogynistic, and/or discriminatory behaviors and/or harassment and by not terminating male employees.

      D.    By declaring Plaintiff was "not a good fit," on or around September 3, 2021, when Defendant BOYLES stated that his decision to terminate Plaintiff was "for cause" and because she was deemed "not a good fit" for the City of Charlottesville.

      E.    By declaring Plaintiff did not have the right "feel and function," on September 20, 2021, when Defendant BOYLES publicly stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function." (See **Exhibit "C"**).

      F.    By continuously subjecting Plaintiff to gender discrimination, by treating her adversely and less equally as an employee pending separation from employment, than all male others (on the LEAD team or Director positions), when Defendants MOONEY and BOYLES:

        (1) revoked Plaintiff's access to: the building, Charlottesville Police Department and city facilities, all police and law enforcement systems, city issued credit card;

(2) required her to make appointments to work in her own office, to be escorted throughout facilities while at work, to request permission (which was ultimately denied) from subordinates to access law enforcement systems; and

(3) removed Plaintiff's photo from the interior lobby, Plaintiff's information, photo, and biography from the Charlottesville Police Department website, and Plaintiff from local task force workgroups.

G.   No LEAD team members or directors who notified the city of their pending resignations, or were notified by the City of Charlottesville of their pending separation from employment, had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraphs, prior to their separation, including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant BOYLES, or Defendant MOONEY.

127.   On November 9, 2021, Plaintiff filed timely charges of gender discrimination with the Charlottesville Office of Human Rights and Human Resource Office, in addition to a complaint on December 13, 2021, with the Virginia Office of the Attorney General – Civil Rights Division ("OCR"). On January 19, 2022, the OCR acknowledged receipt of Plaintiff's complaint and on February 8, 2022, the Attorney General's Office referred the case to the U.S. Equal Employment Opportunity Commission.

128.   As a proximate result of Defendant's unlawful gender discrimination, as set forth above, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, in an amount to be shown according to proof.

129.   As a further proximate result of Defendant's unlawful gender discrimination,

Plaintiff has suffered and continues to suffer physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment, in an amount to be shown according to proof.

130.   Defendants have engaged in discriminatory practices with malice and reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to 42 U.S.C. § 1981a.

131.   Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief this Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Tortious Interference with Employment Contract**
**as Against Defendants, JAMES MOONEY, CHIP BOYLES, BELLAMY BROWN,**
**MICHAEL WELLS, SENA MAGILL, LISA ROBERTSON, and HEATHER HILL**

132.   Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

133.   Plaintiff alleges that at all times relevant to this cause of action, Defendant MOONEY, Defendant BOYLES, Defendant BROWN, Defendant WELLS, Defendant MAGILL, and Defendant HILL were not acting within the course nor scope of their employment but rather were acting with ulterior motives and without an honest belief that their actions would benefit their employer, Defendant CITY OF CHARLOTTESVILLE, VIRGINIA.

134.   On June 18, 2018, Plaintiff entered into an Employment Contract (the "Agreement") with Defendant. (See **Exhibit "F"**).

135.   Following a successful probationary period, the Plaintiff entered the 'initial term' of the Agreement, as outlined in Section 2(B), stating "shall commence on January 19, 2019, and shall continue through December 31, 2023 ('Initial Term')." (See **Exhibit "F"**).

136.   The Agreement further states in Section 2(B)(2) in pertinent part: "During the

Initial Term either the City Manager or the Employee may elect to terminate this Agreement, without cause, after giving ninety (90) days' advance written notice to the other." (See **Exhibit "F"**).

137.    Plaintiff was notified of her termination "without-cause" on September 1, 2021 and the Agreement provided for ninety (90) days advance written notice, which date is November 30, 2021.

138.    At all times material hereto, Plaintiff was to remain an employee of Defendants until November 30, 2021.

139.    Defendant MOONEY tortiously interfered with Plaintiff's at-will employment by:

A.    On or around August 18, 2021, meeting with Defendant BOYLES to discuss the ill-intended and unscientific 17 question PBA Survey conducted amongst anonymous employees or former employees, related to, and conducted due to Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury);

B.    On or around August 25, 2021, announcing he (Defendant MOONEY) will be retiring effective August, 30, 2021, and that he (Defendant MOONEY) is worried about audios being released, indicating that he (Defendant MOONEY)  "speaks before he thinks" and that he (Defendant MOONEY) "has not always supported [Plaintiff];"

C.    On August 26, 2021, Defendant BOYLES had an audio-recorded meeting with Dr. Brackney during which he indicated his confidence in her abilities as Chief;

D.    On or around August 27, 2021, submitting retirement paperwork, Defendant MOONEY stated that if Plaintiff was terminated he would return from retirement and remain in

his position;

  E. On or before September 1, 2021, Defendant MOONEY revoked his retirement;

  F. On September 1, 2021, Plaintiff was notified of her termination "without-cause";

  G. On September 1, 2021, Defendant BOYLES issued a City Press release announcing that Plaintiff had been terminated and that Defendant MOONEY would no longer be retiring;

  H. On September 1, 2021, instructing all supervisors to call their employees to inform them of Plaintiff's termination;

  I. On or around September 1, 2021, terminating Plaintiff's access to all police and law enforcement systems, despite Plaintiff remaining employed as Chief until November 30, 2021;

  J. On September 1, 2021, terminating Plaintiff's access to city issued credit card, despite Plaintiff remaining employed as Chief until November 30, 2021;

  K. On or around September 1, 2021, requiring Plaintiff to make appointments to work in her own office, despite Plaintiff remaining employed as Chief until November 30, 2021;

  L. On or around September 1, 2021, requiring Plaintiff to be escorted throughout facilities while at work, despite Plaintiff remaining employed as Chief until November 30, 2021;

  M. On or around September 1, 2021, requiring Plaintiff to request permission, which was ultimately denied, from subordinates to access law enforcement systems, despite Plaintiff remaining employed as Chief until November 30, 2021;

  N. On September 1, 2021, removing Plaintiff's photo from the interior lobby, despite Plaintiff remaining employed as Chief until November 30, 2021;

  O. On or around September 1, 2021, removing Plaintiff's information, photo, and biography from the Charlottesville Police Department website, despite Plaintiff remaining employed as Chief until November 30, 2021;

P.     On September 1, 2021, removing Plaintiff from local task force workgroups, despite Plaintiff remaining employed as Chief until November 30, 2021;

Q.     On September 2, 2021, revoking Plaintiff's access to the Charlottesville Police Department and city facilities, despite Plaintiff remaining employed as Chief until November 30, 2021;

R.     On September 2, 2021, changing Plaintiff's email signature, despite Plaintiff remaining employed as Chief until November 30, 2021;

S.     By continuously subjecting Plaintiff to gender, racial, and color discrimination, by treating her adversely and less equally as an employee, pending separation from employment, than all others, as no other directors who notified the city of their pending resignations or separation from employment had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraphs, prior to their separation including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant BOYLES, or Defendant MOONEY, himself.

140.     Defendant BOYLES tortiously interfered with Plaintiff's at-will employment by:

A.     On or about June 13, 2021, Defendant BOYLES was contacted by Defendant HILL along with Defendant SNOOK, regarding an "all-hands meeting" on June 14, 2021;

B.     On or around August 18, 2021, meeting with Defendant MOONEY to discuss the ill-intended and unscientific 17 question PBA Survey conducted amongst anonymous employees or former employees related to and conducted due to Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury);

C.    On or around both August 10, and August 23, 2021, meeting with Defendant WELLS to discuss the PBA Survey, give Defendant WELLS a copy of Plaintiff's employment contract, and to listen to audio recordings and to discuss why Defendant WELLS thought that "new leadership is needed"; and Defendant BOYLES noted "Nothing new."

