IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

RASHALL M. BRACKNEY-WHEELOCK,
PH.D.,

   Plaintiff,

v.                                                    Case No. 3:22-cv-35

CITY OF CHARLOTTESVILLE, et al.,

   Defendants.

**BRIEF IN SUPPORT OF CITY OF CHARLOTTESVILLE'S MOTION TO DISMISS**

## I.      INTRODUCTION

The City of Charlottesville ("City") lawfully terminated the employment of RaShall Brackney ("Brackney") without cause by providing the 90-days' written notice required by her contract. While that termination entitled Brackney to a generous severance package, she has decided to file suit against the City and ten individuals[1] alleging that she was terminated in retaliation for disciplining white police officers for inappropriate and unacceptable behavior, as well as discriminated against on the basis of her race, color, and gender.

Brackney's termination was not related to her decision to discipline officers for insupportable conduct. In fact, the City supported Brackney's decision to terminate those officers. The City Manager's decision to terminate Brackney was a result of chaos and upheaval in the Charlottesville Police Department ("CPD"), the imminent threat of departures of important

---

[1] Brackney has named as Defendants Former City Manager Chip Boyles ("Boyles"), City Attorney Lisa Robertson ("Robertson"), Former City Councilor Heather Hill ("Hill"), Current Mayor Lloyd Snook ("Snook"), City Councilor Sena Magill ("Magill"), Former Police Civilian Review Board Chair Bellamy Brown ("Brown"), current Acting Chief Tito Durrette ("Durrette"), Former Assistant Police Chief James Mooney ("Mooney"), Police Benevolent Association Central Virginia Chapter President Michael Wells ("Wells"), and Former Communications Director Brian Wheeler ("Wheeler").

CPD leaders, and the ongoing strained relationship between Brackney, City leadership, and community stakeholders.  The City Manager made the difficult decision to terminate Brackney's employment to ensure the viability of the CPD.

The Complaint does not state a claim against the City and should be dismissed with prejudice.

## II.   <u>FACTS</u>

The City hired Brackney to be the Chief of Police effective June 18, 2018.  (ECF Doc. 1-6, at 1.)  Pursuant to her contract with the City, Brackney was an at-will employee for a term of 5.5 years, with options for renewal.  (ECF Doc. 1-6, at § 2.)  Either party could terminate the contract without cause upon 90-days' written notice.  (*Id.* at § 2(B)(2).)  Under the City Manager form of government, the City Manager has sole discretion to terminate the police chief.  Charlottesville Charter § 5.01.[2]  In the event that the City Manager terminated the contract without cause, Brackney was entitled to 12-months' salary as severance, as well as retirement and COBRA contributions.  (ECF Doc. 1-6, at §2(B)(2).)

On June 3, 2021, Brackney received a citizen complaint via email regarding a video created by a CPD corporal.  (ECF Doc. 1, at ¶ 54.)  Brackney initiated an investigation into the complaint and, in the course of doing so, discovered additional videos and text messages by and between other officers on the Special Weapons and Tactics ("SWAT") Team.  (*Id.* at ¶¶ 57-58.)  She took disciplinary actions against the involved officers and disassembled the SWAT team.  (*Id.* at ¶ 58.)  As part of the investigation, Brackney held an "all hands meeting" on June 14, 2021.  (*Id.* at ¶ 59.)  Boyles, Hill, and Snook learned that this meeting took place.  (*Id.*)

---

[2] *See also* Charlottesville Code §§ 2-146, 2-149, 20-2.

In July 2021, the Police Benevolent Association ("PBA") conducted a 17-question survey of its "Charlottesville City members regarding their current feeling of job security and satisfaction." (ECF Doc. 1, at ¶ 61; ECF Doc. 1-10, at 3; ECF Doc. 1-13; ECF Doc. 1-14.) Sixty-five people completed the survey, which revealed that the majority of respondents felt that Brackney and her Command Staff did not have the best interest of the CPD in mind, that officers did not feel supported by Command Staff, that officers were reducing their normal policing activities for fear of being unfairly targeted by leadership and community groups, and that they would not recommend others to apply to work for the CPD. (ECF Doc. 1-10, at 3-5; ECF Doc. 1-3; ECF Doc. 1-14.) The PBA shared the results of its survey with City Council on or around August 10, 2021. (ECF Doc. 1-10, at 2.)

To support Brackney's decisions, the City issued a press release on August 20, 2021, describing Brackney's reform efforts within the CPD, as well as the disciplinary actions involving the SWAT Team. (August 20, 2021 Press Release, attached as Ex. 1.)

On August 26, 2021, Boyles met with Brackney and discussed what he saw as the two current issues facing the CPD: (1) the discipline of three SWAT officers and (2) the condition and future of the CPD. (ECF Doc. 1, at ¶ 67; ECF Doc. 1-19, at 2-3.) Boyles expressed his unwavering support for Brackney's decision to terminate the officers and confirmed that the conduct of the officers was unacceptable. (ECF Doc. 1-19, at 2.) Boyles did not support Brackney's demand to release the videos in question publicly or to provide any further information regarding the conduct to the public other than what had already been released. (*Id*.)

Boyles also discussed with Brackney the results of the PBA survey, as well as an internal survey that Brackney had previously commissioned. (*Id.*) Both surveys revealed that trust in Brackney's Command Staff and individual supervisors was a concern. (*Id.*) Boyles noted to

3

Brackney that "we do not have the luxury of tearing this department down and building it back from scratch.  It has to be rebuilt while continuing to serve the community."  (*Id.*)  To that end, and to move forward, he needed a plan "to first identify and acknowledge the deficiencies, then to develop a written plan of action for corrections."  (*Id.* at 2-3.)  Finally, Boyles informed Brackney that he needed to know her intentions for continuing as Chief—if she wanted to move on from the City, he would help, and if she wanted to stay and lead a solution, he wanted to help. (*Id.* at 3.)  But if she stayed, Boyles would require there to be a plan to improve the CPD.  (*Id.*)

Brackney's response to the request for an action plan was to first tell Boyles that a plan was not needed and then to ask him what he thought should be in the plan.  (Video of Oct. 4, 2021 Council meeting, at 4:57:15, attached as Ex. 7.)  After the August 26, 2021 meeting, Boyles learned that individuals within the top leadership of CPD were going to leave if Brackney remained as Chief.  (*Id.* at 4:59:30.)  Fearing a further divide within the CPD and a loss of leaders of long tenure that would cripple the CPD's ability to function, Boyles decided immediate action was necessary.  (Sept. 17, 2021 Op-Ed, attached as Ex. 5.)

