# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| RASHALL M. BRACKNEY-WHEELOCK, PH.D., | CASE NO. 3:22-cv-00035 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| CITY OF CHARLOTTESVILLE, *et al.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

This case comes before the Court on Defendants' motions to dismiss, Dkts. 12, 18, 19, 24, 30, 32, 34, 36, 38, 40, 49. Plaintiff Rashall M. Brackney-Wheelock, Ph.D., was hired as the Police Chief for the City of Charlottesville in 2018, following community concerns about the Charlottesville Police Department. In 2021, her position was terminated. She argues that her termination was a result of race, color, and gender discrimination; resulted from tortious interference with her employment contract and a business conspiracy; and involved violations of Virginia's whistleblower statute, defamation standard, Human Rights Act, and Freedom of Information Act. Because Plaintiff does not allege sufficient facts to support these claims, Defendants' motions to dismiss are granted.

## I. Facts[1]

The following facts are alleged in Plaintiff's Complaint and assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

---

[1] Throughout Plaintiff's Complaint, she fully capitalizes Defendants' names. This opinion removes such capitalization from quotations.

Plaintiff alleges that, in the fall of 2017 and early in 2018, the City of Charlottesville Police Department ("CPD") "was in a state of disarray, instability, and chaos," due to the community's "ongoing protesting, to display their displeasure with CPD's pattern and practice of negative responses to community concerns," such as their deploying gas for non-violent protestors and poorly handling the Unite the Right Rally. Dkt. 1 ("Compl.") ¶ 26. Consequently, the City of Charlottesville conducted a search for a new Police Chief. *Id.* ¶ 27.

Defendant City of Charlottesville ("the City") appointed Plaintiff to serve as the City's Chief of Police, and she signed an Employment Agreement with the City on June 18, 2018. *Id.* ¶¶ 28–29. Plaintiff had extensive police training education. *Id.* ¶ 30. She developed a strategic plan for CPD, reorganized it, sought to promote transparency and accountability within it, and reformed it in various ways. *Id.* ¶¶ 32–33, 36, 38–47.

Plaintiff received an email on June 3, 2021, with the subject line "Letter of Concern." *Id.* ¶ 54. Plaintiff alleges that the email "included information and a video involving regarding [sic] police misconduct and discriminatory behavior of CPD officer(s), namely Corporal Robbie Oberholzer." *Id.* And on that same date, "Plaintiff reported unlawful, criminal, departmentally inappropriate, misogynistic, harassing, and racist behaviors she witnessed in a video provided in a citizen's complaint." *Id.* ¶ 55. Her employment duties mandated that she "report and/or conduct an investigation in response to the initial complaint received." *Id.* ¶ 56. Plaintiff alleges that an analysis of a forensic report for the email "exposed several other suspected unlawful, criminal, and racist behaviors, as well as police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment and threats within Defendant's police department." *Id.* ¶ 57. Plaintiff offers little if any supporting factual details elaborating upon these assertions. *Id.* ¶¶ 54–57.

Plaintiff alleges that she, "acting within the scope of her employment, took disciplinary and corrective measures," which included "disassembling the SWAT team and terminat[ing] or suspen[ding] each individual found to be involved in the unlawful, criminal, threatening and racist behaviors, or any police violence and/or corruption, or departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment." *Id.* ¶ 58.

Defendants Heather Hill and Lloyd Snook, both City Councilors, contacted City Manager Defendant Charles 'Chip' Boyles on June 13, 2021, "regarding an 'all-hands meeting' on June 14, 2021." *Id.* ¶ 59. However, Plaintiff doesn't describe this "all-hands meeting" any further.

Defendant Michael 'Mike' Wells (Police Benevolent Association, Central Virginia Chapter President) met with Defendant Boyles on August 10, 2021, Wells requested a copy of Plaintiff's employment contract and, as Plaintiff describes it, "mentioned Steve Sellers' Interim Chief situation"—though Plaintiff doesn't expound on this further. *Id.* ¶ 60. Thereafter, Plaintiff alleges that Defendants—including Defendant Bellamy Brown (Former Police Civilian Review Board ('PCRB') Chair of Charlottesville) and Defendant Wells—convened to assemble a Police Benevolent Association ('PBA') survey "with questions intentionally negatively worded and targeting Plaintiff" because of her "investigation and disciplinary actions." *Id.* ¶ 61.[2] There was no similar survey for "any Caucasian male employees in leadership roles." *Id.* ¶ 63.

Defendant Boyles acknowledged that the survey "was intended to highlight Chief Brackney in a less than positive way" and was a "hit job." *Id.* ¶ 65. Plaintiff contends that "[b]etween June and September 2021, Defendants including, but not limited to, Defendant[s]

---

[2] The survey emerged "because of Plaintiff's recent investigation and disciplinary actions against former and current employees namely: Cpl. Robbie Oberholzer, Sgt. Scott Godfrey, Sgt. Michael Hudson, Cpl. Steve Young, Officer Bethany Denault (Boury)." *Id.* ¶ 62.

[Brown, Hill, Wells, Snook, Boyles, [James] Mooney (Former Assistant Police Chief), and [Sena] Magill (City Councilor)] assembled, physically and virtually, to conspire and agree to mutually undertake together for the purpose of willfully and maliciously injuring [Plaintiff's reputation." *Id.* ¶ 66. They did so, she argues, "in efforts to gain supportive reasoning to terminate her as Chief." *Id.*

Plaintiff received notification of her "without-cause" termination on September 1, 2021. *Id.* ¶ 68. The termination would be effective November 30, 2021. *Id.* And, "[p]ursuant to [Plaintiff]'s Employment Agreement, she was to receive ninety (90) days advance written notice prior to her effective termination date." *Id.* ¶ 69.

Plaintiff argues that Defendants interfered with her employment on September 1, 2021. *Id.* ¶ 70. Defendant Lisa Robertson "ordered the IT Department to access [Plaintiff]'s email account and copy/archive [Plaintiff]'s emails and change her signatures and fonts, despite [Plaintiff] still being employed until November 30, 2021." *Id.* ¶ 71. And Defendant Boyles, on September 1 and 3, wrote and published press releases and made comments about Plaintiff's termination. *Id.* ¶ 72. Plaintiff asserts that the statements these Defendants made between September 2021 and the present about her, her employment, and her termination, "were made with actual malice, knowledge of the falsity, and/or reckless disregard for the truth." *Id.* ¶¶ 73–74. Defendant Snook, on or about October 4, 2021, in an interview on CBS19 News, "explain[ed] he supported the decision to fire Plaintiff because: 'Even Black women officers were leaving.'" *Id.* ¶ 75. Defendant Boyles published a press release on September 3, 2021, which stated:

> However, in order to dismantle systemic racism and eliminate police violence and misconduct in Charlottesville, *we need a leader who is not only knowledgeable in that work, but also is effective building collaborative relationships* with the community, the department, and the team at City Hall [. . .] [w]hile very good work and progress has been

made, I ultimately decided *new leadership was required to continue the City's progress towards building a new climate and culture* within the department.

*Id.* ¶ 76 (emphasis in Compl.). He "insinuat[ed] Plaintiff's termination was 'for cause' stating

she was '*not a good fit.*'" *Id.* ¶ 77 (emphasis in Compl.).

Defendant Boyles wrote an opinion piece in *The Daily Progress* on September 17, 2021,

stating the following:

> [d]espite successes in modernizing the department, recent public statements made by the Virginia Police Benevolent Association brought to the public's attention two officer surveys assessing officers' opinions of the current state of leadership in the department. *These surveys revealed substantial concerns of trust and confidence in the leadership*. I found these concerns troubling, especially when factoring in the known strained relationships across government, community, religious and regional stakeholder groups. These relationships are critically important; and when internal and external strife are present, it is imperative to act. [. . .] In hindsight, I would have engaged the City Council more directly in my deliberations and worked in partnership with [Plaintiff] to develop an improvement plan. Fact is, I just did not have the luxury of time. I found the moment critical to act and felt the larger community would respect my intentions to *guide our police department to a stable and evolving law enforcement outfit capable of making all residents safe, respected, and proud*.