D.    On or around September 1, 2021, ordering Defendant MOONEY to notify CPD of Plaintiff's termination;

E.    On September 1, 2021, issuing a City Press release announcing that Plaintiff had been terminated and that Defendant MOONEY would no longer be retiring;

F.    On or around September 1, 2021, terminating Plaintiff's access to all police and law enforcement systems, despite Plaintiff remaining employed as Chief until November 30, 2021;

G.    On September 1, 2021, terminating Plaintiff's access to city issued credit card, despite Plaintiff remaining employed as Chief until November 30, 2021;

H.    On or around September 1, 2021, requiring Plaintiff to make appointments to work in her own office, despite Plaintiff remaining employed as Chief until November 30, 2021;

I.    On or around September 1, 2021, requiring Plaintiff to be escorted throughout facilities while at work, despite Plaintiff remaining employed as Chief until November 30, 2021;

J.    On or around September 1, 2021, requiring Plaintiff to request permission, which was ultimately denied, from subordinates to access law enforcement systems, despite Plaintiff remaining employed as Chief until November 30, 2021;

K.    On or around September 1, 2021, removing Plaintiff's photo from the interior lobby, despite Plaintiff remaining employed as Chief until November 30, 2021;

L.    On or around September 1, 2021, removing Plaintiff's information, photo, and biography from the Charlottesville Police Department website, despite Plaintiff remaining

employed as Chief until November 30, 2021;

M.   On or around September 1, 2021, removing Plaintiff from local task force workgroups, despite Plaintiff remaining employed as Chief until November 30, 2021;

N.   On September 2, 2021, revoking Plaintiff's access to the Charlottesville Police Department and city facilities, despite Plaintiff remaining employed as Chief until November 30, 2021;

O.   On September 2, 2021, changing Plaintiff's email signature, despite Plaintiff remaining employed as Chief until November 30, 2021.

P.   On September 7, 2021, granting Defendant MOONEY a significant pay increase;

Q.   On or about September 3, 2021, Plaintiff spoke with Defendant BOYLES about the revocation of access to the building, facilities, systems and resources and Defendant BOYLES said that there was "no need to change" access.

141.   On September 3, 2021, Defendant BOYLES stated that he is not changing the language in the press conference that implied a letter shared with the public on August 20, 2021 sharing background information was "her letter" (Dr. Brackney's) despite knowing that the letter was in fact not Dr. Brackney's but instead was Defendant ROBERTSON's draft, and became an edited collaboration between Defendant ROBERTSON, Defendants MOONEY, Defendant BOYLES, and Plaintiff.

A.   On or about October 12, 2021 Defendant BOYLES submitted his resignation and states that he stands by decision to terminate Plaintiff;

B.   By continuously subjecting Plaintiff to gender, racial, and color discrimination, by treating her adversely and less equally as an employee pending separation from employment, than all others, as no other directors who notified the city of their pending resignations or separation

from employment had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraph, prior to their separation including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant MOONEY, or Defendant BOYLES, himself; and

     C.    Defendant BOYLES falsely stated that he conducted six (6) interviews of officers and/or staff regarding their opinions of Chief Brackney and her leadership, for which he based his decision to terminate her from; however no such interviews were conducted.

    142.    Defendant BROWN tortiously interfered with Plaintiff's at-will employment by:

     A.    On or around July 12, 2021 at 4:40PM and July 14, 2021 at approximately 12:11PM, Defendant BROWN exchanged in text conversations with Defendant HILL, and made statements regarding Defendant BROWN not being selected for additional ED for PCRB interviews and feeling frustration towards the Plaintiff. Defendant BROWN stated he "didn't get selected" and "it's not right for this town to be hijacked by two individuals. That's a disservice to this community as a whole." (See **Exhibit "G"**);

     B.    On or around August 2, 2021, at 7:19PM, Defendant BROWN texted to Defendant HILL and stated, "It just occurred to me, in this oversight process more deference is given to a person city leadership has already decided to terminate." (See **Exhibit "G"**);

     C.    On August 10, 2021, at 3:01PM, in an email exchange between Defendant BROWN and William Mendez, wherein Defendant BROWN sought opinions and revisions regarding a prepared statement regarding Plaintiff's position as Chief, Defendant BROWN writes, "From my understanding, there is a possibility that between now and Thursday the matter may get resolved and there will be no need for a statement." William Mendez replied on August 10, 2021, at 3:09PM asking, "By the matter being "resolved", do you mean the Board may get the Climate Survey, or

perhaps something more significant may happen?? Thanks for pushing." On August 10, 2021, at 6:22PM, Defendant BROWN replied to William Mendez, stating, "Something more significant may happen." (See **Exhibit "H"**);

D.     On August 12, 2021, email exchange between Defendant BROWN and William Mendez, regarding edits to Defendant BROWN'S prepared presentation for later that day, it is stated that Defendant BROWN'S "hidden objective" was to "get rid of the Chief." (See **Exhibit "H"**);

E.     By subjecting Plaintiff to gender, racial, and color discrimination, on or about August 12, 2021, when Defendant BROWN made the following statements in the PCRB meeting presentation that contributed directly towards the termination of Plaintiff, "There is a crisis in leadership and morale in the Charlotteville Police Department[,]"... "This statement is made without regard to race or gender, but rather to leadership capacity and effectiveness[,]" and "It is my recommendation that community members email and call members of City Council and the City Manager everyday until action is taken..." (See **Exhibit "H"**);

F.     Defendant BROWN singled out Plaintiff in the proceeding statements when he stated "[t]his statement is made without regard to race or gender, but rather to leadership capacity and effectiveness" knowing that Plaintiff was the only African American Female in the leadership capacity that Defendant BROWN was referring to and intending to make it clear he was making the statements about the Plaintiff. (See **Exhibit "H"**);

G.     On September 1, 2021, Plaintiff was notified of her termination.

143.     Defendant WELLS tortiously interfered with Plaintiff's at-will employment by:

A.     On or around August 6, 2021, Defendant WELLS texted Defendant SNOOK regarding the survey and the City Manager's position. (See **Exhibit "I"**);

B.     On or around August 7, 2021, Defendant WELLS texted Defendant SNOOK that Defendant WELLS has a meeting with Defendant BOYLES. (See **Exhibit "I"**);

C.     On or about August 10, 2021, Defendant WELLS sent a letter to Defendant HILL regarding their survey and a summary of the results. (See **Exhibit "J"**);

D.     On or about August 10, 2021, Defendant WELLS met with Defendant BOYLES and Defendant WELLS mentioned Steve Sellers' Interim Chief situation and requested a copy of Plaintiff's employment contract. (See **Exhibit "K"**);

E.     On or about August 14, 2021, Defendant WELLS texted Defendant BOYLES a link to the following website: https://www.schillingshow.com/2021/08/14/truth-out-bellamy-brown-warns-police-oversight-board-of-cpd-leadership-crisis/; and then requests to schedule another meeting. (See **Exhibit "K"**);

F.     On or about August 20, 2021, Defendant WELLS texted Defendant MOONEY threatening to release audios if the CPD released videos related to the Investigation;

G.     On or about August 21, 2021, at 11:29 AM, Defendant WELLS texted Defendant BOYLES, "id *[sic]* like to schedule another meeting with you before i *[sic]* decide how to proceed"… "I have more information to share with you… i'd *[sic]* like to share with you to give you the opportunity to process it…recordings…specifically…command staff recordings." (See **Exhibit "K"**);

H.     On or about August 21, 2021, at 12:35 PM, Defendant WELLS texted Defendant BOYLES, "i'm *[sic]* not sure if *[sic]* the rules but city council may want to hear some of this privately." (See **Exhibit "K"**);

I.     On or around August 23, 2021, at 5:00 PM, Defendant WELLS met with Defendant BOYLES and played 1 ½ audio tapes of recorded conversations Defendant WELLS had with

Defendant MOONEY; and discussed why Defendant WELLS thought that "new leadership is needed." Defendant BOYLES notes, "Nothing New." (See **Exhibit "K"**);

J.      On or about August 23, 2021, at 6:04 PM, Defendant WELLS texted Defendant BOYLES, "I have lots of other things to speak with you about. Does the city human resources do exit interviews with prior employees? Maybe human resources should do surveys periodically?" (See **Exhibit "K"**);

K. There are recordings that express that Defendant WELL's motivation for conducting the survey was to get Plaintiff fired, as Defendant BOYLES stated, "I can't defend just going back and forth. This Wells guy, all he has in his sights is the chief's badge," … "He is living 24 hours a day seven days a week to try and get her fired. He can say all he wants to, I think he could care less about the officers. For him, it's a mission." (See **Exhibit "L"**).