On September 1, 2021, Boyles notified Brackney that, pursuant to her employment contract, he was terminating her employment without cause effective November 30, 2021.  (ECF Doc. 1, at ¶ 68.)  Boyles placed her on administrative leave for the 90-day notice period and relieved her of her duties as Chief.  (Letter from C. Boyles to R. Brackney (dated Sept. 1, 2021), attached as Ex. 2.)    The same day, Boyles issued a Press Release announcing Brackney's termination.  (ECF Doc. 1, at ¶ 72; September 1, 2021 Press Release, attached as Ex. 3.)  He issued a subsequent Press Release on September 3, 2021, announcing that Mooney was going to remain in position as Assistant Chief, and published an Op-Ed regarding the decision in the Charlottesville Daily Progress on September 17, 2021.  (ECF Doc. 1, at ¶¶ 72, 76-79; September

3, 2021 Press Release, attached as Ex. 4; Ex. 5.)  On September 20, 2021, and October 4, 2021, Boyles addressed the issue of Brackney's termination during the City Council meeting.  (ECF Doc. 1, at ¶ 80; Video of Sept. 20, 2021 City Council Meeting, attached as Ex. 6; Ex. 7.)  On October 4, 2021, Snook gave an interview on CBS19 News.  (ECF Doc. 1, at ¶¶ 101(I); 116(G); ECF Doc. 1-5.)

Brackney further alleges that on September 1, 2021, Robertson "ordered" the City's IT Department to copy/archive Brackney's emails and change her signatures and fonts, and that on October 21, 2021, Durrette authorized and requested that CPD alter and remove Brackney from the website.  (ECF Doc. 1, at ¶¶ 71, 83, 145.)  Brackney alleges that during her period of administrative leave, her access to the CPD building, City facilities, police and law enforcement systems, and City-issued credit card was revoked; she had to make an appointment to work in her office, be escorted throughout the premises, and request access to law enforcement systems from subordinates; and her photo was removed from the lobby of the CPD building.  (ECF Doc. 1, at ¶¶ 101(J); 116(H); 126(F); 139.)

According to Brackney, on August 25, 2021, Mooney announced his plan to retire on August 30, 2021.  (ECF Doc. 1, at ¶ 139(B).)  He then revoked his retirement and remained on staff to facilitate the transition after Brackney's termination.  (ECF Doc. 1, at ¶ 139(E); Ex. 4.)

On September 18, 2021, Brackney issued a request pursuant to the Virginia Freedom of Information Act ("VFOIA") for "all records including the documents read by Chip Boyles' [sic] during his meeting with Chief Brackney on August 26, 2021, and September 1, 2021, and his briefings to Council on September 7, 2021, referencing the termination of Chief R. Brackney's employment contract."  (ECF Doc. 1, at ¶ 84.)  Wheeler provided responsive documents on October 5, 2021, and supplemented that production on October 13, 2021.  (*Id.* at ¶ 86; Emails

between R. Brackney & B. Wheeler re: VFOIA requests and response, attached as Ex. 8.) Brackney complains that the August 26, 2021 "script" that was produced in response to her VFOIA request does not match an audio recording that she made of the meeting.  (*Id.* at ¶¶ 87, 89.)  She subsequently requested the "properties logs associated with the creation, and editing of the document (script) provided."  (*Id.* at ¶¶ 88, 145.)  Contrary to Brackney's allegation that "the original property logs . . . have not been provided . . . and instead, Defendants Robinson [sic] and Boyles submitted falsified documents contradictory to the audio recording," the properties logs depicting the history of the document were provided to Brackney on October 20 and 21, 2021. (Ex. 8.)

Brackney filed a complaint of discrimination with the Charlottesville Office of Human Rights on November 9, 2021.  (ECF Doc. 1, at ¶ 107.)  On December 13, 2021, she filed a charge of discrimination with the Virginia Office of Attorney General—Civil Rights Division ("OCR").  (*Id.*)  OCR referred the case to the Equal Employment Opportunity Commission ("EEOC").  (*Id.*)  When Brackney filed suit on June 15, 2022, she had not received a Dismissal and Notice of Rights from the EEOC.  The EEOC issued the Notice on August 11, 2022, without review of the Charge, since the lawsuit had already been filed.  (Dismissal and Notice of Rights, attached as Ex. 9.)

### III.    ARGUMENT

#### A.    Standard of Review.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss an action if the Complaint fails to state a claim upon which relief can be granted.  *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  In reviewing a defendant's motion under Rule 12(b)(6), a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in

the light most favorable to the plaintiff.  Legal conclusions, however, enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  As the court pointed out in *Iqbal,* "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 678 (emphasis added) (internal quotations omitted).

A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where the allegations permit a court to infer no more than a possibility of misconduct.  *See Iqbal,* 556 U.S. at 678–79.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *See id.* at 678.

To state a plausible claim for relief, the Supreme Court has held that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  To discount such unadorned conclusory allegations "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal,* 556 U.S. at 679.  This approach recognizes that "'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'"  *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly,* 550 U.S. at 557).

The law is clear that "in reviewing a Rule 12(b)(6) dismissal, [courts] are not confined to the four corners of the Complaint."  *U.S. ex. rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F. 3d, 131, 136 (4th Cir. 2014).  Documents that are explicitly incorporated into the Complaint by reference and those attached to the Complaint as exhibits may be considered. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Civ. P. 10.  The

Court may also consider documents integral to the Complaint.  *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).  A document is integral to a complaint when the claims "turn on, []or are . . . otherwise based" on the document.  *Id.*  Finally, the Court may take judicial notice of matters of public record.  *Goldfarb v. Mayor and City Council of Baltimore*, 791 F. 3d 500, 508 (4th Cir. 2015) (noting that a court does not convert a motion to dismiss to a motion for summary judgment when it takes judicial notice of public records).  This includes videos of public meetings.  *See Clatterbuck v. City of Charlottesville*, 841 F. Supp. 2d 943, 952 n.7 (W.D. Va. 2012), *rev'd on other grounds* 708 F.3d 549 (4th Cir. 2013).[3]  Under this exception, courts may consider "relevant facts obtained from the public record," so long as these facts are construed in the light most favorable to the plaintiff along with any well-pleaded allegations of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986).

    **The exhibits attached to the Complaint are subject to the "exhibit-prevails rule."**  *See So. Walk at Broadlands Homeowner's Ass'n v. Open Band at Broadlands, LLC*, 713 F. 3d 175, 182 (4th Cir. 2013) (citing *Fayetteville In'vrs v. Commercial Builders, Inc.*, 936 F. 2d 1462, 1465 (4th Cir. 1991)).  Pursuant to that rule, if a Plaintiff "attaches documents and relies upon the documents to form the basis for a claim or a part of a claim, dismissal is appropriate if the document negates the claim." *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002); *Goines*, 882 F.3d at 16. Finally, where the plaintiff attaches or incorporates a document upon which her claim is based, or when the Complaint shows that the plaintiff has adopted the contents of the document, it is proper to accept the contents of the documents over conflicting allegations in the

---

[3] The Fourth Circuit reversed, because the District Court considered information from the video of a public meeting that was neither a fact nor was it considered in a light most favorable to the plaintiff.  *Clatterbuck*, 708 F.3d at 557.  Specifically, the District Court relied upon a citizen's comments as evidence of legislative purpose and to find that the ordinance was content neutral and necessary.  *Id.* at 558.

Complaint.  *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 233-35 (4th Cir. 2004).