*Id.* ¶ 79 (emphasis in Compl.). Defendant Boyles also stated the following during a Council

meeting on September 20, 2021, referring to Plaintiff: "I in no way intend to malign her

character, professional acumen or ability to perform. I am simply indicating 'Fit' is more than

size and measurement, but feel and function." *Id.* ¶ 80.[3]

Plaintiff asserts that "[t]he articles and press conferences are libel per se, made with

actual malice, knowledge of the false statements contained therein, and/or reckless dis[reg]ard

for the truth." *Id.* ¶ 81. The statements, she argues, "were in contrast to recorded statements made

---

[3] Plaintiff also alleges that she and Defendant Boyles met on August 26, 2021, and an audio-recording of the meeting captured him "indicat[ing] his confidence in her abilities as Chief." *Id.* ¶ 67.

by Defendant Boyles in his meeting with [Plaintiff] on August 26, 2021" and they "created, and made apparent, a substantial danger to the Plaintiff's reputation." *Id.* ¶ 82.

On October 21, 2021, Defendant Latroy 'Tito' Durrette (Assistant Police Chief) "authorized and requested that the Charlottesville Police Department website alter and remove the Plaintiff['s] information and biography from the website." *Id.* ¶ 83. But "Plaintiff's Employment Agreement provid[ed] that she shall hold the Chief of Police position until November 30, 2021." *Id.*

Plaintiff submitted a FOIA request on September 18, 2021, for "all records including the documents read by Chip Boyles' [sic] during his meetings with [Plaintiff] on August 26, 2021, and September 1, 2021, and his briefings to Council on September 7, 2021, referencing the termination of [Plaintiff's] employment contract." *Id.* ¶ 84. Responding to her FOIA request, Defendant Brian Wheeler, FOIA Officer of Communications responded providing records. *Id.* ¶ 85. And Defendant Wheeler replied to Plaintiff's inquiry regarding the script Defendant Boyles read at their August 26, 2021 meeting: "I met with [Defendants Boyles and Robertson] today. Attached is an additional record provided by [Defendant Boyles] ('the script') for August 26. We made a mistake sending you the redacted September 1 notes. The unredacted version is attached." *Id.* ¶ 86. But the unredacted script, Plaintiff asserts, "was not the same script that was read by Defendant Boyles during the August 26, 2021 meeting." *Id.* ¶ 87.

Plaintiff submitted a FOIA request on October 14, 2021 for "Lisa Robertson's and Chip Boyles' properties logs associated with the creation, and editing of the document (script) provided . . ." *Id.* ¶ 88. Plaintiff has not received the original property logs from August 26, 2021. *Id.* ¶ 89. Defendants Robertson and Boyles instead, she contends, "submitted falsified

documents contradictory to the audio recording of [Plaintiff] and Defendant Boyles['] August

26, 2021, [sic] meeting." *Id.*

## II. Summary of Plaintiff's Claims

Plaintiff has filed suit against current and former officials of the City of Charlottesville.

Defendant Charles 'Chip' Boyles is former City Manager of Charlottesville. *Id.* ¶ 3. Defendant

Lisa Robertson is the City Attorney of Charlottesville. *Id.* ¶ 4. Defendant Heather Hill is a former

City Councilor of Charlottesville, and Defendants Lloyd Snook and Sena Magill are current City

Councilors. *Id.* ¶¶ 5–7. Defendant Bellamy Brown is the Former PCRB Chair of Charlottesville.

*Id.* ¶ 8. Defendant Latroy 'Tito' Durrette is the Assistant Police Chief of Charlottesville, and

Defendant James Mooney is the Former Assistant Police Chief of Charlottesville. *Id.* ¶¶ 9, 10.

Defendant Michael 'Mike' Wells is the Central Virginia Chapter-President of the Charlottesville

PBA. *Id.* ¶ 11. And Defendant Brian Wheeler is the Former Communications Director and FOIA

Officer for the City of Charlottesville. *Id.* ¶ 12. For the foregoing defendants (the "individual

Defendants"), Plaintiff states that "[a]t all times relevant" they were "acting in [their] individual

capacity as an employee and/or agent of the City, and the City is liable for [their] actions . . . on

the basis of *respondeat superior* and other applicable law." *Id.* ¶¶ 3–12.[4]

Plaintiff raises the following claims: (1) race discrimination in violation of Title VII of

the Civil Rights Act of 1964, *id.* at 18–24; (2) color discrimination in violation of Title VII, *id.* at

24–27; (3) gender discrimination in violation of Title VII, *id.* at 27–30; (4) tortious interference

with employment contract as against Defendants Mooney, Boyles, Brown, Wells, Magill,

---

[4] Plaintiff states that Defendant City of Charlottesville ("Defendant City") "is the proper Defendant pursuant to § 8.10-195.4 of the Virginia Tort Claim Act" because it "is a body politic, and corporate body, which may sue and be sued and has waived any applicable sovereign immunity in accordance with the Virginia State Tort Claims Act." *Id.* ¶ 13.

Robertson, and Hill, *id.* at 30–41; (5) unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, *id.* at 41–45; (6) violation of the Virginia Code's whistleblower statute (§ 2.2-3011), *id.* at 45–47; (7) violation of Plaintiffs' right to freedom from governmental discrimination under Va. Const. art. I, § 11, *id.* at 47–50; (8) defamation in violation of Va. Code § 18.2-417, *id.* at 51–57; (9) business conspiracy in violation of Va. Code § 18.2-499 *et seq.*, *id.* at 57–64; (10) violation of Virginia Human Rights Act, Va. Code § 2.2-3900-3908, *id.* at 64–71; (11) violation of Plaintiffs' right to freedom of information under Va. Code § 2.2-3704, *id.* at 71–73.

Plaintiff asserts that she "has suffered and continues to suffer substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, as well as physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages, all to her detriment." *Id.* ¶ 90.

At a hearing for the Motions to Dismiss, Plaintiff's counsel conceded the following claims: Counts I, II, III, and V (Title VII claims) against individual Defendants;[5] Count VII (violation of Plaintiffs' right to freedom from governmental discrimination under Va. Const. art. I, § 11); and Count XI (violation of Plaintiffs' right to freedom of information under Va. Code § 2.2-3704).

For the following reasons, the Court finds that all remaining claims will be dismissed.

---

[5] The Title VII claims cannot be asserted against these Defendants because there is no individual liability under Title VII, meaning Counts I, II, III, and V cannot be asserted against the individual Defendants. *Lissau v. Southern Food Serb.*, 159 F.3d 177, 180–81 (4th Cir. 1998). They are not employers (the City of Charlottesville is), so the Virginia Human Rights Act ("VHRA") cause of action, Count X, cannot lie as to the individual Defendants. The VHRA applies to employers or labor organizations. *See* Va. Code § 2.2-3905.

### III. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The purpose of a Rule 12(b)(6) motion is to "test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King*, 825 F.3d at 214 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999)). "Thus, when considering a motion to dismiss, a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616 (4th Cir. 2020). Nevertheless, only facts can render a claim for relief plausible. "[F]ormulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor is it sufficient for a plaintiff to plead facts merely consistent with liability. The plaintiff must plead enough factual content to nudge a claim across the border from mere possibility to plausibility. *Id*. at 570; *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

### IV. Defendants' Motions to Dismiss

#### A. Individual Defendants

##### a. Defendant Wells Was Not an Agent or Employee of the City

Plaintiff only brings two claims against Defendant Wells: (1) tortious interference with employment contract and (2) business conspiracy.

Plaintiff argues Defendant Wells acted as the City's agent, so the City is liable for his actions based on *respondeat superior*. Compl. ¶ 11. But these claims fail because Plaintiff has not pled any allegations of fact that, taken as true, would establish that Defendant Wells was an employee or agent of the City. Dkt. 50 at 5–9.

– 9 –

Pleading *respondeat superior* liability requires a plaintiff to allege that the injury caused by the act of an employee occurred "within the employee's scope of employment or within the ordinary course of business . . . while actively engaged in a job-related service." *Our Lady of Peace, Inc. v. Morgan*, 832 S.E.2d 15, 23 (Va. 2019) (internal citations omitted) (emphasis omitted). The doctrine only applies when "the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of some neglect or wrong at the time and in respect to the very transaction out of which the injury arose." *Parker v. Carilion Clinic*, 819 S.E.2d 809, 819 (Va. 2018) (internal reference omitted). And to determine if a master-servant relationship exists under Virginia law, a court looks to four factors: "(1) selection and engagement of the servant, (2) payment of compensation, (3) power of dismissal, and (4) power of control." *Naccash v. Burger*, 290 S.E.2d 825, 832 (Va. 1982). Though "[t]he first three factors are not essential to the existence of the relationship[,] the fourth, the power of control, is determinative." *Id.* (internal references omitted).