144.    Defendant MAGILL tortiously interfered with Plaintiff's at-will employment by:

A.      On or about August 24, 2021, Defendant MAGILL received a copy of the Survey for her review, from Defendant WELLS, in an email subjected: Meeting request. (See **Exhibit "M"**);

B.      On or about August 31, 2021, at 11:00 AM, Defendant MAGILL attended a zoom conference with Defendant WELLS to discuss the survey. (See **Exhibit "M"**);

C.      On or about August 31, 2021, Defendant WELLS sent a follow up email to Defendant MAGILL and stated, "I look forward to working with you in the future and making Charlottesville a World Class City again." (See **Exhibit "M"**).

145.    Defendant ROBETSON tortiously interfered with Plaintiff's at-will employment by:

A.      On or about September 1, 2021, Defendant ROBERTSON ordered the IT

Department to access Chief Brackney's email account and copy/archive Chief's emails and change her signatures and fonts, despite Chief still being employed until November 30, 2021.

B.    Despite audio recordings that support the assertion that Defendant ROBERTSON ordered the IT Department to access Chief Brackney's email account and copy/archive Chief's emails and change her signatures and fonts, despite Chief still being employed until November 30, 2021, Defendant ROBERTSON then untruthfully claimed she did not instruct such order, contrary to such audio recording claiming that she had.

C.    On October 14, 2021, Plaintiff submitted a FOIA request for "Lisa Robertson's and Chip Boyles' properties logs associated with the creation, and editing of the document (script) provided...".

D.    To date, the original property logs from August 26, 2021, have not been provided to Dr. Brackney; and instead, Defendant ROBINSON and Defendant BOYLES submitted falsified documents that were in fact contradictory to the audio recordings acquired by Plaintiff.

146.    Defendant HILL tortiously interfered with Plaintiff's at-will employment by:

A.    On or about June 13, 2021, Defendant HILL contacted Defendant BOYLES, along with Defendant SNOOK, regarding an "all-hands meeting" on June 14, 2021;

B.    On or about August 22, 2021, Defendant HILL received a copy of the Survey for her review, from Defendant WELLS in an email subjected: Re: PBA Meeting. (See **Exhibit "N"**);

C.    On or about August 24, 2021, at 8:30 AM, Defendant HILL attended a zoom conference with Defendant WELLS to discuss the survey. (See **Exhibit "O"**);

D.    On or about August 24, 2021, Defendant HILL attended a meeting with Defendant BOYLES to discuss Defendant MOONEY, Defendant WELLS, and Plaintiff;

E.    On or about August 27, 2021, Defendant HILL texted Defendant BOYLES

regarding Defendant MOONEY's leaving. (See **Exhibit "P"**);

F.    During the Charlottesville City Council Virtual Meeting on September 7, 2021, Defendant HILL indicated that she knew about the motivation and plans to terminate the Plaintiff and supported terminating Plaintiff. (See **Exhibit "Q"**);

G.    Defendant HILL falsely stated that she conducted interviews of members of the community regarding their opinions of Chief Brackney and her leadership; however no such interviews were conducted;

H.    On or about October 5, 2021, during an interview with a journalist from Charlottesville Tomorrow, Defendant HILL stated, "[t]his decision to me was never in a very finite period of time. It's been something that has been considered and continued to be considered." Defendant HILL also stated, "[a]nd some acute things happened where a decision had to be made and I do not believe that it was influenced in the way that you [Walker] are presenting by Mr. Wells." (See **Exhibit "L"**).

147.   As a proximate result of Defendants' tortious interference, as alleged herein, Plaintiff has suffered, and continues to suffer, substantial losses and damages incurred in lost income, lost future income, bonuses, medical benefits and other compensation, back pay, front pay and in earning capacity in an amount to be determined according to proof.

148.   Plaintiff demands judgment against Defendants, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Unlawful Retaliation**
**Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a))**

149.   Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

150.   At all times material hereto, Plaintiff was an employee of Defendant as defined by 42 U.S.C. § 2000e-(f).

151.   At all times material hereto, Defendant was an employer within the meaning of 42 U.S.C. § 2000e-(b).

152.   On June 3, 3021, Plaintiff reported unlawful, criminal, departmentally inappropriate, misogynistic, harassing, and racist behaviors she witnessed in a video provided in a citizen's complaint.

153.   Plaintiff was unwarrantedly terminated after the following events:

A.   On June 3, 2021, Plaintiff received the initial citizen complaint and video regarding police misconduct and discriminatory behavior involving Defendants employee, Corporal Robbie Oberholzer;

B.   Plaintiff notified Defendants of the initial citizen complaint she received on June 3, 2021;

C.   At all times material hereto, Plaintiff was mandated by her employment duties to report and/or conduct an investigation in response to the initial complaint received;

D.   An analysis of a forensic report regarding the initial investigation related to the June 3, 2021 citizen complaint, exposed several other suspected unlawful, criminal, and racist behaviors, as well as police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment and threats within Defendant's police department;

E.   Plaintiff, acting within the scope of her employment, took disciplinary and corrective measures, such as disassembling the SWAT team and termination, or suspension, of each individual found to be involved in the unlawful, criminal, threatening and racist behaviors, or any police violence and/or corruption, or departmentally inappropriate, misogynistic, and/or

42

discriminatory behaviors and harassment.

154.    As a result of Plaintiff's actions, as described in the above paragraphs, Defendant, through its agents, servants and/or employees, retaliated against Plaintiff by participating in actions protected under 42 U.S.C. § 2000e-3(a) – Title VII.

155.    Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing" or participated in any protective activity regarding any charge of unlawful discrimination under this Act.

156.    Beginning on, or around June 3, 2021, Plaintiff engaged in Protected Activity when she reported, conducted investigations, and took disciplinary actions against Caucasian employees of Defendant, after finding that they were involved in suspected criminal activities, unlawful and racist behaviors, police violence, corruption, departmentally inappropriate behaviors, misogynistic, and/or discriminatory behaviors, harassment, and threats.

157.    Defendant took a material adverse action against Plaintiff, when Defendant terminated Plaintiff on September 1, 2021.

158.    Defendant took the material adverse action specifically because Plaintiff participated in Protected Activity, when Defendants publicly stated:

A.    On or about September 1, 2021, and September 17, 2021, that Defendant fired Plaintiff, following Plaintiff's engagement in the Protected Activity listed above, because the PBA survey conducted revealed "the officers have lost faith in the department's leadership" and further stated that the PBA's survey and the release of its results occurred during "a difficult reorganization and the recent terminations of employment of members of the city's SWAT Team." (See **Exhibit "R"**); and

B.   On or about September 17-18, 2021, Defendant BOYLES stated in the Daily Progress, that "While great strides were made during Chief Brackney's time with the department in areas of racial equity and addressing officer conduct, many of these changes came about at the expense of leadership mistrust among many of the officers we depend on to protect and serve our city…" (See **Exhibit "D"**).

159.   By retaliating against Plaintiff for making a charge, testifying, assisting, or participating in any manner in an investigation relating to the unlawful behavior, discrimination and harassment, Defendant violated Title VII of the Civil Rights Act of 1964.

160.   The retaliatory conduct taken against Plaintiff by Defendant, included, but was not limited to, the following: Wrongfully terminating Plaintiff after she reported and issued lawful investigations against Defendant's employees.

161.   As a direct and proximate result of Defendants' conduct, by and through their employees and/or agents, as described elsewhere herein, Plaintiff has been caused damage including, but not limited to, mental and emotional distress and anguish; as well as economic damages, including, but not limited to, lost wages.

162.   As a further proximate result of Defendant's unlawful retaliatory conduct, Plaintiff has suffered, and continues to suffer, physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment, in an amount to be shown according to proof.

163.   Moreover, as a result of Defendant's unlawful conduct, as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of said suit as provided by 29 U.S. Code § 794a(b).