The Court may consider the following exhibits attached to this Brief, and incorporated into the City's Motion to Dismiss, without converting it to a Motion for Summary Judgment.[4]

**Exhibit 1: August 20, 2021 Press Release**

Brackney references this document three places in the Complaint.  (ECF Doc. 1, at ¶¶ 78, 141, 217(C).)  This is a both a public record of which the Court can take judicial notice and a document incorporated into the Complaint by reference.

**Exhibit 2: September 1, 2021 Termination Letter**

Brackney alleges that she was provided 90-days' written notice of her termination on September 1, 2021.  (ECF Doc. 1, at ¶ 137.)  This is the document that she was provided and it is integral to the Complaint.

**Exhibit 3: September 1, 2021 Press Release**

Brackney references this document throughout the Complaint and relies upon it as one of the bases for her claim of defamation in the Eighth Cause of Action. (ECF Doc. 1, at ¶¶ 72, 273, 276(A).)  This is a both a public record of which the Court can take judicial notice and a document incorporated into the Complaint by reference.

**Exhibit 4: September 3, 2021 Press Release**

Brackney references this document throughout the Complaint and purports to attach it as Exhibit A to the Complaint.  (ECF Doc. 1, at ¶¶ 72, 76-77, 100, 189, 217, 292.)  Exhibit A to the Complaint, (ECF Doc. 1-1), however, is a news article, not the Press Release itself.  The document is both integral to the Complaint and incorporated by reference.

---

[4] The City expressly states it does not intend for its Motion to Dismiss to be construed as a Motion for Summary Judgment.

9

**Exhibit 5: September 17, 2021 Op-Ed**

Brackney references this document throughout the Complaint and purports to attach it as Exhibit D to the Complaint.  (ECF Doc. 1, at ¶¶ 79, 217, 276.)  Exhibit D to the Complaint, (ECF Doc. 1-4), however, is an incomplete copy of the Op-Ed.  The document is both integral to the Complaint and incorporated by reference.

**Exhibit 6: Video of September 20, 2021 Council Meeting**

Brackney references statements purportedly made during the September 20, 2021 Council meeting and uses those statements as a basis for her defamation claim in the Eighth Cause of Action.  The video depicts the exact statements that were made and is both a public record of which the Court can take judicial notice and an exhibit that is incorporated into the Complaint by reference.

**Exhibit 7: Video of October 4, 2021 Council Meeting**

Brackney attaches as Exhibit L to the Complaint a news article referencing statements made at the October 4, 2021 meeting to support her allegation that Wells' motivation for conducting the PBA survey was to get Brackney fired.  (ECF Doc. 1, at ¶ 143(K).)  She also alleges that Hill gave an interview to a journalist from Charlottesville Tomorrow and made certain statements, however, Exhibit L makes clear that the statements attributed to Hill in that article were actually made during the October 4, 2021 Council meeting.  (*Id.* at ¶ 146(H); ECF Doc. 1-12.)  Exhibit 7 depicts the exact statements that were made at the October 4, 2021 Council meeting.  This is a public record of which the Court can take judicial notice and is incorporated into the Complaint by reference.

**Exhibit 8: Emails between Brian Wheeler and RaShall Brackney regarding VFOIA requests and response**

Brackney references the VFOIA requests and responses in support of the Eleventh Cause of Action.  These documents are integral to the claims before the Court.  *See, e.g. Dagulo v. United*

*States*, No. 2:18-cv-366, 2020 WL 2846488, at *4 n.6 (E.D. Va. Apr. 17, 2020) (finding that the court could consider the FOIA-related requests and responses although they were not attached to the amended complaint because they were integral to the FOIA claims before the Court).

**Exhibit 9: Dismissal and Notice of Rights**

The Dismissal and Notice of Rights is integral to the Complaint because it is a pre-requisite to filing suit under Title VII.

**B.** **Brackney does not state a claim against the City for discrimination in violation of Title VII (First, Second, and Third Causes of Action).**

The First, Second, and Third Causes of Action purport to state claims for violation of Title VII of the Civil Rights act of 1964, as amended, on the basis of race, color, and gender discrimination. (ECF Doc. 1, at ¶¶ 91-131.) Brackney alleges that she was subject to a hostile work environment and ultimately terminated because of her race, color, and gender.

**1.** **Brackney does not state a claim for hostile work environment.**

To the extent that the First, Second, and Third Causes of Action purport to allege a hostile work environment in violation of Title VII, they do not state a claim.

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). To establish a hostile work environment claim, a claimant must show that "there is (1) unwelcome conduct; (2) that is based on the plaintiff's [race, color, or gender]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 221 (4th Cir. 2016).

     a.    **There was no severe or pervasive unwelcome conduct based on Brackney's race, color, or gender.**

Harassment is severe and pervasive only if the workplace is "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008). The severe and pervasive test is a high bar. *Id.* at 315 "Thus, complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII . *Id.* (internal citations and quotations omitted).

Whether the unwelcome conduct was severe or pervasive and altered the conditions of employment is judged "'by looking at all the circumstances,' which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris*, 510 U.S. at 23). "[I]ncidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Shields v. Federal Express Corp.*, 120 F. App'x 956, 961 (4th Cir. 2005). **A plaintiff must show that the harassment was severe and pervasive as to her personally *and* objectively abusive to a reasonable person in the plaintiff's position.** *Briggs v. Waters*, 484 F. Supp. 2d 466, 485-86 (E.D. Va. 2007) (citing *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003)). The Supreme Court has cautioned courts not to "mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment.'" *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998).

Brackney claims that she was subjected "to a hostile and offensive environment" because "Caucasian male employees made videos of racist and color discriminatory content [and nude

female content] on company phones" and she was required to investigate and "was subsequently ridiculed, berated, surveyed, and ultimately fired for taking disciplinary action against such employee and those involved."  (ECF Doc. 1, at ¶¶ 101(A), 116(A), 126(A).)

Brackney's contentions are not supported by any **facts** that plausibly allege a hostile work environment claim.  Instead, she conclusorily alleges that she was ridiculed and berated without providing any factual support.  The officers' conduct in creating and exchanging the videos and text messages among themselves did not create a hostile work environment.  The conduct was unknown to Brackney until she received a citizen complaint on June 3, 2021, and undertook an investigation.  The behavior was neither directed at Brackney nor based on her race, color, or gender.  Additionally, the only alleged interceding event between receiving the original complaint about an officer's conduct and her September 1, 2021 notice of termination was the "17 question PBA survey".  (*Id.* ¶¶ at 101(B), 116(B), 16(B).)  The City did not conduct the survey and, furthermore, conducting a survey does not create a hostile work environment. The other conduct complained of—statements by various Defendants—occurred after Brackney was notified of her termination and placed on paid administrative leave.  (*Id.* at ¶¶ 101(D)-(K), 116(D)-(I), 126(C)-(G).)  That post-termination conduct could not have created a hostile work environment.

> b.  **The conduct of which Brackney complains is not imputable to the City.**

Even if Brackney could sufficiently allege a hostile work environment, the conduct is not imputable to the City.

In cases where a co-worker harasses a plaintiff, the employer is vicariously liable if the employer was negligent with respect to the offensive behavior.  *Vance v. Ball State University*, 570 U.S. 421, 427 (2013) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998)).