Plaintiff's claims against Defendant Wells fail that test. Plaintiff has alleged no facts indicating the City ever employed Defendant Wells. The Albemarle County Police Department selected, hired, employed, and compensated him, and he also served as a volunteer with the Central Virginia Chapter of the Southern States Police Benevolent Association. Dkt. 50 at 6. The City could not dismiss him, nor did the City control his position. *Id.* Thus, Plaintiff has not pled facts that would substantiate—and therefore cannot establish—the existence of a *respondeat superior* relationship between Defendant Wells and the City.

Defendant Wells also is not an agent of the City. Generally, written or spoken words of the principal or conduct of the principal creates authority in the agent, and the same words and conduct of the principal as to third persons creates "apparent agency," whereby the principal

consents to the acts of the agent on the principal's behalf. Restatement (Second) of Agency §§ 26, 27 (1958). Under Virginia law, "apparent agency" means "[a]n agency created by operation of law and established by a principal's actions that would reasonably lead a third person to conclude that an agency exists. *Sanchez v. Medicorp Health Sys.*, 618 S.E.2d 331, 333 (Va. 2005) (quoting Black's Law Dictionary 67 (8th ed. 2004)); *see also Title Ins. Co. of Richmond, Inc. v. Howell*, 164 S.E. 387, 391 (Va. 1932) ("One who permits another to hold himself out as agent and appears to acquiesce in that assumption of authority is bound thereby"). Apparent agency differs from *respondeat superior* because there is no actual master-servant relationship. *Sanchez*, 618 S.E.2d at 332. Virginia law does not "impose[] vicarious liability on an employer for the negligence of an independent contractor on the basis of apparent or ostensible agency," so apparent liability is not available as a theory of liability as to these claims. *Id.* at 335. And in any event, Plaintiff has not pled any facts to show apparent authority or apparent agency between Defendant Wells and the City, much less actual authority or agency. Plaintiff has not pled that Defendant Wells was historically an agent of the City and acted with apparent authority based on past agency. Nor has Plaintiff pled any actions that would establish an appearance of the City acquiescing to Defendant Wells. Instead, Plaintiff presents Defendant Wells as acting on behalf of *the PBA*, not the City. Indeed, she repeatedly describes the survey at issue as the Police Benevolent Association Survey or PBA Survey. Compl. ¶¶ 101, 116, 126, 139, 158.

Since Plaintiff based her tortious interference of a contract and business conspiracy claims in the theories of agency and *respondeat superior*, while failing to plead the necessary elements to establish either theory as to Defendant Wells, her claims against him will be dismissed.

– 11 –

**b. Defendants Brown, Hill, Magill, Mooney, Robertson, and Boyles Cannot Interfere with the City's Contract with Plaintiff**

Plaintiff asserts that Defendants Brown, Hill, Magill, Mooney, Robertson, and Boyles tortiously interfered with her employment contract. This claim must also be dismissed because they, as the City's employees, cannot interfere with the City's contract with Plaintiff.

Plaintiff was an at-will employee. Compl. ¶ 139 (discussing tortious interference with her "at-will employment"); *id.* (Ex. F), p. 5 ¶ (C) ("The Employee is an at-will employee, subject to the terms of this Agreement"). Under the express terms of her Employment Agreement during her Initial Term, either the City Manager or Plaintiff as the employee had the unconditional right to terminate her Employment Agreement, without giving cause, after giving 90 days' advance notice. *Id.* (Ex. F), p. 3, ¶ 2.

There are four elements to establish a *prima facie* case for tortious interference with contract or contract expectancy in Virginia:

> (1) The existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). Significantly, a party or its agents cannot intentionally interfere with its own contract. *See, e.g.*, *Francis Hospitality, Inc. v. Read Props., LLC*, 820 S.E.2d 607, 610 (Va. 2018); *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) (internal citations omitted).

At the outset, the Court notes that Plaintiff alleges both that Defendants Brown, Hill, Magill, Mooney, and Boyles *were* acting as the City's employees/agents, Compl. ¶¶ 3, 5–8, 10, and, conversely, that "at all times relevant to this cause of action, . . . [these Defendants] . . . [*were*] *not* acting within the course and scope of their employment but rather were acting with

ulterior motives and without an honest belief that their actions would benefit their employer, Defendant City." Compl. ¶ 133 (emphasis added). The claim could only go forward if the latter statement is true, as agents cannot intentionally interfere with the City's contract.

Plaintiff alleges no facts in support of her legal conclusion that the listed defendants were not acting as agents at all times relevant to her tortious interference with a contract claim. *Twombly*, 550 U.S. at 557. Plaintiff alleges no facts to support that Defendant Brown acted outside his role as PCRB Chair, that Defendants Hill and Magill acted outside their role as City Council members, that Defendant Mooney acted outside of his role as the Assistant Chief of the CPD, or that Defendant Boyles[6] acted outside the scope of his employment as City Manager

---

[6] She alleges that Defendant City Manager Boyles, on June 13, 2021, "was contacted by Defendant Hill along with Defendant Snook, regarding an 'all-hands meeting' on June 14, 2021," met with former Assistant Police Chief of Charlottesville Mooney on August 18, 2021 to discuss a PBA survey of anonymous former and current employees, and on August 10 and 23, 2021 met with PBA Central Virginia President of Charlottesville Defendant Wells to discuss the PBA Survey. Compl. ¶¶ 140(A)–(C). Plaintiff alleges that Defendant Boyles provided Defendant Wells with a copy of the publicly available Employment Agreement and listened to a recording and discussed why Defendant Wells "thought that 'new leadership is needed,'" to which Defendant Boyles noted "Nothing new." *Id.* ¶ 140(C). Other allegations related to her tortious interference with contract claim against Defendant Boyles pertain to alleged actions after Defendant Boyles gave notice to Plaintiff of her termination and placed her on paid administrative leave. *Id.* ¶ 140(D–Q).

There are no allegations of individual conduct or action by Defendant Boyles outside of his duties as the City Manager under the City Charter and Code. Pursuant to § 5.01 of the City Charter, the CPD is expressly under the general supervision of the City Manager. And pursuant to Charlottesville City Code § 2-146 (1990), Boyles as the City Manager was the "chief executive and administrative officer of the city government" responsible for "enforce[ment] of the laws of the city" and was "the director of safety, with general supervision over the . . . police department of the city." Pursuant to Charlottesville City Code § 2-149 (1990), Defendant Boyles as City Manager had the "power to dismiss, suspend and discipline, in accordance with duly adopted personnel regulations, all officers and employees in such departments, except as otherwise specifically provided by law." And under § 20-3, the chief of police "shall always be subject to the orders and regulations of the city manager and the city council." Thus, it appears Defendant Boyles acted for Defendant City and was Defendant City, for purposes of this claim.

when performing any of the acts in the Complaint. *See Stronach v. Virginia State Univ.*, 631 F. Supp. 2d 743, 753 (E.D. Va. 2008) (summary judgment stage). Her facts instead support that they were acting *because of* these positions. So this claim fails against Defendants Brown, Hill, Magill, Mooney, and Boyles because they, as agents of the City, cannot interfere with the contract between the City and Plaintiff.

Plaintiff's tortious interference of the contract claim also fails against Defendant Robertson. Plaintiff does not include Defendant Robertson in her bare legal conclusion that "at all times relevant to this cause of action, [the above Defendants] were not acting within the course and scope of their employment but rather were acting with ulterior motives and without an honest belief that their actions would benefit their employer, Defendant City of Charlottesville, Virginia," Compl. ¶ 133, a statement to which this Court does not afford a presumption of truth. *Twombly*, 550 U.S. at 557. Plaintiff also alleges that "[a]t all times relevant to the occurrences complained of herein," Defendant Robertson "was acting in her individual capacity as an employee and/or agent of Defendant City of Charlottesville . . . ." Compl. ¶ 4. And without any factual allegations that Defendant Robertson acted outside of her role as City Attorney when performing any of the acts outlined in the Complaint, she, as an employee and agent of the City, could not commit tortious interference of the contract between the City and Plaintiff.