164.   Plaintiff demands judgment against Defendant, a trial by jury on all issues so

triable, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### *In the alternative:* Violation of Virginia Code's Whistleblower Statute §2.2-3011

165.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

166.    At all times material hereto, Plaintiff was an employee of Defendant as defined by the Code of Virginia § 2.2-3010.

167.    At all times material hereto, Defendant was an employer within the meaning of the Code of Virginia § 2.2-3010.

168.    Beginning June 18, 2018, Plaintiff held the title of City of Charlottesville Chief of Police, until her termination on September 1, 2021. Plaintiff was qualified for the position she held, and worked diligently during her employment.

169.    At all times material hereto, Plaintiff's performance was so satisfactory that she received selective awards and numerous praises for her success and achievements within the department.

170.    Plaintiff was unwarrantedly terminated after the following events:

A.    On June 3, 2021, Plaintiff received the initial citizen complaint and video regarding police misconduct and discriminatory behavior involving Defendant's employee, Corporal Robbie Oberholzer;

B.    Plaintiff notified Defendant of the initial citizen complaint received on June 3, 2021;

C.    At all times material hereto, Plaintiff was mandated by her employment duties to report and/or conduct an investigation in response to the initial complaint received;

D.    An analysis of a forensic report regarding the initial investigation related to the June

3, 2021 Citizen Complaint, exposed several other suspected unlawful, criminal, and racist behaviors, as well as police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment within Defendant's police department; and

      E.    Plaintiff, acting within the scope of her employment, took disciplinary and corrective measures, such as disassembling the SWAT team and termination or suspension of each individual found to be involved in the unlawful, criminal, threatening and racist behaviors, or any police violence and/or corruption, or departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment.

      171.    This is an action for violation of the Virginia Code's Whistleblower Statute, §2.2-3011. Virginia Code §2.2-3011 provides, in pertinent part, as follows: "No employer may discharge, threaten, or otherwise discriminate or retaliate against a whistleblower, in whole or in part, because the whistleblower is requested or subpoenaed by an appropriate authority to participate in an investigation, hearing, or inquiry by an appropriate authority or in a court action."

      172.    Defendant violated the Virginia Whistleblower Statute when it retaliated against Plaintiff for participating in an investigation and for objecting to unlawful, criminal activities, racist behaviors, police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors, harassment and threats perpetuated against her and others by Caucasian employees of the Defendant, namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury).

      173.    The retaliatory conduct taken against Plaintiff by Defendant, included, but was not limited to, the following: Terminating her employment after she reported, conducted investigations, and took disciplinary actions against Caucasian employees of Defendant after finding that they were involved in unlawful, criminal activities, racist behaviors, police violence,

corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors, harassment, and threats.

174. Defendant's actions as described above violated Virginia Statute §2.2-3011 and constituted a prohibitive employment practice.

175. As a proximate result of Defendant's unlawful conduct, as set forth above, Plaintiff has suffered, and continues to suffer, substantial losses incurred in earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, in an amount to be shown according to proof.

176. As a further proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment, in an amount to be shown according to proof.

177. Moreover, as a result of Defendant's conduct, as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of said suit as provided by the Code of Virginia § 2.2-3012 and § 2.2-3011(D).

178. Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
*In the alternative:* **Violation of Plaintiffs' Right to
Freedom from Governmental Discrimination
(Va. Const. Art. I, § 11)**

179. Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

180. The Virginia Constitution prohibits government actors from discriminating on the basis of race, providing that "the right to be free from any governmental discrimination upon the

basis of religious conviction, race, color, sex, or national origin shall not be abridged." Va. Const. Art. I, §11.

181.   The Virginia Constitution "is congruent with the federal equal protection clause," and Virginia courts apply "the standards and nomenclature developed under the equal protection clause of the United States Constitution to claims involving claims of discrimination under Article I, § 11 of the state constitution." *Wilkins v. West*, 571 S.E.2d 100, 111 (Va. 2002).

182.   Defendants' differential treatment of Plaintiff is based upon her race and is intentional. Defendants' actions explicitly promote race-based discrimination, and Defendants' differential treatment of Plaintiff based on her race constitutes unlawful racial discrimination.

183.   The Virginia Constitution prohibits government actors from discriminating on the basis of race and creating or permitting a racially hostile environment.

184.   Defendants' differential treatment of Plaintiff, based upon race, has created a racially hostile environment in which the Defendant's institution, itself, stereotypes and denigrates employees based on their race.

185.   Plaintiff cannot avoid the racially hostile environment because it is intentionally woven into many aspects of the Defendant's institution and the Defendant has publicly acknowledged this racially hostile environment.

186.   In 2018, Defendant hired Plaintiff, who is the City of Charlottesville's first African-American female chief with the intention of combating the Defendant's deep-rooted issues with systemic racism and police misconduct.

187.   On or about August 26, 2021, Defendant BOYLES noted to, and on September 1, 2021, stated to Plaintiff, "I know without a doubt that you will make a great chief in many places, I am just convinced that this community will not allow you to be a great chief here. They never

gave you a chance from day one and you came into an impossible situation and given a nearly impossible vision to meet." (See **Exhibit "S"**).

188.   On September 1, 2021, in response to Plaintiff's termination, Former Mayor Walker addressed the racism within the department and on Facebook Live stated, "People who are not anti-racist are struggling with a chief who's trying to create an anti-racist police department and she's the one out?" Former Mayor Walker continued with stating that the city manager's decision to get rid of Brackney was a sign that "white supremacy is winning."

189.   On or about September 3, 2021, Defendant BOYLES admitted to systemic racism and police violence within the department and stated, "In order to dismantle systemic racism and eliminate police violence and misconduct in Charlottesville, we need a leader who is not only knowledgeable in that work, but also is effective building collaborative relationships with the community, the department, and the team at City Hall." (See **Exhibit "A"**).

190.   On or around September 3, 2021, Defendant BOYLES stated that his decision to terminate Plaintiff was "for cause" and because she was deemed "not a good fit" for the City of Charlottesville.

191.   September 17, 2021, Defendant BOYLES publicly stated, "While great strides were made during Chief Brackney's time with the department in areas of racial equity and addressing officer conduct, many of these changes came about at the expense of leadership mistrust among many of the officers we depend on to protect and serve our city." (See **Exhibit "D"**).

192.   September 17, 2021, Defendant BOYLES publicly stated, "In hindsight, I would have engaged the City Council more directly in my deliberations and worked in partnership with Chief Brackney to develop an improvement plan. Fact is, I just did not have the luxury of time." (See **Exhibit "D"**).

193.    September 20, 2021, Defendant BOYLES admitted that Plaintiff's character and ability to perform her job was not at issue and he publicly stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function." (See **Exhibit "C"**).

194.    The racially hostile environment is so severe, pervasive, and objectively offensive that it drastically undermines Plaintiff's career and effectively deprives her of equal opportunities.

195.    The creation of such a racially hostile environment is the responsibility of Defendants because it is directly created by Defendant's employees and policies.

196.    Defendants' actions have caused injury to Plaintiff, including depriving her of constitutional and statutory rights.

197.    Defendants have no legitimate or compelling government interest in indoctrinating racial stereotypes and treating Plaintiff, or any employee, differently based on race, nor is their practice of doing so narrowly tailored to any such interest.

198.    The excuses that the department "did not have the luxury of time," and that its policies have already been in place and it is difficult to change is not an acceptable government interest or reason to continue practicing racial stereotypes and discrimination.

199.    Defendant's actions have caused Plaintiff injury, including depriving her of her statutory and constitutional rights.

200.    Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Defamation
### (Va. Code § 18.2-417)

201.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

202.    Under §18.2-417 of the Virginia Code, it is unlawful to intentionally make false communications to another about a person that damages such person's reputation.

203.    The website CBS19News.com is of worldwide general circulation.

204.    The station CBS19 News: Charlottesville News First ("CBS19 News"), is a public broadcasting and media production company and TV channel.