"The employer knew or should have known about the harassment and failed to take effective action to stop it." *Strothers v. City of Laurel, Md.,* 895 F.3d 317, 332 (4th Cir. 2018). An employer is vicariously liable for harassment by a supervisor when that supervisor takes a tangible employment action against the plaintiff. *Vance,* 580 U.S. at 428-30 (citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 762 (1998)).

Here, there is no allegation that Brackney's supervisor, Boyles, harassed her or contributed to an alleged hostile work environment. Therefore, Brackney must be complaining of conduct from her subordinates, which is analyzed under the co-worker standard explained *supra. See Dortch v. Cellco P'ship,* 770 F. App'x 643, 646 (4th Cir. 2019). Brackney's factual allegations clearly establish that, as soon as the officers' videos and text messages came to light through a citizen complaint on June 3, 2021, the City supported Brackney in her decision to investigate and discipline the involved officers. *See infra* Part III.C.2. There is no allegation that the City knew or should have known about the conduct before June 3, 2021. Therefore, any purported hostile work environment is not imputable to the City and the First, Second, and Third Causes of Action should be dismissed with prejudice.

### 2. Termination is the only adverse employment action.

"An adverse employment action is a discriminatory act which 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 375 (4th Cir. 2004) (quoting *Von Gunten v. Maryland,* 243 F.3d 858, 865 (4th Cir. 2001)). "[N]ot every aspect of an employee's daily work experience constitutes a 'term[], condition[], or benefit[]' of employment that can give rise to a federal cause of action if changed or withdrawn." *Peary v. Goss,* 365 F. Supp. 2d 713, 722 (E.D. Va. April 15, 2005) (citing *Von Gunten,* 243 F.3d at 865).

Termination is the only adverse action at issue in this case.  While Brackney complains about her restricted access and inability to perform her duties as Chief between September 1 and November 30, 2021, that conduct does not constitute an adverse employment action.  Under the law, the City could have terminated Brackney's employment on September 1, 2021, with no prior notice.  *See Johnston v. William E. Wood & Assocs.*, 292 Va. 222, 225-26, 787 S.E.2d 103, 104-05 (2016) (under the at-will employment doctrine, an employer is free to terminate the employment relationship at any time without any reason).

The contract, however, entitled Brackney to 90-days' notice if she was going to be terminated without cause.  (ECF Doc. 1-6, at § 2(B)(2).)  Brackney had no contractual right to continue to perform her job functions during that 90-day period; the contract entitled her only to be paid and receive benefits through that notice period and to receive severance pay at the end.  Therefore, the City placing Brackney on administrative leave with pay and relieving her of her duties as Chief of Police was not an adverse employment action.  (*See* Ex. 2.)  *See also Nzabandora v. Univ. of Va.*, No. 3:17-cv-00003, 2017 WL 4230509, at *9 (W.D. Va. Sept. 22, 2017) (citing *Sturdivant v. Green*, No. CIV.A. 1:09-cv-586, 2009 WL 4030738, at *6 (E.D. Va. Nov. 19, 2009), *aff'd sub nom. Sturdivant v. McHugh*, 450 F. App'x 235 (4th Cir. 2010); *Grice v. Baltimore Cty., Md.*, No. CIV JFM 07-1701, 2008 WL 4849322, at *8 (D. Md. Nov. 5, 2008, *aff'd* 354 F. App'x 742 (4th Cir. 2009)).

Brackney also relies upon the PBA survey and statements made after she was notified of her termination as bases for her claim.  (ECF Doc. 1, at ¶¶ 101(B)-(I), 116(B)-(I), 125(B)-(G).)  Again, neither the survey nor the referenced statements are adverse employment actions.  The City did not conduct the PBA survey.  Furthermore, as outlined more fully in the Brief in Support of Boyles' Motion to Dismiss, Boyles did not make many of the statements attributed to

him by Brackney.  (*Compare* ECF Doc. 1, at ¶¶ 101(E), (F), 116(E), (F), 126(D), (E) *with* Ex. 4;

Ex. 6.)  Even if Boyles did make some of the alleged statements, as a matter of law they do not

constitute an adverse employment action.  *See Adams v. Anne Arundel County Pub. Sch.*, 789

F.3d 422, 429 (4th Cir. 2015); *Blount v. Dept. of Health & Human Servs.*, 400 F. Supp. 2d 838

(D. Md. 2004) (holding that disparaging remarks by a supervisor do not constitute an adverse

employment action).

### 3.   Brackney does not allege that she was treated differently than those outside of her protected class.

Absent direct or indirect evidence of discrimination, a plaintiff may establish a *prima*

*facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she

suffered from an adverse employment action; (3) she was performing at a level that met her

employer's legitimate expectations; and (4) she was treated differently than similarly-

situated employees outside the protected class or her position was filled by a similarly

qualified applicant outside of the protected class.  *Guessous*, 828 F.3d at 219; *Brockman* v.

*Snow,* 217 F. App'x 201, 205 (4th Cir. 2007).

As to the fourth element, "the validity of [the plaintiff's] prima facie case depends upon

whether that comparator is indeed similarly situated."  *Haywood v. Locke*, 387 F. App'x 355, 359

(4th Cir. 2010); *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010)

(affirming dismissal of Plaintiff's Title VII race discrimination claim because the Complaint

failed to establish a plausible basis that white co-workers were "actually similarly situated or that

race was the true basis for [plaintiff's] termination.").  Brackney alleges that she was treated

"less equally as an employee pending separation from employment, than other Caucasian

employees (on the LEAD team or Director positions) . . . ."  (ECF Doc. 1, at ¶¶ 101(J), 116(H),

126(F).)   She references John Jones, Brian Daley, Mike Murphy, Boyles, Wheeler, and

Mooney,[5] noting that they did not have their access or privileges terminated during the period pending their separation from employment.  (*Id.* at ¶¶ 101(K), 116(I), 126(G).)

Employees relied upon as comparators must have held a similar position, dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct as Brackney, without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  *Haywood*, 387 F. App'x at 359.  "And, of course, the comparator must have been treated more favorably than the Plaintiff with respect to the adverse action complained of."  *Wilson v. City of Chesapeake*, 290 F. Supp. 3d 444, 457-58 (E.D. Va. 2018) (quoting *Haywood*, 387 F. App'x 355, 359 (4th Cir. 2010)).

Brackney has not identified any similarly-situated comparators.  First, none of the "comparators" were terminated.  Second, none is alleged to have served as the Chief of Police, a position that comes with broad access to highly confidential information within federal and state databases.  Third, no facts are alleged establishing that Jones, Daley, Murphy, or Boyles reported to Boyles as their supervisor.  Therefore, as a matter of law, none of the "comparators" were similarly situated to Brackney and none were treated differently than Brackney with respect to the adverse action complained of—termination.  The First, Second, and Third Causes of Action should be dismissed with prejudice.

## C.   Brackney does not state a claim against the City for retaliation in violation of Title VII (Fifth Cause of Action).