Additionally, when a plaintiff seeks to recover for tortious interference with contract expectancy, the plaintiff must plead and ultimately prove that the defendant employed improper methods to interfere with the contract. *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493

S.E.2d 375, 378 (Va. 1997); *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987). Such methods

include "those means that are illegal or independently tortious, such as violations of statutes,

regulations, or recognized common law rules," and "violence, threats or intimidation, bribery,

unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence,

misuse of inside or confidential information, or breach of a fiduciary relationship." *Id.* And

improper methods do not include "actions solely motivated by spite, ill will and malice" toward

the plaintiff. *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 871 (Va. 2011).

Plaintiff has not alleged any facts that would support the satisfaction of this requirement as to

any of the individual Defendants.

Because the tortious interference claim fails as a matter of law, the Court need not

consider immunity arguments brought pursuant to Virginia Code § 8.01-223.2. Dkt. 39 at 9;

Dkt. 21 at 18.

### c.   Plaintiff Does Not Allege Business Injury

Plaintiff asserts that Defendants Brown, Hill, Magill, Mooney, Snook, and Boyles

engaged in a statutory business conspiracy to harm her reputation, and she brings her claim

pursuant to Virginia Code § 18.2-499. Plaintiff has not made sufficient factual allegations to

assert her claim for business conspiracy. Virginia Code § 18.2-499 provides, in relevant part:

> Any two or more persons who combine, associate, agree, mutually undertake or concert
> together for the purpose of (i) willfully and maliciously injuring another in his reputation,
> trade, business or profession by any means whatsoever . . . shall be jointly and severally
> guilty of a Class 1 misdemeanor.

Virginia law dictates that Virginia Code § 18.2-499 and -500, which can be applicable in certain

civil actions, "apply to business and property interests, not to personal or employment interests."

*Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003); *see also Buschi v. Kirven*, 775 F.2d 1240,

1259 (4th Cir. 1985); *Cox v. MAG Mutual Ins. Co.*, No. 3:14-cv-277, 2015 WL 1640513, at *2

(E.D. Va. Apr. 9, 2015) ("The business conspiracy statute requires the alleged injury to be to a business or a business owner, not to an individual's employment interests."). And "[a]n individual does not have a business interest if 'he neither owned a company, did business as a separate organization, nor had a separate tax identification number for his contractor status.'" *Id.* at *6 n.17 (quoting *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012)). The Fourth Circuit has long recognized that

> the federal district courts in Virginia have consistently held that a right of action is afforded [under these statutes] only when malicious conduct is directed at one's *business*, not one's *person*, and that the statute focuses upon conduct directed at property, *i.e.*, one's business and applies only to conspiracies resulting in business-related damages.

*Buschi*, 775 F.2d at 1259 (internal quotations omitted, alterations and emphasis in original).

To be sure, Plaintiff alleges some facts relevant to her claim of professional or reputational injury. Compl. ¶¶ 90, 229, 234, 274, 276, 280, 281. She alleges that because of the actions of the Defendants involved in the conspiracy, she lost her position as Police Chief, and Defendants continued to harm her reputation, trade, and profession through defamation, to support their excuse for terminating her. Dkt. 56 at 8. She asserts that "Defendants conspired and agreed to mutually undertake or concert together for the purpose of willfully and maliciously injuring [her] reputation," Compl. ¶ 238, causing damages in the form of "substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay, and other employment benefits" and "physical personal injuries, embarrassment, humiliation, mental anguish, and other general damages." *Id.* ¶¶ 280–81. However, she *never* alleges *business*-related damages as Virginia law requires. The damages alleged relate only to Plaintiff's personal and employment interests, and thus they are outside the domain of a statutory conspiracy claim. The claim thus will be dismissed as to all individual Defendants. *See Andrews*, 585 S.E.2d at 784; *Cox*, 2015 WL 1640513, at *2, 6.

Even if the claim was within the statute's domain—and it is not—the intracorporate immunity doctrine would also bar Plaintiff's claim. This doctrine "deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting within the scope of their employment/agency." *Vollette v. Watson*, 937 F. Supp. 2d 706, 727 (E.D. Va. 2013) (internal citations omitted). In other words, there can be no claim for conspiracy against employees or agents of the same entity acting within the scope of their employment/agency. *E.g.*, *Park v. Vector Resources Group, Ltd.*, 485 S.E.2d 140, 144 (Va. 1997); *see also Buschi*, 775 F.2d at 1251. The Court need not consider arguments related to Defendant Boyles' alleged ulterior motive[7] or whether there was a meeting of the minds.[8]

---

[7] Defendant Boyles argues that the claim fails as to him because Plaintiff does not identify or allege any facts pertaining to what Defendant Boyles' ulterior motive was. She conclusorily alleges that Boyles and five of the other individual Defendants were not acting within the scope of their employment but rather were acting with "ulterior motives and without an honest belief that their actions would benefit their employer." Compl. ¶ 133. But Defendant Boyles' ability to terminate her at will contract derived from his position as City Manager and authority under the City Charter and applicable ordinances. And, as Defendant Boyles asserts, Plaintiff "alleges again in only conclusory fashion that the 'Defendants' (presumably encompassing all of the defendants, including Boyles) 'conspired and agreed to mutually undertake or concert together for the purpose of willfully and maliciously injuring Plaintiff's reputation.'" Dkt. 21 at 32 (quoting Compl. ¶ 238).

[8] Parties also argued whether there was a meeting of the minds, as needed for a conspiracy claim. *Shirvinski*, 673 F.3d at 321; *Kamin v. United States Bank Nat'l Ass'n*, No. 1:13-cv-00058, 2013 WL 6409891, at *3 (W.D. Va. Dec. 9, 2013). Defendants Brown, Snook, and Boyles argue that the Complaint does not contain any facts to support that any of them had a meeting of the minds with the other Defendants to injure Plaintiff's reputation. Dkt. 39 at 12–13; Dkt. 27 at 17–18; Dkt. 21 at 35–36. A statutory business conspiracy claim requires the existence of "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together." Va. Code Ann. § 18.2-499, 500. And "as with common law civil conspiracy, this statute requires proof 'that the defendants have combined . . . to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.'" *Shirvinski*, 673 F.3d at 321. Plaintiff conclusorily asserts that "defendants conspire[d] and agree[d] to mutually undertake or concert together for

#### d. Plaintiff Does Not Allege Individual Defendants Showed Actual Malice

Plaintiff also brings a defamation claim against Defendants Durrette, Snook, and Boyles.[9] But the claim fails as to all of them because she does not allege facts showing they acted with actual malice.

Under Virginia law, a claim for defamation must allege: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015) (quoting *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013) (internal quotation marks omitted)). And "[g]ood pleading requires that the exact words spoken or written must be set out in the declaration *in haec verba*. Indeed, the pleading must go further,—that is, it must purport to give the exact words." *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 862 (Va. 2003) (quoting *Fed. Land Bank of Baltimore v. Birchfield*, 3 S.E.2d 405, 410 (Va. 1939)).

"[P]ublication of a defamatory statement requires that it be communicated to a third party 'so as to be heard and understood by such person.'" *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 915 (E.D. Va. 2004) (quoting *Thalhimer Bros. v. Shaw*, 159 S.E. 87, 90 (Va. 1931)).

"To be 'actionable,' a statement must be a false assertion of fact that 'tend[s] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* at 922 (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). Defamatory words must "make the plaintiff appear

---

the purpose of willfully and maliciously injuring [Plaintiff's] reputation." Compl. ¶¶ 66, 238. But Plaintiff does not allege any facts to support this conclusion.