205.    CBS19 News at 11:00 p.m. is publicly broadcasted on television and internet streaming services.

206.    CBS19 News Facebook has over 56,413 people following their stories.

207.    On or about October 4, 2021, Defendant SNOOK interviewed on CBS19 News 11:00PM News, explaining he supported the decision to fire Plaintiff because: "Even Black women officers were leaving." (See **Exhibit "E"**).

208.    Defendant SNOOK made such comments, as listed above, implying that "black women officers" were leaving because they did not support the Plaintiff as Chief.

209.    The statement is libel per se, made with actual malice, knowledge of the false statements contained therein, and/or reckless discard for the truth.

210.    On February 17, 2022, Plaintiff submitted a FOIA request for "all records, notes, text messages, emails and other written documents related to Lloyd SNOOK's public statements regarding Chief Brackney," specifically referencing Defendant SNOOK's October 4, 2021 comment on CBS19 News: "Even Black women officers were leaving." (See **Exhibit "T"**).

51

211.     On March 8, 2022, FOIA Officer, Teresa Pollak, replied to Plaintiff's request for information stating, "Regarding this request, the City does not have any responsive documents in its possession." (See **Exhibit "T"**).

212.     Defendant SNOOK knew the information in his October 4, 2021 comment was false; or believing the information to be true, he lacked reasonable grounds for such belief; or acted negligently in failing to ascertain the facts on which the public statements were based and therefore the Defendant was negligent in the public broadcasting of such statements, the content of which the Defendant stated, authorized, and ratified.

213.     Defendant SNOOK specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated and implied that "black women officers" did not support Plaintiff as Chief of Police.

214.     Defendant SNOOK made such comment knowing it would be displayed on all of CBS19 News platforms, including, but not limited to, CBS19 News 11:00PM News, CBS19 News Facebook, CBS19 News Twitter, CBS19 News Instagram, and on CBS19News.com

215.     The defamatory statements and articles published, quoting the statements, which were authorized and ratified by the Defendant, create and makes apparent a substantial danger to the Plaintiff's reputation and professional career.

216.     On or about September 2021, Defendant BOYLES authored and published several press releases and made several comments regarding the termination of Plaintiff.

217.     The following particular statements were false, libelous and slanderous of the Plaintiff:

A.     On September 3, 2021, Defendant BOYLES published a press release that stated: "However, in order to dismantle systemic racism and eliminate police violence and misconduct in

Charlottesville, <u>we</u> <u>need</u> <u>a</u> <u>leader</u> <u>who</u> <u>is</u> <u>not</u> <u>only</u> <u>knowledgeable</u> <u>in</u> <u>that</u> <u>work,</u> <u>but</u> <u>also</u> <u>is</u> <u>effective</u> <u>building</u> <u>collaborative</u> <u>relationships</u> with the community, the department, and the team at City Hall [...] [w]hile very good work and progress has been made, I ultimately decided <u>new</u> <u>leadership</u> <u>was</u> <u>required</u> <u>to</u> <u>continue</u> <u>the</u> <u>City's</u> <u>progress</u> <u>towards</u> <u>building</u> <u>a</u> <u>new</u> <u>climate</u> <u>and</u> <u>culture</u> within the department." (See **Exhibit "A"**);

B.   On September 3, 2021, Defendant published a press release insinuating Plaintiff's termination was "for cause" stating she was "<u>not</u> <u>a</u> <u>good</u> <u>fit</u>";

C.   On September 3, 2021, Defendant BOYLES stated that he is not changing the language in the press conference that implied a letter shared with the public on August 20, 2021 sharing background information was "her letter" (Dr. Brackney's) despite knowing that the letter was in fact not Dr. Brackney's but instead was Defendant ROBERTSON's draft, and became an edited collaboration between Defendant ROBERTSON, Defendants MOONEY, Defendant BOYLES, and Plaintiff;

D.   On September 17, 2021, Defendant BOYLES wrote an Op-Ed in Daily Progress stating, "[d]espite successes in modernizing the department, recent public statements made by the Virginia Police Benevolent Association brought to the public's attention two officer surveys assessing officers' opinions of the current state of leadership in the department. <u>These</u> <u>surveys</u> <u>revealed</u> <u>substantial</u> <u>concerns</u> <u>of</u> <u>trust</u> <u>and</u> <u>confidence</u> <u>in</u> <u>the</u> <u>leadership</u>. I found these concerns troubling, especially when factoring in the known strained relationships across government, community, religious and regional stakeholder groups. <u>These</u> <u>relationships</u> <u>are</u> <u>critically</u> <u>important;</u> <u>and</u> <u>when</u> <u>internal</u> <u>and</u> <u>external</u> <u>strife</u> <u>are</u> <u>present,</u> <u>it</u> <u>is</u> <u>imperative</u> <u>to</u> <u>act</u>. [...] In hindsight, I would have engaged the City Council more directly in my deliberations and worked in partnership with Chief Brackney to develop an improvement plan. Fact is, I just did not have the luxury of time. I

found the moment critical to act and felt the larger community would respect my intentions to guide our police department to a stable and evolving law enforcement outfit capable of making all residents safe, respected, and proud." (See **Exhibit "D"**); and

E.    September 20, 2021, during a Council meeting Defendant BOYLES stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function." (See **Exhibit "C"**).

218.    The articles and press conferences are libel per se, made with actual malice, knowledge of the false statements contained therein, and/or reckless discard for the truth.

219.    Defendants either knew the articles, or language, in the press releases were false, or believing them to be true lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publications were based and therefore Defendants are negligent in the authorship and publications of the articles and press releases, the content of which Defendants authorized and ratified.

220.    Defendant BOYLES specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated and implied that she was "not a good fit" for the position based on a survey conducted.

221.    Defendant BOYLES specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated and implied that she was not a "knowledgeable" leader and "ineffective" in "building collaborative relationships" and a "new leader" was "required" to allow the City to "progress towards building a new climate and culture within the department," despite Plaintiff maintaining position as Chief of Police until November 30, 2021.

222.    Defendant BOYLES specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated and implied that he did not have "the luxury of

time" and it was "critical" that he terminate the Plaintiff on September 1, 2021.

223.  Defendant BOYLES specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated, and implied, that while Plaintiff was Chief, the department was "unstable" and "nonevolving" and "incapable" of "making all residents safe, respected, and proud," despite Plaintiff maintaining position as Chief of Police until November 30, 2021.

224.  Defendant BOYLES specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated and implied that the officers in the department had "concerns of trust and confidence in the leadership" of the Plaintiff, based on the Survey, which was conducted immediately after Plaintiff reported, investigated, and took disciplinary and corrective action against employees of Defendant, after finding that they were involved in racist, departmentally inappropriate behaviors, misogynistic, and/or discriminatory behaviors and/or harassment.

225.  Defendant BOYLES specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated, and implied that, based on six (6) interviews, the officers and staff in the department had issues with Plaintiff's leadership as Chief; however no such interviews occurred.

226.  On September 18, 2022, Plaintiff submitted a FOIA request for "all of Chip Boyles' records to include emails, text messages, and notes from any interviews conducted with CPD personnel referencing the PBA and/or CPD's surveys, or Chief Brackney. To include the interviews of the "good" officers Chip Boyles indicated were going to immediately leave due to Chief Brackney's leadership" (See **Exhibit "U"**).

227.  On October 5, 2022, FOIA Officer, Defendant WHEELER, replied to Plaintiff's

55

request for information stating, "The records responsive to your request are attached. Redactions have been made in accordance with exemptions allowed by the Virginia Freedom of Information Act. Specific exemptions are noted on each page in the header area of the document." Enclosed in the attachment were no records supporting any such interviews ever being scheduled or occurring. (See **Exhibit "U"**).

228.   Defendant BOYLES specifically made such comments to harm Plaintiff's reputation as a Chief of Police, and falsely stated and implied that Plaintiff did not have the "right" "feel and function" to be Chief of Police, despite Plaintiff maintaining position as Chief of Police until November 30, 2021.

229.   The defamatory statements and articles create, and make apparent, a substantial danger to the Plaintiff's reputation.