---

[5] John Jones was the Transit Director for the City.  Brian Daley was the Director of Parks and Recreation for the City.  Mike Murphy served in a variety of roles, ultimately concluding his career with the City as the Deputy City Manager for Human Services.  He served as Interim City Manager for a period of time as well.

In the Fifth Cause of Action, Brackney alleges that the City terminated her employment in retaliation for engaging in protected activity in the form of reporting "unlawful, criminal, departmentally inappropriate, misogynistic, harassing, and racist behaviors she witnessed in a video provided in a citizen's complaint."  (ECF Doc. 1, at ¶¶ 152, 156.)

To state a viable claim for retaliation, Brackney must allege facts sufficient to show that she "engaged in protected activity" and that the City "took the adverse action because of the protected activity."  *Bryant v. Aiken Regional Medical Centers, Inc.,* 333 F.3d 536, 543 (4th Cir. 2013).  That is, the protected activity must be the **"but for" cause** of the adverse employment action.  *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362-63 (2013) (emphasis added).

### 1.    Brackney did not engage in protected activity.

"Protected activities fall into two distinct categories: participation or opposition.  An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace."  *Laughlin v. Metropolitan Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)).

Protected activity does not include opposition to "all unlawful practices" or "practices the employee simply thinks are somehow unfair"; the employee must have "actually opposed employment practices made unlawful by Title VII."  *McNair v. Computer Data Sys., Inc.*, No. 98-1110, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999).  To survive a motion to dismiss, a plaintiff must allege facts to demonstrate that her actions constituted protected activities.  *See Phillips v. Loudoun County Public Schools*, No. 1:19-cv-501, 2020 WL 2205065, at *8 (E.D. Va. May 6, 2020).

Brackney alleges, in conclusory fashion, that she "engaged in protected activity when she reported, conducted investigations, and took disciplinary actions against Caucasian employees . . . after finding that they were involved in suspected criminal activities, unlawful and racist behaviors, police violence, corruption, departmentally inappropriate behaviors, misogynistic, and/or discriminatory behavior's [sic], harassment, and threats."  (ECF Doc. 1 at ¶ 156.)  This bald assertion does not constitute protected activity under the participation clause of Title VII, because that clause does not protect participation in an internal employer investigation not associated with any formal EEOC charge.  *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 166-67 (4th Cir. 2017); *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41 (2d Cir. 2012).  The participation clause of Title VII makes it unlawful for an employer to discriminate against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing **under this subchapter**."  42 U.S.C. § 2000e-3(a) (emphasis added).  As a matter of law, leading an internal affairs investigation into police misconduct is not a Title VII investigation.

Furthermore, Brackney did not oppose conduct prohibited by Title VII.  While she conclusorily describes the behavior of several officers as "unlawful, criminal, departmentally inappropriate, misogynistic, harassing, and racist," (ECF Doc. 1, at ¶ 152), the behavior was not conduct prohibited by Title VII, and Brackney does not allege otherwise.  Title VII is not a code of general civility in the workplace.  *Oncale*, 523 U.S. at 80.  Instead, it "makes unlawful certain, defined intentional acts of discrimination."  *Darvishian v. Geren*, 404 F. App'x 822, 830 (4th Cir. 2010).

Brackney received an email from a citizen on June 3, 2021, complaining about a video of a CPD corporal who was the citizen's former son-in-law.  (ECF Doc. 1, at ¶ 54.)  After viewing

that video and undertaking an investigation, Brackney learned of additional videos and text messages created and exchanged by and among other officers using City-issued cellphones. (*Id.* at ¶¶ 57, 153.) Internal disciplinary action ensued. (*Id.* at ¶¶ 58, 153.) Brackney engaged a State Police investigator and a special prosecutor was appointed. Both determined there was no criminal activity. (Ex. 1.) The City's August 20, 2021 Press Release details the content of the videos and text messages that were the subject of the investigation and subsequent disciplinary action. (*Id.*) These videos and text messages had been shared between CPD officers at least a year before Brackney received the complaint. (*Id.*) It is clear that the conduct at issue, while unacceptable pursuant to CPD policies and procedures, is not conduct prohibited by Title VII. The conduct does not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Even if Brackney's investigation and discipline of the officers could be construed as "opposition" activity, she was not opposing conduct prohibited by Title VII, or conduct which a person could have reasonably believed was prohibited by Title VII. *See Boyer-Liberto*, 786 F.3d at 282.

    **2.**    **There is no causal connection between Brackney's purported protected activity and her termination.**

Even if Brackney could plausibly allege that she engaged in protected activity, there is no causal connection between that activity—investigation and discipline of officers—and her termination. The documents attached to the Complaint show that the City **supported** Brackney's decision to discipline the officers.

> I want the community to understand that **I fully supported the difficult personnel decisions** recently made by Chief Brackney . . . I also supported the publication of her letter on August 20 that shared background information with the community on these departmental and staffing changes. Promoting transparency and fostering trust are also important values for me as City Manager.

(ECF Doc. 1-1, at 5.)

> **I strongly support the actions taken** for these three.  Whether criminal activity
> occurred, whether other officers have been treated differently, whether they have
> new families, etc., **the actions shown in the videos and in the texts are not
> "silly'" and no[t] just "boys will be boys**."  I would be glad to state anytime this
> support of these actions.

(ECF Doc. 1-19, at 2.)

Furthermore, Boyles' comments during the October 4, 2021 Council meeting

affirmatively state his **support** for Brackney's actions.

> I think Chief Brackney **acted very appropriately** in the discipline measures.  I
> **upheld everything** that was disciplined by the police department, by Chief
> Brackney, and will continue to do so. . . . I have **fully supported the discipline**
> for the SWAT team members that were made. . . . **I have not overturned any of
> the police departments' disciplinary actions** in my eight months here.

(Ex. 7, at 4:16:47.)

Because the City backed Brackney's decision with respect to the SWAT officers, those

disciplinary actions could not possibly have been the "but for" cause of her termination.  Instead,

as Boyles has consistently explained, he was concerned about discontent, distrust, and lack of

confidence in the department and felt the City needed to move in a different direction.  (Ex. 7, at

4:14:00.)

> Despite successes in modernizing the department, recent public statements made
> by the Virginia Police Benevolent Association brought to the public's attention
> two officer surveys assessing officers' opinions of the current state of leadership
> in the department.  These surveys revealed **substantial concerns of trust and
> confidence in the leadership.**  I found these concerns troubling, especially when
> factoring in the **known strained relationships across government, community,
> religious and regional stakeholder groups**.  These relationships are critically
> important; and **when internal and external strife are present, it is imperative
> to act.**  So as your city manager, **I took decisive action to prevent key
> leadership positions—which were in jeopardy of becoming vacant—from
> erupting into deeper divides within the department.**

21

(ECF Doc. 1, at ¶ 217(D); Ex. 5, at 2 (emphasis added).)   (*See also* Ex. 6, at 1:11:38 ("[D]irection needed to change to preserve the department so that it could continue to provide the safety and protection that our citizens deserve"); Ex. 7, at 4:15:26 ("[S]everal of our departmental leaders had intended to leave the department very shortly if things continued in the manner that they were.  That gave me even heightened concern.  I thought that would lead to further chaos.").)   Boyles simply asked Brackney for a commitment to a specific plan for improvement of conditions within the CPD, and she declined.  Boyles' request for a plan was a reasonable employment-based requirement given the current dysfunction within the CPD.  There is no causal connection between Brackney's purported protected activity regarding the disciplinary actions and her termination.  The Fifth Cause of Action does not state a claim and should be dismissed with prejudice.