[9] Plaintiff asserts defamation in violation of Virginia Code § 18.2-417. Compl. ¶ 21. The Court considers the defamation claim under Virginia's common law defamation standard.

odious, infamous, or ridiculous." *Id.* (quoting *Chapin*, 993 F.2d at 1092). And "a statement cannot be actionable as defamatory if it 'cannot reasonably be interpreted as stating actual facts about an individual.'" *Id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (internal quotation and citation omitted)). Defamatory words that are actionable per se in Virginia include "[t]hose which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment," and "[t]hose which prejudice such person in his or her profession or trade." *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va. 1981) (quoting *Shupe v. Rose's Stores*, 192 S.E.2d 766, 767 (Va. 1972) (internal quotations omitted)). The Supreme Court of Virginia has elaborated that, to be actionable *per se*, "the words must contain an imputation that is 'necessarily hurtful' in its effect upon plaintiff's business and must affect [her] in [her] particular trade or occupation." *Id.* at 636 (quoting *James v. Haymes*, 168 S.E. 333, 336 (Va. 1933)). Thus, "[t]here must be a nexus between the content of the defamatory statement and the skills or character required to carry out the particular occupation of the plaintiff." *Id.* (referencing Restatement (Second) of Torts § 573, Comment e (1976)).

And "[t]he requisite level of intent a plaintiff must prove in a defamation action depends upon the plaintiff's status as a public or private figure and the damages sought." *Jordan v. Kollman*, 612 S.E.2d 203, 207 (Va. 2005). Public figures or officials must ultimately prove that the statement was made with actual malice, requiring a plaintiff to plead and ultimately prove that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)). A police chief is a public figure. *See Henry v. Collins*, 380 U.S. 356, 357 (1965). "[E]vidence of either deliberate falsification or reckless publication 'despite the publisher's

awareness of probable falsity' [i]s essential to recovery by public officials in defamation actions." *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 721 (Va. 1985) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Ultimately, there must be clear and convincing proof of actual malice for a public official to recover on her defamation claim. *Id.* at 722 (referencing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 325 (1974)). And under Virginia law, for a defamation claim to move forward it must sufficiently allege facts that make plausible that the alleged false statements were made with the requisite degree of fault. *Fairfax v. CBS Broadcasting Inc.*, 534 F. Supp. 3d 581, 595 (E.D. Va. 2020); *Xuli Zhang v. Regan*, No. 1:10CV1329, 2011 WL 1456188, at *8 (E.D. Va. Apr. 14, 2011) (discussing that plaintiff "has failed to plead any plausible basis for her conclusory allegation that the statements were made with the intent to harm her reputation.").

### i.     Defendant Durrette

Plaintiff asserts that Defendant Durrette defamed her by "authoriz[ing] and request[ing] that the [CPD] website alter and remove [Plaintiff's] information and biography from the website, despite Plaintiff's Employment Agreement providing that she shall hold the Chief of Police position until November 30, 2021 . . . ." Compl. ¶ 230. Plaintiff specifically points to Defendant Durrette's statement that: "Nathan and I updated the Police web pages on the City's website and removed the pages for Chief Brackney and Major Mooney and updated your page to reflect you are now the Assistant Chief and Major Durrette." *Id.* And, Plaintiff continues, "Defendant Durrette specifically made such premature alterations to the website to harm

Plaintiff's reputation as a Chief of Police, and falsely stated and implied that he was 'Chief of Police' for the City of Charlottesville on October 21, 2021." *Id.* ¶ 232.[10]

Defendant Durrette counters that he "did not make the statement attributed to him in the Complaint," and provides a City News Alert as an exhibit in support. Dkt. 33 at 7; *id.* (Ex. 4). Nonetheless, the Court cannot assume just because the City News Alert does not contain the alleged defamatory statements, that they were not said.

Even if Plaintiff has identified an actionable statement, Plaintiff has alleged no facts to show Defendant Durrette acted with actual malice. She conclusorily asserts that "Defendants . . . knew the . . . language, altered on the CPD website was false" and "are negligent in the authorship and publication of the . . . language on the CPD website, the content of which the Defendant authorized and ratified." Compl. ¶ 231. Those legal conclusions are not entitled to a presumption of truth. *Twombly*, 550 U.S. at 557; *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012).

Thus, as Plaintiff fails to allege facts that, taken as true, would state a plausible defamation claim, this claim against Defendant Durrette will be dismissed.

### ii. Defendant Snook

Next, Plaintiff contends that Defendant Snook defamed her by stating to CBS19 on October 4, 2021 that he supported the termination decision because "[e]ven Black women officers were leaving." Compl. ¶ 207. Plaintiff alleges that Defendant Snook "made [his] comments . . . implying that 'black women officers' were leaving because they did not support

---

[10] Plaintiff never alleges to whom he said this, so it is not clear if the statement was "communicated to a third party 'so as to be heard and understood by such person.'" *Katz*, 332 F. Supp. 2d at 915 (internal reference omitted).

the Plaintiff as Chief." *Id.* ¶ 208. And "CBS19 News at 11:00 p.m. is publicly broadcasted on

television and internet streaming services." *Id.* ¶ 205. Plaintiff alleges that

> Defendant Snook knew the information in his October 4, 2021 comment was false; or
> believing the information to be true, he lacked reasonable grounds for such belief; or acted
> negligently in failing to ascertain the facts on which the public statements were based and
> therefore the Defendant was negligent in the broadcasting of such statements, the contents of
> which the Defendant stated, authorized, and ratified.

*Id.* ¶ 212. Again, even if deemed actionable,[11] Plaintiff's defamation claim fails because she has

not alleged factual support that Defendant Snook had the requisite intent to make a defamatory

statement.

---

[11]   Plaintiff has alleged enough facts to show publication, as Defendant Snook's explanation
that "he supported the decision to fire Plaintiff because: 'Even Black women officers were
leaving,'" was made in an interview on CBS19 News 11:00PM. *Id.* ¶ 207. Thus, the statement
was "communicated to a third party 'so as to be heard and understood by such person.'" *Katz*,
332 F. Supp. 2d at 915 (internal references omitted).

   Defendant Snook's statement could be actionable. "To be 'actionable,' a statement must be a
false assertion of fact that 'tend[s] so to harm the reputation of another as to lower him in the
estimation of the community or to deter third persons from associating or dealing with him.'" *Id.*
at 922 (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). Defamatory
words must "make the plaintiff appear odious, infamous, or ridiculous." *Id.* (quoting *Chapin*, 993
F.2d at 1092). And "a statement cannot be actionable as defamatory if it 'cannot reasonably be
interpreted as stating actual facts about an individual.'" *Id.* (quoting *Milkovich*, 497 U.S. at 20
(internal quotation and citation omitted)).

   Plaintiff does not allege that Defendant Snook's statement that "Even Black women officers
were leaving" is a false assertion of fact. Perhaps it could be construed as falsely implying that
these "'black women officers' were leaving because they did not support the Plaintiff as Chief."
Compl. ¶ 208. Construing the statement liberally in Plaintiff's favor, one could determine that
individuals of a certain group not supporting Plaintiff as Chief makes her appear "odious," and
imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of
duties. Defendant Snook asserts that "[a]llegations of an unsatisfactory job performance do not in
and of themselves so harm a plaintiff's reputation as to lower her in the estimation of the
community or deter third persons from associating or dealing with her." Dkt. 27 at 12 (citing
*McBride v. City of Roanoke Redevelopment & Hous. Auth.*, 871 F. Supp. 885, 892 (W.D. Va.
1994); *Am. Commc'n Network, Inc. v. Williams*, 568 S.E.2d 683, 686 (Va. 2002)). But Defendant
Snook's statement could be construed as implying her job performance was particularly bad for
Black women, which, in the context of her being hired to foster community after the Unite the

Plaintiff argues that "[t]he intent of Defendant was to say that 'Even Black female officers were leaving' and it was because of Plaintiff.'" Dkt. 68 at 10 (citing Compl. ¶ 213). And Plaintiff further contends that "Defendant actually even supports that this was intentional malice when he explains that the statement was made to support her reason for termination." *Id.* (citing Dkt. 27 at 11). Plaintiff also argues that "[t]he confidence and boldness of Snook's racist and false statement must be considered," because

> [n]ot only did Snook know that Black officers were NOT leaving ([Compl.] ¶ 210-01 [sic]; Doc. 1-20) but even, *in arguendo*, if there were Black female officers leaving, Snook stated and implied that it was *because of* Plaintiff; and even worse, that if Black women do not support Plaintiff, then she must be terminated because she too, is a Black woman.