230.   On or about October 21, 2021, Defendant DURRETTE authorized and requested that the Charlottesville Police Department website alter and remove the Plaintiff, Dr. Brackney's information and biography from the website, despite Plaintiff's Employment Agreement providing that she shall hold the Chief of Police position until November 30, 2021, stating "Nathan and I updated the Police web pages on the City's website and removed the pages for Chief Brackney and Major Mooney and updated your page to reflect you are now the Assistant Chief and Major Durrette."

231.   Defendants either knew the articles, or language, altered on the CPD website was false, or believing them to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publications were based, and therefore, Defendants are negligent in the authorship and publications of the articles and language on the CPD website, the content of which the Defendant authorized and ratified.

232.   Defendant DURRETTE specifically made such premature alterations to the website to harm Plaintiff's reputation as a Chief of Police, and falsely stated and implied that he was "Chief of Police" for the City of Charlottesville on October 21, 2021.

233.   The defamatory statements and articles create and makes apparent a substantial danger to the Plaintiff's reputation.

234.   As a proximate result of the Defendant's libel, slander, malice, and negligence, the Plaintiff has been caused to suffer permanent actual damages, including but not limited to impairment of reputation, diminished standing in the community, personal humiliation, mental anguish, and suffering.

235.   Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### Business Conspiracy
### (Va. Code § 18.2-499 *et seq.*)

236.   Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

237.   Virginia Code § 18.2-499 *et seq.* imposes liability on "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever […]. *See* Virginia Code § 18.2-499.

238.   Defendants conspired and agreed to mutually undertake or concert together for the purpose of willfully and maliciously injuring Plaintiff's reputation.

239.   On or about June 13, 2021, Defendant BOYLES was contacted by Defendant HILL, along with Defendant SNOOK, regarding "all-hands meeting" on June 14, 2021.

240.    Defendants gathered or convened to assemble a 17 question PBA survey with questions specifically negatively worded and targeting Plaintiff.

241.    Such survey was conducted after, and because of, Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury).

242.    Defendant did not conduct a similar survey on any Caucasian male employees in leadership roles.

243.    Defendants organized and conducted the 17 question PBA survey with the intention, and expectations, of receiving negative feedback regarding the Plaintiff and her role as Chief of Police.

244.    There are recordings that express that Defendant WELL's motivation for conducting the survey was to get Plaintiff fired, as Defendant BOYLES stated, "I can't defend just going back and forth. This Wells guy, all he has in his sights is the chief's badge," … "He is living 24 hours a day seven days a week to try and get her fired. He can say all he wants to, I think he could care less about the officers. For him, it's a mission." (See **Exhibit "L"**).

245.    On or around July 12, 2021 at 4:40PM, and July 14, 2021 at approximately 12:11PM, Defendant BROWN exchanged in text conversations with Defendant HILL, and made statements regarding Defendant BROWN not being selected for additional ED for PCRB interviews and feeling frustration towards the Plaintiff: Defendant BROWN stated he "didn't get selected" and "it's not right for this town to be hijacked by two individuals. That's a disservice to this community as a whole." (See **Exhibit "G"**).

246.    On or around August 2, 2021, at 7:19PM, Defendant BROWN texted to Defendant

HILL and stated, "It just occurred to me, in this oversight process more deference is given to a person city leadership has already decided to terminate." (See **Exhibit "G"**).

247.    On or around August 6, 2021, Defendant WELLS texted Defendant SNOOK regarding surveys and the City Manager's position. (See **Exhibit "I"**).

248.    On or around August 7, 2021, Defendant WELLS texted Defendant SNOOK that Defendant WELLS had a meeting with Defendant BOYLES. (See **Exhibit "I"**).

249.    On or about August 10, 2021, Defendant WELLS sent a letter to Defendant HILL regarding their survey and a summary of the results. (See **Exhibit "J"**).

250.    On or about August 10, 2021, Defendant WELLS met with Defendant BOYLES and Defendant WELLS mentioned Steve Sellers' Interim Chief situation and requested a copy of Plaintiff's employment contract. (See **Exhibit "K"**).

251.    On August 10, 2021, at 3:01PM, in an email exchange between Defendant BROWN and William Mendez, wherein Defendant BROWN sought opinions and revisions regarding a prepared statement regarding Plaintiff's position as Chief, Defendant BROWN wrote, "From my understanding, there is a possibility that between now and Thursday the matter may get resolved and there will be no need for a statement." William Mendez replied August 10, 2021, at 3:09PM asking, "By the matter being "resolved", do you mean the Board may get the Climate Survey, or perhaps something more significant may happen?? Thanks for pushing." On August 10, 2021, at 6:22PM, Defendant BROWN replied to William Mendez, stating, "Something more significant may happen." (See **Exhibit "H"**).

252.    In an August 12, 2021, email exchange between Defendant BROWN and William Mendez, regarding edits to Defendant BROWN'S prepared presentation for later that day, it is stated that Defendant BROWN'S "hidden objective" was to "get rid of the Chief." (See **Exhibit**

**"H"**).

253.    On or around August 18, 2021, Defendant MOONEY met with Defendant BOYLES to discuss the 17 question PBA Survey, related to, and conducted due to Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury);

254.    On or about August 20, 2021, Defendant WELLS texted Defendant BOYLES a link to the website as follows: https://www.schillingshow.com/2021/08/14/truth-out-bellamy-brown-warns-police-oversight-board-of-cpd-leadership-crisis/. (See **Exhibit "K"**).

255.    On or about August 20, 2021, Defendant WELLS texted Defendant MOONEY threatening to release the audio if the CPD releases videos related to the Investigation.

256.    On or about August 21, 2021, at 11:29 AM, Defendant WELLS texted Defendant BOYLES, "id [sic] like to schedule another meeting with you before i [sic] decide how to proceed"... "I have more information to share with you... i'd [sic] like to share with you to give you the opportunity to process it...recordings...specifically...command staff recordings." (See **Exhibit "K"**).

257.    On or about August 21, 2021, at 12:35 PM, Defendant WELLS texted Defendant BOYLES, "i'm [sic] not sure if [sic] the rules but city council may want to hear some of this privately." (See **Exhibit "K"**).

258.    On or about August 22, 2021, Defendant HILL received a copy of the Survey for her review from Defendant WELLS, in an email subjected: Re: PBA Meeting. (See **Exhibit "N"**).

259.    On or around August 23, 2021, at 5:00 PM, Defendant WELLS met with Defendant BOYLES and played 1 ½ audio tapes of recorded conversations Defendant WELLS had with

Defendant MOONEY; and discussed why Defendant WELLS thought that "new leadership is needed." Defendant BOYLES notes, "Nothing New." (See **Exhibit "K"**).

260.    On or about August 23, 2021, at 6:04 PM, Defendant WELLS texted Defendant BOYLES, "I have lots of other things to speak with you about. Does the city human resources do exit interviews with prior employees? Maybe human resources should do surveys periodically?" (See **Exhibit "K"**).

261.    On or about August 24, 2021, at 8:30 AM, Defendant HILL attended a zoom conference with Defendant WELLS to discuss the survey. (See **Exhibit "O"**).

262.    On or about August 24, 2021, Defendant MAGILL received a copy of the Survey for her review from Defendant WELLS, in an email subjected: Meeting request. (See **Exhibit "M"**).

263.    On or about August 24, 2021, Defendant HILL attended a meeting with Defendant BOYLES to discuss Defendant MOONEY, Defendant WELLS, and Plaintiff.

264.    On or around August 25, 2021, Defendant MOONEY announced he will be retiring effective August 30, 2021, and that he (Defendant Mooney) is worried about the audio being released.

265.    On or around August 25, 2021, Defendant MOONEY stated that he "speaks before he thinks" and that he (Defendant Mooney) "has not always supported [Plaintiff]."

266.    On August 26, 2021, Defendant BOYLES had an audio-recorded meeting with Dr. Brackney during which he indicated his confidence in her abilities as Chief.

267.    On or about August 27, 2021, Defendant HILL texted Defendant BOYLES regarding Defendant MOONEY's leaving. (See **Exhibit "P"**).