**D.**     **Brackney does not state a claim against the City for violation of the Virginia Human Rights Act (Tenth Cause of Action).**

The Tenth Cause of Action purports to state a claim for violation of the Virginia Human Rights Act ("VHRA") in the form of "differential treatment" based on Brackney's race, color, and gender.  (ECF Doc. 1, at ¶¶ 284-85.)  It is premised on the same conduct and events on which Brackney's Title VII claims are based.

**1.**     **Brackney has not exhausted her administrative remedies.**

The VHRA "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination in employment because of race, color, . . . sex, . . . ."  Va. Code § 2.2-3900(B)(2).  "The VHRA prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act."  *Hice v. Mazzella Lifting Technologies, Inc.*, --- F. Supp. 3d ---, No. 2:21-cv-281, 2022 WL 636640, at *11 (E.D. Va., Mar. 4, 2022). "An aggrieved person who has been provided a notice of his right to file a civil action pursuant to §

2.2-3907 may commence a timely civil action . . . over the person who allegedly unlawfully discriminated against such person in violation of this chapter." Va. Code § 2.2-3908(A).

In *Parikh-Chopra v. Strategic Management Services, LLC*, No. CL-2021-0003051, 2021 WL 5863546, at *2 (Fairfax. Cir. Ct. Dec. 9, 2021), the Circuit Court for the County of Fairfax analyzed this issue and concluded that a plaintiff who wishes to pursue a claim under the VHRA must first exhaust her administrative remedies under Va. Code § 2.2-3907 and receive a notice of the right to file a civil action.

> **Virginia law does not recognize the exhaustion of administrative remedies with the EEOC** as a precondition to filing a discrimination lawsuit in state court under Va. Code § 2.2-3908. . . . **Only the presentment of claims and the exhaustion of the administrative remedies before the Virginia Attorney General's Office of Civil Rights satisfy the prerequisite** to filing a discrimination lawsuit in Virginia's state courts.

*Id.* (emphasis added). *See also McLaurin v. Liberty Univ.*, No. 6:21-cv-00038, 2022 WL 1143534, at *6 n.5 (W.D. Va. Apr. 18, 2022).

The fact that Brackney has now received a Dismissal and Notice of Rights from the EEOC (57 days after filing this lawsuit) does not exhaust the administrative requirements under the VHRA.  Brackney has not "been provided a notice of [her] right to file a civil action" by the OCR as required in order to file suit pursuant to Virginia Code section 2.2-3908(A). Accordingly, she has not satisfied the threshold requirements for exhausting her administrative remedies and cannot advance any claim under the VHRA.  The Tenth Cause of Action must be dismissed.


2.      **Brackney's VHRA claim suffers from the same defects as her Title VII claim.**

Even if Brackney were to exhaust her administrative remedies, the VHRA claim fails for all of the reasons stated *supra* in Part III.B. and III.C. with respect to the Title VII claims.

**E.**    **Brackney does not state a claim against the City for violation of Virginia Code section 2.2-3011 (Sixth Cause of Action).**

In the Sixth Cause of Action, Brackney alleges that her termination violated the Fraud and Abuse Whistle Blower Protection Act ("Act"), Virginia Code section 2.2-3011. (ECF Doc. 1, at ¶¶ 165-78.) Specifically, she alleges that she participated in an investigation of, and objected to, "unlawful, criminal activities, racist behaviors, police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors, harassment and threats perpetrated against her and others" and then was retaliated against. (*Id.* at ¶¶ 172-74.)

The Act provides that, "No employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower, in whole or in part, because the whistle blower is **requested** or **subpoenaed** by an appropriate authority to **participate in** an investigation, hearing, or inquiry by an appropriate authority or in a court action." Va. Code § 2.2-3011(B) (emphasis added). A "whistle blower" is defined as:

> [A]n employee who witnesses or has evidence of wrongdoing or abuse and who makes or demonstrates by clear and convincing evidence that he is about to make a good faith report of, or testifies or is about to testify to, the wrongdoing or abuse to one of the employee's superiors, an agent of the employer, or an appropriate authority.

Va. Code § 2.2-3010. "Wrongdoing" is "a violation, which is not of a merely technical or minimal nature, of a federal or state law or regulation, local ordinance, or a formally adopted code of conduct or ethics of a professional organization designed to protect the interests of the public or employee." *Id.* "Abuse" is "an employer's or employee's conduct or omissions that result in substantial misuse, destruction, waste, or loss of funds or resources belonging to or derived from federal, state, or local government sources." *Id.*

24

The conduct that Brackney investigated does not constitute "abuse" under the Act.  There is no allegation that the behaviors exhibited in the videos and text messages resulted "in substantial misuse, destruction, waste, or loss of funds or resources".  *See* Va. Code § 2.2-3010.  Nor does the conduct constitute "wrongdoing" under the Act.  While Brackney characterizes the actions as "criminal", the special prosecutor and a State Police investigator assigned to investigate the allegations declined to prosecute.  (Ex. 1.)  The behavior did not meet departmental expectations, but a violation of internal operating procedures does not amount to a violation of "a formally adopted code of conduct or ethics".

Even if the conduct could be considered an "abuse" or "wrongdoing", Brackney was not requested to participate in an investigation or inquiry.  *See* Va. Code § 2.2-3011(B).  Instead, Brackney was the "appropriate authority" conducting the investigation.  Moreover, as explained *supra* in Part III.C.2. Brackney was not terminated in whole or in part for her report and investigation of that conduct.  Therefore, the Complaint does not state a claim for violation of the Act and the Sixth Cause of Action should be dismissed with prejudice.

## F.     Brackney does not state a claim against the City for violation of Article 1, § 11 (Seventh Cause of Action).

In the Seventh Cause of Action, Brackney alleges that the purported differential treatment she experienced was based on her race and violated Article 1, § 11 of the Constitution of Virginia.  (ECF Doc. 1, at ¶¶ 179-200.)  This cause of action fails to state a claim, because Article I, § 11 is not self-executing.

The Commonwealth and its agencies are immune from liability . . . in the absence of an express constitutional or statutory waiver of sovereign immunity."  *Gray v. Va. Secretary of Transp.*, 276 Va. 93, 102, 662 S.E.2d 66, 71 (2008) (quoting *Billups v. Carter*, 268 Va. 701, 707, 604 S.E.2d 414, 418 (2004)).  Accordingly, in order to maintain a private cause of action against

a governmental entity, a plaintiff must rely on a provision that is self-executing or a legislative enactment authorizing a private cause of action. *Robb v. Shockoe Slip Foundation*, 228 Va. 678, 681, 324 S.E.2d 674, 676 (1985). Courts have concluded that a constitutional provision is self-executing where "no further legislation is required to make it operative." *Gray*, 276 Va. at 103, 662 S.E.2d at 71. That is, the constitutional provision "supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced." *Robb*, 228 Va. at 682, 324 S.E.2d at 676.