*Id.*

But Plaintiff provides nothing more than conclusory allegations concerning actual malice, such as the allegation that Defendant Snook's statement was "made with actual malice, knowledge of the false statements contained therein, and/or reckless dis[reg]ard for the truth." Compl. ¶ 209. Legal conclusions and mere recitations of the elements of a cause of action are not entitled to a presumption of truth. *Twombly*, 550 U.S. at 545. In addition, the Exhibit Plaintiff cites in her opposition to Defendant Snook's motion, Exhibit T of the Complaint, provides no further factual allegations that he made this statement with knowledge of its falsity. Compl. (Ex. T). It just shows the FOIA record that he said, "Even Black women officers were leaving," and "There were her hand-picked people who were leaving." *Id.* at 3.

_____

Right events of 2017, could be viewed as deterring third parties from associating or dealing with her.

Without factual allegations that show Defendant Snook's knowledge of his statement's falsity and/or reckless disregard for the truth, Plaintiff's defamation claim as to Defendant Snook cannot survive at the motion to dismiss stage.

### iii.   Defendant Boyles

In support of her defamation claim against Defendant Boyles, Plaintiff alleges that "on or about September 2021, Defendant Boyles authored and published several press releases and made several comments regarding the termination of Plaintiff." Compl. ¶ 216. She alleges that Defendant Boyles made "particular statements" that were "false, libelous, and slanderous" on three dates: September 3, 2021, in a Press Release she quotes from and attached as Exhibit A to the Complaint, *id.* ¶ 217(A–B); a September 17, 2021 Op-Ed by Defendant Boyles in *The Daily Progress* that she quotes from and attached as Exhibit D to the Complaint, *id.* ¶ 217(D); and a public statement that she alleges Defendant Boyles made at the Charlottesville City Council Virtual Meeting on September 20, 2021, which she attached as Exhibit C to her Complaint, *id.* (Ex. C).

The September 3, 2021 press release by Defendant Boyles stated:

> However, in order to dismantle systemic racism and eliminate police violence and misconduct in Charlottesville, *we need a leader who is not only knowledgeable in that work, but also is effective building collaborative relationships* with the community, the department, and the team at City Hall [. . . ] [w]hile very good work and progress has been made, I ultimately decided *new leadership was required to continue the City's progress towards building a new climate and culture* within the department.

*Id.* ¶ 217(A) (emphasis in original); *see also id.* (Ex. A) (no emphasis). Plaintiff alleges that the Press Release that Defendant Boyles published "insinuate[ed] Plaintiff's termination was 'for cause' stating she was '*not a good fit*.'" *Id.* ¶ 217(B). And on September 3, 2021 Defendant Boyles "stated that he [wa]s not changing the language in the press conference that implied a letter shared with the public on August 20, 2021 sharing background information was 'her letter'

([Plaintiff's]) despite knowing that the letter was in fact not [hers] . . . ." The September 17, 2021

Op-Ed for *The Daily Progress* stated:

> Despite successes in modernizing the department, recent public statements made by the Virginia Police Benevolent Association brought to the public's attention two officer surveys assessing officers' opinions of the current state of leadership in the department. *These surveys revealed substantial concerns of trust and confidence in the leadership*. I found these concerns troubling, especially when factoring in the known strained relationships across government, community, religious and regional stakeholder groups. *These relationships are critically important; and when internal and external strife are present, it is imperative to act*. [. . .] In hindsight, I would have engaged the City Council more directly in my deliberations and worked in partnership with Chief Brackney to develop an improvement plan. Fact is, I just did not have the luxury of time. I found the moment critical to act and felt the larger community would respect my intentions to *guide our police department to a stable and evolving law enforcement outfit capable of making all residents safe, respected, and proud*.

*Id.* ¶ 217(D) (emphasis in Compl.).[12]

And Plaintiff alleges that on September 20, 2021, "during a Council meeting Defendant

Boyles stated, 'I in no way intend to malign her character, professional acumen or ability to

perform. I am simply indicating 'Fit' is more than size and measurements, *but feel and

function*.'" *Id.* ¶ 217(E).

All these statements meet the publication element for a defamation claim. Plaintiff also

tries to allege actual or constructive knowledge of falsity,[13] and that Defendant Boyles has the

---

[12] Plaintiff claims to attach this as Exhibit D, but this quote is not present in the September 17, 2021 op-ed by Defendant Boyles attached as Exhibit D. The quotation appears instead in Exhibit C, and it appears to be a statement to the public made on September 13, 2021. *Id.* (Ex. C) at 3.

[13] But his statements appear to be statements of opinion. "Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003) (citing *Chaves*, 335 S.E.2d at 101)). And they are not actionable under Virginia law, "because such statements cannot be objectively characterized as true or false." *Jordan*, 612 S.E.2d at 206. Further, "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law

requisite intent for a defamation claim, but she does not allege facts that, taken as true, would establish actual malice. Thus, the claim fails.

To establish a defamation claim against Defendant Boyles, Plaintiff must plead facts that, taken as true, would establish that he had the requisite intent, i.e., actual malice. Because Plaintiff's complaint is entirely deficient in that regard, the claim cannot go forward.

**ii.     City of Charlottesville**

**a.   Title VII Discrimination**

**i.     Plaintiff Does Not Allege Facts Supporting Her Hostile Work Environment Claim**

Plaintiff claims that the City created a hostile work environment, which was discriminatory based on race, color, and gender.

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A claimant seeking to establish a hostile work environment claim must show "there is (1) unwelcome conduct; (2) that is based on the plaintiff's [race, color, or gender]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016). Harassment is severe and pervasive if the workplace is "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008). The Fourth Circuit views this test as a "high bar." *Id.* at 315. So

---

defamation action." *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 137 (Va. 1998) (citing *Milkovich*, 497 U.S. 1, 16–17, 20).

"complaints premised on nothing more than 'rude treatment by coworkers,' 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII." *Id.* at 315–16 (internal citations and quotations omitted). And "[a] hostile-work-environment claim will only succeed when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (internal references omitted). "The severe or pervasive conduct which gives rise to an abusive work environment must be both objectively and subjectively 'hostile' and 'abusive.'" *Id.* (citing *Harris*, 510 U.S. at 21–22).

Courts must decide "whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). Indeed, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788. "[H]ostile work environments generally result only after an accumulation of discrete instances of harassment." *Id.* And the U.S. Supreme Court has emphasized that a plaintiff must show "the environment would reasonably be perceived, and is perceived, as hostile or abusive," though a plaintiff is not required to show that the environment is "psychologically injurious." *Harris*, 510 U.S. at 22. Further, "'[t]o establish that harassment was based on race, [the plaintiff] must show that but for her race, she would not have been the victim of the alleged discrimination.'" *McIver*, 42 F.4th at 409 (quoting *Gilliam v. S.C. Dep't of*

*Juv. Justice*, 474 F.3d 134, 142 (4th Cir. 2007)). "[A] plaintiff cannot rely on her own

'conjecture' to impute a racial character to what appears to be neutral harassment." *Id.* (quoting

*Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280–81 (4th Cir. 2000)).

 Plaintiff alleges that she experienced "a hostile and offensive environment" because

"Caucasian male employees made videos of racist and color discriminatory content [and nude

female content] on company phones," she was required to investigate, and she "was

subsequently ridiculed, berated, surveyed, and ultimately fired for taking disciplinary action

against such employee[s] and those involved." Compl. ¶¶ 101(A), 116(A), 126(A). But there are

no factual allegations that the behavior was directed at Plaintiff or based on her race, color, or

gender. While what Plaintiff asserts is more than "'rude treatment by coworkers,'" she does not

allege enough facts to support the hostile behavior claim she asserts. *Sunbelt Rentals, Inc.*, 521

F.3d at 315–16 (internal citations and quotations omitted). There are no facts alleged to show

that Plaintiff was targeted, and "none of the acts are attributed to a supervisor." *McIver*, 42 F.4th

at 410; *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4 th Cir. 2015) ("In

measuring the severity of harassing conduct, the status of the harasser may be a significant

factor . . . Simply but, 'a supervisor's power and authority invests his or her harassing conduct

with a particular threatening character.'") (citing *Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668,

675 (7th Cir. 1993) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)).

 Based on the facts alleged, it appears the officers created and exchanged the videos and

texts among themselves, and then Plaintiff conclusorily asserts that she was ridiculed and berated

because of how she handled taking disciplinary action against those involved. As such, Plaintiff

does not meet the high bar for establishing a hostile work environment under Title VII.