268.    On or about August 31, 2021, at 11:00 AM, Defendant MAGILL attended a zoom

conference with Defendant WELLS to discuss the survey. (See **Exhibit "M"**).

269.    On or about August 31, 2021, Defendant WELLS sent a follow up email to Defendant MAGILL and stated, "I look forward to working with you in the future and making Charlottesville a World Class City again." (See **Exhibit "M"**).

270.    On or before September 1, 2021, Defendant MOONEY stated that if Plaintiff was terminated, then he would return from retirement and remain in his position.

271.    On or before September 1, 2021, Defendant MOONEY revoked his retirement.

272.    On September 1, 2021, Plaintiff was notified of her termination "without-cause".

273.    On September 1, 2021, Defendant BOYLES issued a City Press release announcing that Plaintiff had been terminated, and that Defendant MOONEY would no longer be retiring.

274.    On September 1, 2021, Defendants further conspired and agreed to mutually undertake or concert together, for the purpose of willfully and maliciously injuring Plaintiff's reputation, by ordering the following actions:

A.    On September 1, 2021, Defendant MOONEY instructed all supervisors to call their employees to inform them of Plaintiff's termination.

B.    On or around September 1, 2021, terminating Plaintiff's access to all police and law enforcement systems;

C.    On September 1, 2021, terminating Plaintiff's access to city issued credit card;

D.    On or around September 1, 2021, requiring Plaintiff to make appointments to work in her own office;

E.    On or around September 1, 2021, requiring Plaintiff to be escorted throughout facilities while at work;

F.    On or around September 1, 2021, requiring Plaintiff to request permission, which

was ultimately denied, from subordinates to access law enforcement systems;

    G.   On September 1, 2021, removing Plaintiff's photo from the interior lobby;

    H.   On or around September 1, 2021, removing Plaintiff's information, photo, and biography from the Charlottesville Police Department website;

    I.   On September 1, 2021, removing Plaintiff from local task force workgroups;

    J.   On September 2, 2021, revoking Plaintiff's access to the Charlottesville Police Department and city facilities; and

    K.   On September 2, 2021, changing Plaintiff's email signature.

    275.   On or about September 3, 2021, Plaintiff spoke with Defendant BOYLES about the revocation of access to the building, facilities, systems, and resources and Defendant BOYLES said that there was "no need to change."

    276.   Between September 2021, through the present, Defendants have made numerous public statements harming Plaintiff's reputation, and leading the public to believe she was unfit for the role as Chief of Police, such statements include but are not limited to:

    A.   The September 1-3, 2021, press releases;

    B.   The September 17, 2021, Op-Ed in Daily Progress article;

    C.   The statements made during the September 20, 2021, Council meeting; and

    D.   The October 4, 2021, CBS19 News 11:00PM interview.

    277.   During the Charlottesville City Council Virtual Meeting on September 7, 2021, Defendant HILL indicated that she knew about the motivation and plans to terminate the Plaintiff and supported terminating Plaintiff. (See **Exhibit "Q"**).

    278.   October 5, 2021, during an interview with a journalist from Charlottesville Tomorrow, Defendant HILL stated, "This decision to me was never in a very finite period of time.

It's been something that has been considered and continued to be considered," Hill said. "And some acute things happened where a decision had to be made and I do not believe that it was influenced in the way that you [Walker] are presenting by Mr. Wells." (See **Exhibit "L"**).

279.    The combination of two, or more, Defendants gathered or assembled together, and/or attempted to procure the participation or cooperation of another to enter into a business conspiracy, for the purpose of willfully or maliciously injuring the Plaintiff in reputation or profession, resulting in damage to the Plaintiff.

280.    As a proximate result of Defendant's unlawful actions, as set forth above, Plaintiff has suffered, and continues to suffer substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, in an amount to be shown according to proof.

281.    As a further proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment, in an amount to be shown according to proof.

282.    Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
***In the alternative:* Violation of Virginia Human Rights Act**
**(Va. Code § 2.2-3900-3908)**

283.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

284.    Pursuant to the Code of Virginia and the Virginia Human Rights Act (VA HRA), it is unlawful to discriminate "in employment" because of race, color, sex, or gender. Va. Code § 2.2-3900.

285.   Defendants' differential treatment of Plaintiff is based on her race, color, and that she is a female, .and the differential treatment was intentional. Defendants' actions explicitly promote gender, sex, color and race-based discrimination and Defendants' differential treatment of Plaintiff based on her race, color and gender constitutes unlawful discrimination.

286.   The Code of Virginia also prohibits employers from creating or permitting a discriminatory hostile environment. *See* Va. Code § 2.2-3900-3908.

287.   Defendants' differential treatment of Plaintiff based upon race has created a racially hostile environment in which the Defendant's institution, itself, stereotypes and denigrates employees based on their race.

288.   Plaintiff cannot avoid the racially hostile environment because it is intentionally woven into many aspects of the Defendant's institution, and the Defendant has publicly acknowledged this racially hostile environment.

289.   In 2018, Defendant hired Plaintiff, who is the City of Charlottesville's first African-American female chief, with the intention of combating the Defendant's deep-rooted issues with systemic racism and police misconduct.

290.   On or about August 26, 2021, Defendant BOYLES noted to, and on September 1, 2021, stated to Plaintiff, "I know without a doubt that you will make a great chief in many places, I am just convinced that this community will not allow you to be a great chief here. They never gave you a chance from day one and you came into an impossible situation and given a nearly impossible vision to meet." (See **Exhibit "S"**).

291.   On September 1, 2021, in response to Plaintiff's termination, Former Mayor Walker addressed the racism within the department and on Facebook Live stated, "People who are not anti-racist are struggling with a chief who's trying to create an anti-racist police department

and she's the one out?" Former Mayor Walker continued with stating that the city manager's decision to get rid of Brackney was a sign that "white supremacy is winning."

292.   On or about September 3, 2021, Defendant BOYLES admitted to systemic racism and police violence within the department and stated, "In order to dismantle systemic racism and eliminate police violence and misconduct in Charlottesville, we need a leader who is not only knowledgeable in that work, but also is effective building collaborative relationships with the community, the department, and the team at City Hall." (See **Exhibit "A"**).

293.   Defendants have engaged in intentional racial and color discrimination in the terms and conditions of the Plaintiff's employment, including, but not limited to, the Plaintiff's termination.

294.   Defendant's racial and color discrimination included, but was not limited to, the following:

A.   By subjecting Plaintiff to a hostile and offensive environment, as Caucasian male employees made videos of racist and color discriminatory content on company phones, an action Plaintiff was required to investigate, and Plaintiff, who is African-American was subsequently ridiculed, berated, surveyed, and ultimately fired for taking disciplinary action against such employee and those involved;

B.   By conducting a 17 question PBA Survey that was specifically intended to target and highlight Plaintiff in a negative manner. Such survey was conducted after, and because of, Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury), and Defendant did not conduct a similar survey on any Caucasian male employees in leadership roles;

C.    Retaliating against Plaintiff by terminating her employment for reporting, investigating, and taking disciplinary and corrective action against Caucasian employees of Defendant, after finding that they were involved in racist, and departmentally inappropriate, behaviors, misogynistic, and/or discriminatory behaviors and/or harassment and by not terminating said Caucasian male employees.

D.    By declaring Plaintiff was "not a good fit," on or around September 3, 2021, when Defendant BOYLES stated that his decision to terminate Plaintiff was "for cause" and because she was deemed "not a good fit" for the City of Charlottesville;

E.    September 17, 2021, Defendant BOYLES publicly stated, "While great strides were made during Chief Brackney's time with the department in areas of racial equity and addressing officer conduct, many of these changes came about at the expense of leadership mistrust among many of the officers we depend on to protect and serve our city." (See **Exhibit "D"**);

F.    September 17, 2021, Defendant BOYLES publicly stated, "In hindsight, I would have engaged the City Council more directly in my deliberations and worked in partnership with Chief Brackney to develop an improvement plan. Fact is, I just did not have the luxury of time." (See **Exhibit "D"**);

G.    By declaring Plaintiff did not have the right "feel and function," on September 20, 2021, when Defendant BOYLES publicly stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function." (See **Exhibit "C"**);

H.    On or about October 4, 2021, Defendant SNOOK interviewed on CBS19 News 11:00PM News, explaining that he supported the decision to fire Plaintiff because: "Even Black women officers were leaving. […] These were her hand-picked people…" (See **Exhibit "E"**);

I.    By continuously subjecting Plaintiff to racial discrimination, by treating her differently and less equally as an employee pending separation from employment, than other Caucasian employees (on the LEAD team or Director positions), as  no Caucasian LEAD team members or Caucasian directors, who notified the city of their pending resignations or separation from employment, had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraph, prior to their separation including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant BOYLES, Defendant WHEELER, or Defendant MOONEY.