Article I, § 11 provides in pertinent part "That no person shall be deprived of his life, liberty, or property without due process of law . . . and that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged . . . ." Va. Const. art. I, § 11. Although the right to due process under the Constitution of Virginia is "virtually the same" as the correlative right under the United States Constitution, *Willis v. Mullett*, 263 Va. 653, 657, 561 S.E.2d 705, 708 (2002), "pleading a claim for relief under federal law is not sufficient to establish a claim for relief under Virginia law." *Doe v. Rector and Visitors of George Mason University*, 132 F. Supp. 3d 712, 728 (E.D. Va. 2015). In addition to a right, a plaintiff must have a cause of action by which he or she can vindicate that right, but—unlike the federal government—the Commonwealth has not adopted a state-law equivalent of 42 U.S.C. § 1983. *Id.* Accordingly, Brackney may only state a claim under Article I, § 11 if the provision upon which she relies is self-executing.

Article I, § 11 is not self-executing for purposes of Brackney's alleged cause of action. No court in the Commonwealth has concluded that the portion of Article I, § 11 referenced in the Complaint is self-executing. Courts that have previously considered whether Article I, § 11 is self-executing are in universal agreement: the takings clause is the only self-executing

provision.[6]  This outcome is consistent with the analytical framework outlined in *Robb*.  As such, further legislation is necessary to create an enforceable private right of action pursuant to Article I, § 11. Therefore, Brackney's Seventh Cause of Action fails as a matter of law.

**G.**      **Brackney does not state a claim against the City for defamation (Eighth Cause of Action).**

Brackney's Eighth Cause of Action purports to state a claim for defamation based on statements by Defendants Snook, Boyles, and Durrette.  (ECF Doc. 1, at ¶¶ 201-35.)  To the extent that Brackney seeks to hold the City vicariously liable under a theory of *respondeat superior*, the Eighth Cause of Action does not state a claim and should be dismissed with prejudice.

**1.**      **The City is entitled to sovereign immunity.**

The doctrine of sovereign immunity is "alive and well" in Virginia.  *Moreau & Assoc.'s, Inc. v. Health Center Comm'n for the County of Chesterfield*, 283 Va. 128, 137, 720 S.E.2d 105, 110 (2012); *Gray*, 276 Va. at 101, 662 S.E.2d at 70; *Messina v. Burden,* 228 Va. 301, 307, 321 S.E.2d 657, 660 (1984).  "It is an established principle of sovereignty, in all civilized nations, that a sovereign state cannot be sued in its own courts, or in any other, without its consent and

---

[6] *See, e.g., Quigley v. McCabe*, 91 Va. Cir. 397 (Norfolk Cir. Nov. 30, 2015) (finding that only the takings clause of Article I, § 11 is self-executing); *Young v. Norfolk*, 62 Va. Cir. 307 (Norfolk Cir. July 17, 2003) (same); *Gray v. Rhoads*, 55 Va. Cir. 362 (Charlottesville Cir. July 2, 2001), *rev'd on other grounds*, 268 Va. 81, 597 S.E.2d 93 (2004) (same).  *See also Jones v. City of Danville*, No. 4:20-cv-20, 2021 WL 3713063, at *11 (W.D. Va. Aug. 20, 2021) ("Article I, Section 11 is Virginia's Due Process Clause and it self-executing only in the context of claims of damages to or takings of property."); *Botkin v. Fisher*, No. 5:08-cv-58, 2009 WL 790144, at *5 (W.D. Va. March 25, 2009) ("Virginia courts have repeatedly rejected the assertion that a private right of action exists under Article I, § 11 for the deprivation of life or liberty."); *Quigley v. McCabe*, No. 2:17-cv-70, 2017 WL 3821806, at *6 (E.D. Va. Aug. 30, 2017) ([Article I], § 11 of the Virginia Constitution has been found to be self-executing only in the context of claims of damages to or takings of property."); *Doe v. Rector and Visitors of George Mason University*, 132 F. Supp. 3d 712 (E.D. Va. 2015) (finding that Article I, § 11 is not self-executing).

permission." *Board of Public Works v. Grant,* 76 Va. 455, 1882 WL 6042, at *3 (1882).   The

shield of sovereign immunity applies to protect the Commonwealth and municipal corporations,

including cities.   *See, e.g., id*; *Niese v. City of Alexandria*, 264 Va. 230, 239, 564 S.E.2d 127,

132-33 (2002).

When performing governmental functions, municipalities are immune from liability for

even the intentional torts of their employees.   *Niese*, 264 Va. at 239, 564 S.E.2d at 132-33.

Operating a police force is a governmental function.   *Id.*, 564 S.E.2d at 132 (quoting *Hoggard v.*

*City of Richmond*, 172 Va. 145, 147-48, 200 S.E. 610, 611 (1939)).

The claims for defamation concern statements made about the CPD and Brackney acting

as Chief of Police.   Because the operation of a police department is a governmental function, the

City is entitled to sovereign immunity for the alleged statements of Snook, Boyles, and Durrette.

> **2.**      **Brackney does not state a claim for defamation against Boyles, Snook, or Durrette and, therefore does not state a claim against the City.**

For the reasons stated in the Motions to Dismiss and Briefs in Support filed by Boyles,

Snook, and Durrette, and specifically incorporated herein by reference, the Complaint does not

state a claim against those individuals for defamation.   The failure to state a claim against the

City's agents and employees is fatal to a vicarious liability claim against the City.   *See Roughton*

*Pontiac Corp. v. Alston*, 236 Va. 152, 156, 372 S.E.2d 147, 149 (1988); *Hughes v. Doe*, 273 Va.

45, 47-48, 639 S.E.2d 302, 303-04 (2007).

**H.**      **Brackney does not state a claim against the City for business conspiracy (Ninth Cause of Action).**

In the Ninth Cause of Action, Brackney attempts to assert a statutory business conspiracy claim pursuant to Virginia Code section 18.2-499. (ECF Doc. 1, at ¶¶ 236-82.) That section provides, in relevant part:

> Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatsoever . . . shall be jointly and severally guilty of a Class 1 misdemeanor.

Va. Code § 18.2-499(A). Section 18.2-500 provides a civil cause of action for "any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499 . . . ." Va. Code § 18.2-500(A).

### 1.      Brackney does not allege damage to business or property interests.

Virginia Code sections 18.2-499 and -500 protect business-related interests, not personal reputation and interests. *See, e.g. Andrews v. Ring*, 266 Va. 311, 319, 585 S.E.2d 780, 784 (2003). "The business conspiracy statute requires the alleged injury to be to a business or a business owner, not to an individual's employment interests." *Cox v. MAG Mut. Ins. Co.*, No. 3:14-cv-377, 2015 WL 1640513, *2 (E.D. Va. Apr. 9, 2015). "An individual does not have a business interest if 'he neither owned a company, did business as a separate organization, nor had a separate tax identification number for his contractor status.'" *Id.* at *6 n.17 (quoting *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012)).