Additionally, Plaintiff alleges that "a 17 question PBA Survey that was specifically intended to target and highlight Plaintiff in a negative manner . . . was conducted after, and because of, Plaintiff's recent investigation and disciplinary actions against former and current employees." Compl. ¶¶ 101(B), 116(B), 126(B). The City, however, did not conduct the survey. And the other conduct that Plaintiff alleges, i.e., statements from various Defendants, occurred after Plaintiff was notified of her termination and placed on paid administrative leave. *Id.* ¶¶ 101(D)–(K), 116(D)–(I), 126(C)–(G). As precedent in this district has previously noted, "'post-termination harassment' does 'not constitute evidence of a hostile work environment.'" *Dawson v. Kroger Ltd. P'ship I*, No. 7:19-cv-00388, 2021 WL 2589701, at *15 n.5 (W.D. Va. June 24, 2021) (Cullen, J.) (citing *Gilson v. Pa. State Police*, 175 F. Supp. 3d 528, 564 (W.D. Pa. 2016), *aff'd*, 676 F. App'x 130 (3d Cir. 2017); *Breauburn v. Thomas Jefferson Univ.*, 578 F. Supp. 2d 777, 784 (E.D. Pa. 2008)).

The conduct alleged also is not imputable to the City. When a co-worker harasses a plaintiff, courts generally apply the rule that "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior. . . . to evaluate employer liability." *Vance v. Ball State University*, 570 U.S. 421, 427 (2013) (citing *Faragher*, 524 U.S. at 789). When a supervisor takes a tangible employment action against a plaintiff, the employer is vicariously liable. *Id.* at 428–30. And when the employer knew or should have known about the harassment and failed to take effective action to stop it, the employer is liable. *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 332 (4th Cir. 2018). There is no allegation that Defendant Boyles, Plaintiff's supervisor, harassed her or contributed to the allegedly hostile work environment. Thus, the Court need not consider whether a supervisor has taken a tangible employment action against a plaintiff.

Plaintiff complains of conduct from her subordinates. On June 3, 2021, Plaintiff received an email from a citizen, complaining about a video of a CPD corporal. Compl. ¶ 54. On the same day, Plaintiff alleges that she "reported unlawful, criminal, departmentally inappropriate, misogynistic, harassing, and racist behaviors she witnessed in a video provided in a citizen's complaint." *Id.* ¶ 55. A forensic report centered on the initial investigation "exposed several other suspected unlawful, criminal, and racist behaviors, as well as police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors and harassment and threats within Defendant's police department," leading Plaintiff to take disciplinary action. *Id.* ¶¶ 57–58. Plaintiff's complaint includes few if any allegations with factual enhancement of those claims. And significantly, Plaintiff's own allegations also demonstrate that when a citizen complaint brought the officers' videos and text messages to light on June 3, 2021, the City *supported* Plaintiff in her decision to investigate and discipline the involved officers. Exhibit A, an article from *Charlottesville Tomorrow*, discusses individual Defendants' views of Plaintiff as an ineffective leader. But it also states the following:

> Six days prior to [Plaintiff's] termination, an unsigned city-issued news release lambasted a handful of officers for "disturbing behaviors." Those officers, the release said, had since either resigned or been fired. . . . "I want the community to understand that I fully supported the difficult personnel decisions made recently by [Plaintiff]," Boyles said in his Friday statement.

Compl. (Ex. A) at 5. Exhibit S, an unsigned letter to the Chief from someone representing City Hall, states of "the discipline of the three officers":

> I strongly support the actions taken for these three. Whether criminal activity occurred, whether other officers have been treated differently, whether they have new families, etc., the actions shown in the videos and in the texts are not "silly" and no just "boys will be boys." I would be glad to state anytime this support of these actions.

*Id.* (Ex. S) at 2.[14]

As there is no allegation that the City knew or should have known about the conduct before June 3, 2021, and no allegation that the City opposed Plaintiff's decision to investigate and discipline the involved officers, any purported hostile work environment is not imputable to the City, even if Plaintiff had stated a plausible claim—and she has not.

### ii.   Plaintiff Does Not Make Out a Prima Facie Case of Discrimination

Plaintiff also claims that the City, in terminating her, discriminated against her based on race, sex, and color, in violation of Title VII. "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)). Courts consider this test when there is no direct evidence of discrimination, which appears to be the case here. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude

---

[14] Defendant City also alleges that at the October 4, 2021 Council meeting Defendant Boyles' comments "affirmatively state his support for [Plaintiff's] actions," based on the statement:

I think [Plaintiff] *acted very appropriately* in the discipline measures. I *upheld everything* that was disciplined by the police department, by [Plaintiff], and will continue to do so . . . . I have *fully supported the discipline* for the SWAT team members that were made . . . . *I have not overturned any of the police departments' disciplinary actions* in my eight months here.

Dkt. 15 at 21 (citing Ex. 7, at 4:16:47).

and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks and citation omitted).

Termination is the only adverse action alleged in this case. "An adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001) (internal quotations and references omitted). Plaintiff relies upon the PBA survey and statements made after she was notified of her termination as bases for her Title VII claims. Compl. ¶¶ 101(B–I), 116(B–I), 125(B–G). But the City did not conduct the PBA survey. And even if City Manager Boyles made the alleged statements, disparaging remarks by a supervisor, without disciplinary action, do not qualify as adverse employment actions. *Adams v. Anne Arundel Cnty. Public Schs.*, 789 F.3d 422, 429 (4th Cir. 2015); *Blount v. Dep't of Health & Human Servs.*, 400 F. Supp. 2d 838, 842 (D. Md. 2004).

Plaintiff's contract with the City entitled her to 90 days' notice if she was going to be terminated without cause. *Id.* (Ex. F), p. 3 ¶ 2. However, she did not have a contractual right to continue to perform her job functions during that 90-day period. "[C]ourts have held that placing an individual on paid administrative leave does not constitute an adverse employment action in the discrimination context or in the retaliation context." *Sturdivant v. Geren*, No. 1:09-cv-586, 2009 WL 4030738, at *6 (E.D. Va. Nov. 19, 2009), *aff'd sub nom. Sturdivant v. McHugh*, 450 F. App'x 234 (4th Cir. 2010); *see also Grice v. Baltimore Cnty., Md.*, No. 07-cv-1701, 2008 WL 4849322, at *8 (D. Md. Nov. 5, 2008), *aff'd* 354 F. App'x 742 (4th Cir. 2009). And under Virginia law, the at-will employment doctrine allows employers to terminate the employment

relationship at any time without reason. *Johnston v. William E. Wood & Assocs.*, 787 S.E.2d 103, 104–05 (Va. 2016).

"[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." *McDonnell Douglas Corp. v. Green*, 411 U.S.792, 804 (1973); *see also Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010). Plaintiff alleges that she was treated "adversely, and less equally as an employee pending separation from employment, than other Caucasian employees (on the LEAD team or Director positions) . . . ." Compl. ¶¶ 101(J), 116(H), 126(F)). She alleges that Defendants Mooney and Boyles:

(1) revoked Plaintiff's access to: the building, Charlottesville Police Department and city facilities, all police and law enforcement systems, city issued credit card;

(2) required her to make appointments to work in her own office, to be escorted throughout facilities while at work, to request permission (which was ultimately denied) from subordinates to access law enforcement systems; and

(3) removed Plaintiff's photo from the interior lobby, Plaintiff's information, photo, and biography from the [CPD] website, and Plaintiff from local task force workgroups.

*Id.* ¶¶ 101(J), 116(H), 126(F)). She goes on to allege that

No Caucasian LEAD team members or Caucasian directors who notified the city of their pending resignations, or separation from employment, had their access or privileges terminated, or any similar treatment or actions made against them as set forth in the preceding paragraph, prior to their separation, including but not limited to: John Jones, Brian Daley, Mike Murphy, Defendant Boyles, Defendant Wheeler, or Defendant Mooney.

*Id.* ¶¶ 101(K), 116(I), 126(G). John Jones was the City's Transit Director, Brian Daley was its Director of Parks and Recreation, Mike Murphy served in many roles and concluded his time working for the City as Deputy City Manager for Human Services, having previously served as Interim City Manager. Dkt. 15 at 17, n.5.