295.    Defendants have also engaged in intentional sex and gender discrimination in the terms and conditions of the Plaintiff's employment, including, but not limited to, the Plaintiff's termination.

296.    Defendant's sex and gender discrimination included, but was not limited to, the following:

A.    By subjecting Plaintiff to a hostile and offensive environment, as male employee made videos of nude female content on company phones, an action Plaintiff, who is female, was required to investigate, and Plaintiff was subsequently ridiculed, berated, surveyed, and ultimately fired for taking disciplinary action against such employee and those involved;

B.    By conducting a 17 question PBA Survey that was specifically intended to target and highlight Plaintiff in a negative manner. This survey was conducted after, and because of, Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. James Fink, Cpl. Steve Young, Officer Bethany Denault (Boury). and Defendant did not conduct a similar survey on any Caucasian male employees in leadership roles;

C.    Retaliating against Plaintiff by terminating her employment for reporting, investigating, and taking disciplinary and corrective action against employees of Defendant, after finding that they were involved in racist, departmentally inappropriate behaviors, misogynistic, and/or discriminatory behaviors and/or harassment and by not terminating male employees;

D.    By declaring Plaintiff was "not a good fit," on or around September 3, 2021, when Defendant BOYLES stated that his decision to terminate Plaintiff was "for cause" and because she was deemed "not a good fit" for the City of Charlottesville;

E.    By declaring Plaintiff did not have the right "feel and function," on September 20, 2021, when Defendant BOYLES publicly stated, "I in no way intend to malign her character, professional acumen or ability to perform. I am simply indicating "Fit" is more than size and measurements, but feel and function." (See **Exhibit "C"**);

F.    By continuously subjecting Plaintiff to gender discrimination, by treating her differently and less equally as an employee pending separation from employment, than all male others (on the LEAD team or Director positions), as no LEAD team members or directors, who notified the city of their pending resignations or were notified by the City of Charlottesville of their pending separation from employment, had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraph, prior to their separation including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant BOYLES, or Defendant MOONEY.

297.    The racially hostile and sexist environment is so severe, pervasive, and objectively offensive that it drastically undermines Plaintiff's career and effectively deprives her of equal opportunities.

298.    The creation of such a racially hostile and sexist environment is the responsibility

of Defendants because it is directly created by Defendant's employees and policies.

299.    Defendants' actions have caused injury to Plaintiff, including depriving her of constitutional and statutory rights.

300.    Defendants have no legitimate or compelling government interest in indoctrinating sexist or racial stereotypes and treating Plaintiff, or any employee, differently based on sex or race, nor is their practice of doing so narrowly tailored to any such interest.

301.    The excuses that the department "did not have the luxury of time," and that its policies have already been in place and it is difficult to change is not an acceptable government interest or reason to continue practicing racial stereotypes and discrimination.

302.    On November 9, 2021, Plaintiff filed timely charges with the Charlottesville Office of Human Rights and Human Resource Office, in addition to a complaint on December 13, 2021, with the Virginia Office of the Attorney General – Civil Rights Division ("OCR"). On January 19, 2022, the OCR acknowledged receipt of Plaintiff's complaint, and on February 8, 2022, the Attorney General's Office referred the case to the U.S. Equal Employment Opportunity Commission.

303.    As a proximate result of Defendant's unlawful discrimination, as set forth above, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, in an amount to be shown according to proof.

304.    As a further proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment, in an amount to be shown according to proof.

305.    Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Violation of Plaintiffs' Right to Freedom of Information
### (Va. Code § 2.2-3704)

306.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

307.    Virginia's Freedom of Information Act (FOIA) grants Virginia citizens access to all public records pursuant to §2.2-3704(A).

308.    At all times relevant, Plaintiff was a resident of the Commonwealth of Virginia.

309.    On September 18, 2021, Plaintiff submitted a FOIA request for "all records including the documents read by Chip Boyles' during his meetings with Chief Brackney on August 26, 2021, and September 1, 2021, and his briefings to Council on September 7, 2021, referencing the termination of Chief R. Brackney's employment contract". (See **Exhibit "V"**).

310.    In response to Plaintiff's request, Defendant WHEELER, FOIA Officer of Communications, wrote, "The records responsive to your request are attached. Redactions have been made in accordance with exemptions allowed by the Virginia Freedom of Information Act. Specific exemptions are noted on each page in the header area of the document." Upon inquiry from Plaintiff regarding the script Defendant BOYLES was reading during their August 26, 2021, meeting, on October 13, 2021, Defendant WHEELER replied, "I met with Chip and Lisa today. Attached is an additional record provided by Chip ("the script") for August 26. We made a mistake sending you the redacted September 1 notes. The unredacted version is attached." (See **Exhibit "V"**).

311.    The unredacted "script" that Defendant WHEELER, Defendant ROBERTSON, and Defendant BOYLES, subsequently provided to Plaintiff, was not the same script that was read by Defendant BOYLES during the August 26, 2021 meeting, as such script does not mirror the language that is reflected in the audio recording of the August 26 meeting.

312.    On October 14, 2021, Plaintiff submitted a FOIA request for "Lisa Robertson's and

Chip Boyles' properties logs associated with the creation, and editing of the document (script) provided...". (See **Exhibit "V"**).

313.    No documents responsive to this October 14, 2021, FOIA request were provided.

314.    It is a violation of Virginia's Freedom of Information Act to alter or destroy requested information. See § 2.2-3714.

315.    Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

316.    Plaintiff demands a trial by jury on all counts set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff, Dr. Brackney, respectfully prays the entry of judgment against the Defendants pursuant to an order awarding ten million dollars ($10,000,000.00):

A.    For special and economic damages, including, but not limited to lost employment, lost wages, lost back pay and front pay, lost future income, compensatory damages, and lost employee benefits, and other special and economic damages to be shown according to proof, for the first, through the eleventh causes of action;

B.    For other special, economic and non-economic damages, including, but not limited to impairment of reputation and standing in the community, lost potential employment opportunities, diminished character, lost public speaking engagement opportunities, and other special and general damages to be shown according to proof, for the first, through the eleventh, causes of action;

C.    For general damages and non-economic damages, including  but not limited to mental and emotional distress damages, mental anguish, personal humiliation, shame, and disgrace, and other special and general damages to be shown according to proof, for the first,

through the eleventh, causes of action;

    D.    For an award of interest, including prejudgment interest, at the legal rate;

    E.    For punitive damages;

    F.    For Attorney costs and fees of suit herein incurred; and

    G.    For all such other, and further, relief as the Court may deem proper.


RaShall M. Brackney-Wheelock, Ph.D.

        Respectfully submitted,
        RASHALL M. BRACKNEY-WHEELOCK, PH.D.

Dated: June 15, 2022        By and through her counsel

        Alexander Taylor, Esq.
        VSB# 29292
        Alex Taylor Law, PLC
        1622 West Main Street
        Richmond, VA 23220
        Tel: 804-239-9232
        Fax: 866-446-6167
        alextaylor@alextaylorlaw.com

        Charles Tucker, Jr., Esq.
        MD Bar # 0808260001
        Tucker Moore Group, LLP
        8181 Professional Place
        Hyattsville, MD 20785
        Email: charles@tuckerlawgroupllp.com
        Telephone: 301-577-1175
        Facsimile: 240-467-5787
        *Pro Hac Vice applications forthcoming*