> [T]he federal district courts in Virginia have consistently held that a right of action is afforded [under these statutes] only when malicious conduct is directed at one's *business*, not one's *person*, and that the statute focuses upon conduct directed at property, *i.e.*, one's business and applies only to conspiracies resulting in business-related damages.

*Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (internal quotations omitted, alterations and emphasis in original). The Fourth Circuit has consistently recognized that injuries to professional reputations are not business-related claims. Instead they relate only to employment,

29

and possible injury to employment reputation, which is outside of the ambit of a statutory conspiracy claim. *Id.*

Brackney alleges that "Defendants conspired and agreed to mutually undertake or concert together for the purpose of willfully and maliciously injuring [her] reputation." (ECF Doc. 1, at ¶ 238.)  She alleges damages in the form of "substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay, and other employment benefits" as well as "physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages." (*Id.* at ¶¶ 280-81.)  These damages relate only to Brackney's personal and employment interests and, therefore, are outside of the domain of a statutory conspiracy claim.  The Ninth Cause of Action should be dismissed with prejudice.

## 2. <u>Brackney's claim is barred by the intracorporate immunity doctrine.</u>

Even if Brackney could allege the necessary elements and damages for a statutory conspiracy claim, such a claim is barred by the doctrine of intracorporate immunity.

To state a claim for statutory conspiracy, the Complaint must allege a combination of two or more persons. *See* Va. Code § 18.2-499(A) (requiring "two or more persons").  In the context of conspiracy, the Supreme Court of Virginia has established that "a corporation, like an individual, cannot conspire with itself." *Bowman v. State Bank of Keysville*, 229 Va. 534, 541, 331 S.E.2d 797, 801 (1985).  The intracorporate immunity doctrine "deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting within the scope of their employment/agency." *Vollette v. Watson*, 937 F. Supp. 2d 706, 727 (E.D. Va. 2013) (internal citations omitted).  This analysis applies to both common law and statutory conspiracy claims.

30

*See id.; Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 925 (E.D. Va. 2000). Thus, no claim for conspiracy can lie against agents or employees of the same entity acting within the scope of their employment/agency. *See Perk v. Vector Resources Group, Ltd.,* 253 Va. 310, 317, 485 S.E.2d 140 (1997); *Lewin v. Cooke,* 95 F.Supp.2d 513, 524 (E.D. Va. 2000).

As pled, Defendants Boyles, Robertson, Durrette, Mooney, and Wheeler were all employees of the City alleged to have been acting in their individual capacities as employees and/or agents of the City. (ECF Doc. 1, at ¶¶ 3-4, 9-10, 12.) Defendants Hill, Snook, and Magill are or were members of City Council alleged to have been acting in their individual capacities as employees and/or agents of the City. (*Id.* at ¶¶ 5-7.) Brackney further alleges that, at all relevant times, Defendants Brown and Wells were "acting in [their] individual capacit[ies] as an employee and/or agent of Defendant City of Charlottesville, and Defendant City of Charlottesville is liable for [their] actions . . . on the basis of *respondeat superior . . . .*" (*Id.* at ¶¶ 8, 11.) Because Brackney pleaded that Defendants are employees or agents of the City acting within the scope of their employment or agency, the doctrine of intracorporate immunity bars Brackney's statutory conspiracy claim.

I.    **Brackney does not state a claim against the City for violation of the VFOIA (Eleventh Cause of Action).**

In the Eleventh Cause of Action, Brackney purports to state a claim for violation of the VFOIA. (ECF Doc. 1, at ¶¶ 306-15.) She alleges that she made a request for records on September 18, 2021, for "all records including the documents read by Chip Boyles'[sic] during his meetings with Chief Brackney on August 26, 2021, and September 1, 2021, and his briefings to Council on September 7, 2021, referencing the termination of Chief R. Brackney's employment contract." (*Id.* at ¶ 309.) According to Brackney, the August 26, 2021 "script" that was produced to her, "was not the same script that was read by Defendant Boyles during the

August 26, 2021 meeting . . . ."  (*Id.* at ¶ 311.)  Brackney then made a request for the "properties logs" for Robertson and Boyles "associated with the creation, and editing of the document (script) provided."  (*Id.* at ¶ 312.)  Brackney alleges that "no documents responsive to this October 14, 2021, VFOIA request were provided."  (*Id.* at ¶ 313.)

The VFOIA provides that a "[a]ny person . . . denied the rights and privileges conferred by this chapter may proceed to enforce such rights and privileges by filing a petition for mandamus or injunction, supported by an affidavit showing good cause."  Va. Code § 2.2-3713(A).  The Complaint does not include an affidavit in support of the claim under the VFOIA and, therefore, must be dismissed.

Furthermore, Brackney's allegations are false.  As the documents attached hereto as Exhibit 8 show, Wheeler provided Brackney with the properties logs associated with the August 26, 2021 script on October 20 and 21, 2021.  Furthermore, those logs demonstrate that the document was last edited by Boyles on August 25, 2021.  There is no basis in fact for Brackney's bald assertion that documents were falsified, destroyed, or withheld.  Brackney's inaccurate allegations cannot survive when proven false by the very records upon which her claim relies.  *See Goines*, 882 F.3d at 166; *Am. Chiropractic Ass'n*, 367 F.3d at 233-35.  The Eleventh Cause of Action does not state a claim and should be dismissed with prejudice.

## IV.   CONCLUSION

For all of the foregoing reasons, the City of Charlottesville, by counsel, respectfully requests that this Court grant its Motion to Dismiss, dismiss the Complaint against it with prejudice, and for such other relief that is just and proper.

**CITY OF CHARLOTTESVILLE**

By Counsel

s/David P. Corrigan
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for City of Charlottesville
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

## C E R T I F I C A T E

I hereby certify that on the 30th day of August, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Alexander L. Taylor, Jr., Esq.
Alex Taylor Law
1622 W. Main Street
Richmond, VA 23220
804-239-9232 - Phone
866-446-6167 - Fax
alextaylor@alextaylorlaw.com

William M. Stanley, Jr., Esq.
Autumn Dawn Price Johnson, Esq.
The Stanley Law Groupl PLLC
13508 Booker T. Washington Hwy
Moneta, VA 24121
540-721-6028 - Phone
540-721-6405 - Fax
rsmith@vastanleylawgroup.com
ajohnson@vastanleylawgroup.com

Charles Tucker, Jr., Esq.
The Tucker Moore Group
8181 Professional Place, Suite 207
Hyattsville, MD 20785
301-577-1175 - Phone
240-467-5678 - Fax
charles@tuckerlawgroupllp.com

Richard H. Milnor, Esq.
VSB No. 14177
Zunka, Milnor & Carter, Ltd.
P.O. Box 1567
Charlottesville, VA 22902
434-977-0191 x234 - Phone
434-977-0198 - Fax
RMilnor@zmc-law.com

s/David P. Corrigan
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for City of Charlottesville
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com