But to establish the existence of similarly situated comparators, a plaintiff must show the comparators "dealt with the same supervisor, [were] subject to the same standards and . . .

engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood*, 387 F. App'x at 359 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). None of the comparators Plaintiff alleges were terminated or served as Police Chief. Dkt. 15 at 17. Also, there are no facts alleged that they had the same supervisor (Boyles) that Plaintiff had. *Id.* As a matter of law, the alleged comparators were not similarly situated to Plaintiff or treated differently than Plaintiff with respect to termination (the adverse action at issue).

For the foregoing reasons, Plaintiff's Title VII discrimination claims against the City will be dismissed.

Plaintiff asserts that "Defendants' differential treatment of Plaintiff is based on her race, color, and that she is female, and the differential treatment was intentional," in violation of the Virginia Human Rights Act ("VHRA"). Compl. ¶¶ 284–85. She also argues that "Defendants' differential treatment of Plaintiff based upon race has created a racially hostile environment in which the Defendant's institution, itself, stereotypes and denigrates employees based on their race," in violation of Va. Code § 2.2-3900-3908. *Id.* ¶¶ 286–87. And Plaintiff claims that she could not "avoid the racially hostile environment because it is intentionally woven into many aspects of the Defendant's institution, and the Defendant has publicly acknowledged this racially hostile environment." *Id.* ¶ 288. Plaintiff premises her VHRA claim on the same conduct as discussed for her Title VII claims. The City argues, and this Court agrees, that the VHRA claim suffers from the same defects as her Title VII claim. Dkt. 15 at 23–24.[15]

---

[15] A portion of the VHRA statutory provision states:

> Conduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions

Thus, since her Title VII discrimination claims will be dismissed, so too will her VHRA claim. The Court thus need not consider parties' administrative exhaustion argument for this claim.

### iii.   Plaintiff Does Not Allege Protected Conduct Prompting Retaliation in Violation of Title VII

Plaintiff also asserts that the City terminated her employment in retaliation for engaging in protected activity in the form of "report[ing] unlawful, criminal, departmentally inappropriate, misogynistic, harassing, and racist behaviors she witnessed in a video provided in a citizen's complaint." Compl. ¶ 152; *see also id.* ¶ 156. For her retaliation claim to survive a motion to dismiss, Plaintiff must allege facts to show she "engaged in protected activity" and the City "took the adverse action because of the protected activity." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2013). The protected activity must be "a but for cause of the alleged adverse action by the employer." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "Protected activity of an employee . . . can take the form of either opposing a practice prohibited under Title VII (pursuant to the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause). *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 395 (D. Md. 2010); *see also Laughlin v. Metropolitan Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

---

including lactation, age, military status, disability, or national origin is an unlawful discriminatory practice under this chapter.

Va. Code. § 2.2-3902.

– 35 –

Plaintiff asserts she "engaged in Protected Activity when she reported, conducted investigations, and took disciplinary actions against Caucasian employees of Defendant, after finding that they were involved in suspected criminal activities, unlawful and racist behaviors, police violence, corruption, departmentally inappropriate behaviors, misogynistic, and/or discriminatory behaviors, harassment, and threats." Compl. ¶ 156. But Title VII does not protect participation in an employer's internal investigation not associated with a formal EEOC charge. *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 166–67 (4th Cir. 2017); *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41 (2d Cir. 2012). And Plaintiff does not allege conduct opposing behavior prohibited by Title VII. She disciplined employees for conduct that may have been unacceptable pursuant to CPD policies and procedures, but their conduct was not prohibited by Title VII. *See Darvishian v. Geren*, 404 F. App'x 822, 830 (4th Cir. 2010) (explaining that Title VII "makes unlawful certain defined intentional acts of discrimination"). The conduct she disciplined did not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Thus, Plaintiff does not appear to have engaged in protected conduct under Title VII.

If the Court were to find that Plaintiff engaged in protected activity, Plaintiff would still need to plead facts that, taken as true, would establish that her termination was casually connected to her investigation and discipline of officers. The Court has already addressed that the City supported Plaintiff's decision to discipline the officers, thus undermining any argument for a causal connection. So, Plaintiff's Title VII retaliation claim will be dismissed.

**b.  Plaintiff's Actions Do Not Fall Within Virginia's Fraud and Abuse Whistle Blower Protect Act**

Plaintiff also argues that the City violated the Fraud and Abuse Whistle Blower Protection Act ("Act"), Va. Code § 2.2-3011. Compl. ¶¶ 165–78. Plaintiff alleges that she participated in an investigation of, and objected to, "unlawful, criminal activities, racist behaviors, police violence, corruption, departmentally inappropriate, misogynistic, and/or discriminatory behaviors, harassment and threats perpetrated against her and others," then retaliated against. *Id.* ¶¶ 172–74.

The Act prohibits retaliation against a whistle blower "because the whistle blower is requested or subpoenaed by an appropriate authority to participate in an investigation, hearing or inquiry by an appropriate authority or in a court action." Va. Code § 2.2.-3011(B). The Act defines a whistleblower as:

> [A]n employee who witnesses or has evidence of wrongdoing or abuse and who makes or demonstrates by clear and convincing evidence that he is about to make a good faith report of, or testifies or is about to testify to, the wrongdoing or abuse to one of the employee's superiors, an agent of the employer, or an appropriate authority.

Va. Code § 2.2-3010. The statute defines "wrongdoing" as "a violation, which is not of a merely technical or minimal nature, of a federal or state law or regulation, local ordinance, or a formally adopted code of conduct or ethics of a professional organization designed to protect the interests of the public of employee." *Id.* It defines "abuse" as "an employer's or employee's conduct or omissions that result in substantial misuse, destruction, waste, or loss of funds or resources belonging to or derived from federal, state, or local government sources." *Id.* The behaviors in the videos that prompted Plaintiff's investigation do not fit within the definition of "abuse" or "wrongdoing" under the statute.

And even if they did, the Act prohibits retaliation against a whistle blower "because the whistle blower is requested or subpoenaed by an appropriate authority to participate in an investigation, hearing or inquiry by an appropriate authority or in a court action." Va. Code §

2.2-3011(B). Plaintiff was the "appropriate authority" conducting the investigation. That term is statutorily defined as "a federal, state, or local agency or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or abuse; or a member, officer, agent, representative, or supervisory employee of the agency or organization." *Id.* However, Plaintiff was not requested to participate in an investigation or inquiry and thus does not fall within the Act's retaliation provision. For these reasons, her state law whistleblower claim fails.

      **c.  Plaintiff's Defamation and Business Conspiracy Claims Fail as to the City Because They Fail as to Individual Defendants**

For reasons discussed as to individual Defendants, the defamation[16] and business conspiracy[17] claims cannot move forward, as the claims against the City are based on the theory of *respondeat superior*, so if they cannot survive as to individual Defendants, they cannot against the City.

----

[16] And even if the defamation claim could move forward against the individual Defendants, the City would be entitled to sovereign immunity. Sovereign immunity applies to Virginia's municipalities when they are performing governmental functions, even regarding the intentional torts of their employees. *Niese v. City of Alexandria*, 564 S.E.2d 127, 132–33 (Va. 2002); *see also Massenburg v. City of Petersburg*, 836 S.E. 2d 391, 395 (Va. 2019). The Supreme Court of Virginia has recognized that operating a police force is a governmental function. *Niese*, 564 S.E.2d at 133 (citing *Hoggard v. City of Richmond*, 200 S.E. 610, 611 (1939)). Plaintiff argues, without providing case law support, that "[s]overeign immunity will not be a valid defense for Defamation as an intentional tort," and "intentionally fostering systemic racism and police misconduct, creating a racially hostile institution which stereotypes and denigrates employees and others, based on their race and sex because of 'decades old policing practices' is not and should not be considered a governmental function." Dkt. 58 at 25. But, based on the case law mentioned above, Defendant City would be shielded from the defamation claim by sovereign immunity.

[17] And Defendant City cannot interfere with its own contract, as discussed above. Defendant City also asserts intracorporate immunity, which has already been discussed in reference to individual Defendants. Dkt. 15 at 30–31.

## V. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are hereby granted.

\* \* \* \*

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this _20th_ day of January, 2023.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE